**UNITED STATES BANKRUPTCY COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | Chapter 7 |
| | Case No. 17-11329-MSH |
| Robert R. McNamara, | |
| Debtor | |
| | |
| THE BANK OF CANTON | Adversary Proceeding |
| Plaintiff, | No:  18-1022 |
| v. | |
| ROBERT R. MCNAMARA, | |
| Defendant. | |

## MEMORANDUM IN SUPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff and creditor, The Bank of Canton (the "Plaintiff") moves for summary judgment against the Defendant/Debtor, Robert R. McNamara (the "Debtor") requesting denial of discharge in the underlying Chapter 7 pursuant to Count I of the Complaint and 11 U.S.C. § 727(a)(4) for Debtor's false oaths or account and withholding information and records, Count II of the Compliant and 11 U.S.C. § 727(a)(5) for Debtor's failure to satisfactorily explain loss of assets and Count III of the Complaint and 11 U.S.C. § 727(a)(2) for Debtor's fraudulent transfer or concealment of property.  The Debtor's activities and false and misleading filings concerning the value of his funeral home business, Sparrell Funeral Services, Inc. ("Sparrell"), are the focal point of this adversary proceeding.  In further support of this motion, the Plaintiff states the following:

## I.     Background

### A.     Relationship of the Parties

The Debtor and his spouse, Alice E. McNamara ("Alice") borrowed money from the

Bank that resulted in litigation for non-payment.  One loan was made pursuant to a promissory

note in the original principal amount of $50,000 ("Note-1.")  On or about November 18, 2015,

the Plaintiff brought suit to enforce the obligations of Note-1 in the Norfolk Superior Court

(Case No. 1582CV01506) resulting in judgment against the Debtor and Alice in the sum of

$43,615.37 on or about June 29, 2016 (the "Norfolk Judgment.")  Facts ¶23.    The other loan

was made pursuant to a $746,250 promissory note by the Debtor and Alice on or about

November 9, 2007 ("Note-2") upon which a post- foreclosure deficiency balance in excess of

$156,700 remains due to the Plaintiff.[1]  Facts ¶1.  On or about August 15, 2016, the Plaintiff

filed suit against the Debtor and Alice in the Norfolk Superior Court, Docket No. 1682CV01049,

seeking judgment for the deficiency balance (the "Deficiency Action.")  Facts ¶2.  The Plaintiff's

Deficiency Action includes equitable claims involving the Debtor's interests in Sparrell whereby

the Plaintiff was pursuing injunctive relief to reach monies that may be due to the Debtor from

Sparrell and apply such funds to pay down the deficiency balance.  Facts ¶2.  The Deficiency

Action has been automatically stayed by the Debtor's filing of the underlying Ch. 7 action.  Facts

¶2.

## B.  The Debtor's Chapter 7 filings

On or about April 13, 2017, the Debtor petitioned for relief under Chapter 7 of the

Bankruptcy Code.[2]  Facts ¶3.  On or about April 28, 2017, the Debtor filed schedules of assets

and liabilities (the "Schedules") and a statement of financial affairs ("SOFA.")  Facts ¶4.  The

Debtor's Schedules concerning his financial assets identify a 100% ownership interest in Sparrell

---

[1] Note-2 was secured by a mortgage on real estate located at 21 Central Street, Norwell, MA that was foreclosed
upon by the Plaintiff on or about June 11, 2015.  The Plaintiff was the successful bidder at the auction for $600,000
taking title via a Foreclosure Deed. Facts ¶9.

[2] The Debtor and Alice petitioned separate Chapter 7 filings.  Alice petitioned her Chapter 7 case on May 25, 2017
(Case No. 17-11943-MSH) and was discharged on January 8, 2018.

which the Debtor represented the current value was $0.00.[3]  Facts ¶5.  In his SOFA, Debtor also represented that he had not given any financial statements about Sparrell to anyone within the two years before he filed for bankruptcy.  Facts ¶10.  Among other things, these representations were demonstrably untrue.   The Debtor's objective in withholding information regarding the value of his stock and the transactions of Sparrell was consistent with his course of conduct to hinder, delay and defraud his creditors into thinking that he had no assets or ability to pay his debts.[4]

### C. Sparrell

#### (i)    Pre-2011 Fallout

Sparrell was organized in 1983 by the Debtor and his now deceased brother, John B. McNamara ("John").  Facts ¶12.  Since inception, the Debtor was the President of Sparrell and he and John were Directors. Facts ¶12.   The two brothers also had interests in McNamara Associates, LLC ("McNamara Associates") which organized in 1999 and the debtor was Manager.  Facts ¶13.  The two entities operated multiple funeral homes doing business as McNamara-Sparrell Funeral Homes.[5]   The Debtor primarily operated the two funeral homes on the south shore, one located at 1 Summer Street, Cohasset, MA (the "Cohasset Property") and the other at 30 Central Street, Norwell, MA (the "Norwell Property.")[6]  Facts ¶14.   Ownership

---

[3] The Debtor also represented in his Schedules that he did not have any financial assets or business-related property that were not already listed and that he had no ownership or legal or equitable interest in any business-related property.  Facts ¶¶ 6-8.

[4] The Debtor even admitted at deposition that he took certain actions to transfer his business to his son Brendan McNamanra in an effort to avoid at least one of his creditors -  his brother John McNamara.  Facts ¶ 53

[5] According to the company website, the McNamara-Sparrell Funeral Homes have been family owned for 198 years first established by the Debtor's father, Bernard S. McNamara in 1934.

[6] John primarily operated the third funeral home in Brighton, MA.  Facts ¶14.

of the real estate at the Cohasset Property and Norwell Property was held by the McNamara

Associates since its formation 1999.[7]  Facts ¶15.

In or around August 2011, the Debtor and John had a falling out resulting from the

Debtor's so called "mismanagement" of hundreds of thousands of dollars in prepaid funeral

funds (the "Pre-needs")  Facts ¶16.   The Pre-needs were pre-paid funeral funds that were to be

held in trust by the funeral home for its clients' pre-needs benefits. Facts ¶18.   It was discovered

that approximately $246,000 of Pre-needs money was missing.[8]  Facts ¶16. On or about August

31, 2011, under a written settlement agreement, the Debtor agreed to indemnify John from any

liability for the missing Pre-needs and the brothers divided up the businesses and parted ways.[9]

Facts ¶16.   Among other things, the Debtor surrendered all of his interests in McNamara

Associates to John and in turn retained sole ownership in Sparrell (the "Settlement.") Facts ¶16.

As part of the Settlement, Sparrell agreed to lease the Cohasset Property and Norwell Property

from McNamara Associates.[10] Facts ¶16 and ¶19.

### (ii)    Post-2011 Settlement

### (a) Operations and payment of personal expenses

The Debtor was Sparrell's sole principal officer and shareholder following the 2011

Settlement.  Facts ¶5.  At all relevant times following the 2011 Settlement, the Debtor's son,

Brendan McNamara ("Brendan") was employed as the funeral director for Sparrell. Facts ¶20.

---

[7] John and the Debtor initially acquired title to both properties jointly and then transferred title into the McNamara Associates.

[8] Other documentation produced in discovery indicates that there was $261,000 missing. Facts ¶17 (Exhibit M).

[9] The clients who deposited the missing Pre-needs were not made aware of the issue.

[10] The lease included an option for Sparrell to purchase the two properties for $1.322 Million and, if exercised, allowed Sparrell to credit all rent and mortgage payments paid against the purchase price.  Facts ¶19.

In addition to the Debtor, Brendan had authorization to use Sparrell's accounts, including its operating account.  Facts ¶21.   The Debtor paid and/or authorized payment of various personal expenses for himself and family through Sparrell's account, including:

- Loan payments due to the Plaintiff by the Debtor and Alice on Note-1 and Note-2. Facts ¶22 (i);

- Student loans for his adult children whom were also codebtors, including, A.C.S. for Shane C. McNamara, AES Credit for Katie M. Funari, Navient for Kelly A. Sherman.  Facts ¶22 (ii);

- Expenses relating to Debtor's personal boat, including loan payment, trailer registration and harbor moorings. Facts ¶22 (iii);

- Dues to maintain his personal memberships at the Scituate Country Club, the Scituate Harbor Yacht Club and the Cohasset Country Club.[11] Facts ¶22 (iv); and

- A personal auto loan to Workers Credit Union for a Jeep Wrangler that he and his son Brendan were codebtors that they registered to Sparrell. Facts ¶22 (v).

**(b) <u>Acquisition of the Cohasset and Norwell Properties and payoff of personal obligations</u>**

On or about September 26, 2016, Sparrell purchased the Cohasset and Norwell Properties from McNamara Associates.  Facts ¶15 and ¶24.   The Cohasset Property was acquired by Sparrell for consideration of $660,000 and the Norwell Property was acquired by Sparrell for $440,000. Facts ¶15 (*Deed to the Cohasset Property*) and Facts ¶15 (*Deed to the Norwell Property*).   To fund its purchase of the Cohasset and Norwell Properties, Sparrell obtained a

---

[11] The Debtor did not disclose that he has a lieftime membership to the Scituate Harbor Yacht Club in his bankruptcy Schedules.  Facts ¶22(iv).

$1.39 Million loan through Live Oak Banking Company (the "Acquisition Loan").[12] Facts ¶25

In connection with the Acquisition Loan, Sparrell was required to (and did) provide financial

documents including balance sheets and financial statements to Live Oak Banking Company.[13]

Facts ¶26.  A portion of the proceeds from Sparrell's Acquisition Loan was used to settle and

payoff two personal obligations of the Debtor consisting of:

- $42,069.61 paid to the Plaintiff for the sums due from the Debtor and Alice on the

  Norfolk Judgment. Facts ¶27(i); and

- $175,000.00 paid to Forethought to satisfy the Debtor's liability for his mismanagement

  of the missing/deficient Pre-needs.[14]  Facts ¶27(ii).

### (c) Pre-bankruptcy shifting and siphoning of assets to an insider with intentional diminution of Sparrell's value

On or about May 1, 2016, the Debtor made written representation to Live Oak Banking

Company of the Debtor's desire and intent to gift Sparrell and its "business, property, assets, etc.

and all aspects relating to" to his son Brendan for "no cash exchange or sale price; this business

will be 100% gifted…"[15]  Facts ¶28.  Consistent with his stated desire and intent, on or about

November 7, 2016, the Debtor transferred all of Sparrell's real estate and business assets to

Brendan under two newly formed entities.  The Cohasset and Norwell Properties were

---

[12] The Acquisition Loan was secured by mortgages to Live Oak Banking Company on the Cohasset and Norwell Properties. Facts ¶25.

[13] Debtor's SOFA response to Q28 was not truthful regarding his representation that no financial statements were provided to anyone concerning his business within 2 years of his filing Chapter 7. Facts ¶11.

[14] According to Brendan, he and his father performed the services for approximately $86,000 of the missing Pre-needs funeral contracts as they came due.  This helped reduce the deficncy on the missing Pre-needs from $261,000 to $175,000 as of September 2016.  Facts ¶27(ii).  The $175,000 that was deposited in an escrow trust account with the trust company named Forethought from the disbursements of the closing on the Acquisition Loan was the balance of the missing Pre-Needs of which the Debtor was personally liable.

[15] Remarkably, six months earlier, on or about November 30, 20**15**, the Defendant represented in open Court that Sparrell had already been transferred to Brendan.  Facts ¶23.

transferred to BM Mack Properties, LLC ("BM Mack"), a realty holding company owned by Brendan and his wife Melissa McNamara.  Facts ¶29.  All of Sparrell's physical business assets and accounts were transferred BM McNamara Funeral Services, Inc. ("BM McNamara"), an entity engaged in the operation of funeral services in which Brendan is the sole principal officer. Facts ¶30.

The transfers were documented under a Real Estate Purchase and Sale Agreement (the "P&S"), an Asset Purchase Agreement (the "Asset Agreement") and separate quitclaim deeds from Sparrell to BM Mack (the "Deeds") all dated and purportedly signed on the transfer date, November 7, 2016.[16]  Facts ¶¶31 - 32.  The Deeds each only state that the consideration for the transfers is "of One Hundred Thousand ($100,000.00) Dollars, pursuant to a Promissory Note." Facts ¶29.   The P&S provides for BM Mack's assumption of the Acquisition Loan plus the consideration stated on each of the Deeds.  Facts ¶31.   Per the Asset Agreement the purchase price for all of Sparrell's assets was $25,000 (including its goodwill.)  Facts ¶32.  No cash was exchanged for the transfer of the real estate or business assets.  Instead, BM Mack and BM McNamara executed a promissory note payable to Sparrell in the sum of $225,000 (the "Sparrell Note.")[17] Facts ¶33.

Just prior to the transfers, the Cohasset and Norwell Properties were appraised in excess of $1.81 Million.[18]  Facts ¶¶35-36.   Consequently, Sparrell equitable value in the Cohasset and Norwell Properties was $221,000 more than the total amount of the Acquisition Loan and

---

[16] There was no closing disclosure statement or settlement statement concerning the purported closing, nor were there any offsets or adjustments made for real estate taxes, etc.  Facts ¶34.

[17] The principal amount of the Sparrell-Note was allocated for the total amount of consideration listed on the Deeds ($100,000/property) plus $25,000 for Sparrell's assets. Facts ¶31.

[18] Specifically, as of August 12, 2016, the Cohasset Property had a market value appraisal of $1 Million and the Norwell Property was appraised at $811,000.  Facts ¶¶35-36.

alleged consideration of the Sparrell-Note.  As for Sparrell's business assets, the Debtor admits

that no appraisal was obtained prior to the transfer.  Facts ¶37.   However, according to its own

financial reports, Sparrell's assets exceeded $269,000 as of March 31, 2016 Facts ¶26 and, as of

May 31, 2016, it claimed to have Pre-needs contracts valued at $369,000[19] Facts ¶37 and

reported its goodwill to be valued at $100,000 for the beginning of 2016.  Facts ¶38  Clearly, the

Sparrell's assets were not transferred for fair consideration.  Had fair consideration been paid,

Sparrell's value would not have been $0.00 and/or the Debtor would have had an ability to pay

more to his creditors.  Furthermore, if Sparrell truly had ceased operations on November 7, 2016,

its cash and other remaining assets would have belonged to the Debtor.

### (d) Post-draining operations

The Debtor and Brendan allege that Sparrell was defunct and ceased operations following

their draining of its real estate and assets to Brendan's companies on November 7, 2016.  Facts

¶39.  However, despite how the transfers appeared on paper and the claims that BM McNamara

was the emerging entity, the transfer was disregarded and nothing suggests that there was any

distinction in business operations.  BM McNamara did not open its own operating account until

on or about May 2017, as business operations continued under Sparrell's operating accounts for

over six months following the alleged transfer.  Facts ¶40.    All business operations continued

in the same ordinary course using all of Sparrell's same vendors without setting up new accounts

(including vehicle loans), all of Sparrell's same independent contractors continued working in

customary fashion and the business continued receiving receivables payable in Sparrell's name

and deposited in Sparrell's account. Facts ¶41.[20]   Additionally, the operations continued to be

---

[19] Brendan confirmed that the Preneeds were included in the transfer.  Facts ¶32.

[20] Brendan attempts to mitigate this issue claiming that BM McNamara was simply operating through Sparrell's
accounts while Sparrell was winding down.  Facts ¶41.

insured under Sparrell's name (*with Sparrell's existing insurance policy*) as BM McNamara (*the alleged new operating entity*) did not obtain its own insurance policy until April or May 2017 (*seven months after the transfer*).  Facts ¶42.  Public records also suggest that the business also continued operating under Sparrell's Funeral Establishment License until on or about October 25, 2018 when BM McNamara obtained its own license.  Facts ¶43.  In addition, records obtained in discovery shows that Sparrell continued to draw on its open line of credit at Eastern Bank (the "Line of Credit") following the November 7, 2016 transfers.[21]  Facts ¶44.  Clearly, the Debtor and Brendan were in no immediate rush to make any changes to Sparrell's ordinary business operations except for transferring the valuable assets (*the real estate and business assets*) out of Sparrell's name before the Debtor filed Chapter 7.   The transfers were done with the intent to create a false impression that Sparrell was valueless at the time the Debtor petitioned his bankruptcy so that he could claim an inability to pay his liabilities.

In addition to the $225,000 Sparrell-Note, as of November 7, 2016, Sparrell had a balance of $8,102.20 in its operating account at Eastern Bank.  Facts ¶45.

### (e)  The Sparrell-Note and payments

Per its terms, payments on the Sparrell-Note were to be made in monthly installments of $949.00 beginning December 1, 2016, through its maturity of November 30, 2031.  Facts ¶33.  Although payments under the Sparrell-Note are due to Sparrell, the first five

---

[21] There were seven draws made against Sparrell's Line of Credit following the November 7, 2016 transfer.  The first draw-down on the line was made the very next day (November 8, 2016) in the sum of $3,000 and was deposited into Sparrell's operating account.  Facts ¶¶44 and 41.  Thereafter draws were made on November 14, 2016 ($100.38), November 15, 2016 ($37.00); July 11, 2017 ($2,454.13), July 12, 2017 ($875.67); July 17, 2017 ($338.13) and July 18, 2017 ($1,000).  Facts ¶44.  As of October 2018, the total payoff balance on the Line of Credit is $34,000. Facts ¶44.

payments were paid directly to the Debtor.[22] Facts ¶ 46.  The Debtor and Brendan accounted for the payments under  "Cash" and/or "Note Payable RRM Buyout." Facts ¶ 46. Clearly the Debtor and Brendan structured the Sparrell-Note to provide an on-going income stream for the Debtor.  Payments to the Debtor directly would have likely continued had his bankruptcy counsel not flagged the activity just prior to filing Chapter 7 and advised that it was inappropriate. Facts ¶ 46.

On or about July 18, 2017, a new checking account was opened for Sparrell at Eastern Bank in which Brendan was the only authorized signor (the "New Account.")[23]   Facts ¶ 46.  In March 2018, the New Account was set up for automatic loan repayment of monthly installments due on Sparrell's open Line of Credit at Eastern Bank.  Facts ¶¶ 44 and 45.  In April 2018, BM McNamara obtained a $60,000 SBA loan from Eastern Bank (the "SBA Loan") and deposited $39,319.53 from the SBA Loan proceeds into Sparrell's New Account.[24]   Facts ¶ 49. Essentially, the New Account is a passthrough which allows Brendan to repay the existing Line of Credit over time while creating an appearance that Sparrell is repaying its debt.[25]  To further their charade, Brendan claims that the SBA Loan proceeds that were deposited into Sparrell's New Account is an offset of the balance due on the Sparrell-Note. Facts ¶ 49.

---

[22]On December 22, 2016 the Debtor received a payment of $950 due on the Sparrell-Note. Facts ¶46.  Also on March 12, 2017, Debtor received a payment of $3,800 for the months of February, March, April and May 2017. Facts ¶46.  This payment is logged into the company's general ledger for the operating account at Eastern Bank but appears to have been made from an Account at Hingham Institute for Savings which was not produced by the Debtor or Sparrell in discovery.  Payment on the Sparrell-Note for the month of January 2017 is currently unaccounted for.

[23] Oddly, the Debtor had no authorized use or signing authority for Sparrell's New Account even though he is Sparrell's sole principal officer.  Also, even though Brendan claims to have ceased his employment with Sparrell as November 7, 2016, (Facts ¶20) he was the only authorized signor for the New Account opened in July 2017.

[24]Brendan claims that he personally guarantees the $60,000 SBA loan taken out by BM McNamara.

[25] As of October 2018 the Line of Credit had a payoff balance of $34,000.  Facts ¶44.

### D.  Current operations under BM McNamara

The licenses to continue operations of the Cohasset and Norwell Properties as

McNamara-Sparrell Funeral Homes were transferred to BM McNamara in or around October

2018 at or about the time the Debtor's license as a Certified Funeral Director expired.  Facts

¶43[26]  In his Schedules, the Debtor represents that he is not employed and has no monthly

income.  Facts ¶4.  Despite continued claims of being unemployed, the Debtor obtained a new

Funeral Director and Embalmer License from the State Board of Embalming & Funeral

Directing on January 2, 2019 and testified at deposition that he's now "… just a funeral director

working just so I'm available" and admits that he works wakes and funerals "[o]n occasion."

Facts ¶¶ 43 and 50.  The Debtor has the access code and free access to the Cohasset and Norwell

Properties, he is given access to BM McNamara's checkbook, and has written and signed checks

from that account. Facts ¶50.   Also, contrary to claims that the Debtor no longer works for the

business, the application to change ownership that BM McNamara filed with the State's

Licensing Board on July 18, 2018 indicates that Debtor is BM McNamara's only anticipated

employee.  Facts ¶43.  Furthermore, BM McNamara's records indicate that this entity continued

paying personal expenses for the Debtor, including his dental bills, yacht club membership and

pharmacy prescriptions (Facts ¶51).

### E.  Inability to explain the loss of assets

On its face, the Debtor's Chapter 7 filings fail to disclose the value of the Sparrell-Note.[27]

The Debtor's bankruptcy Schedules that represent his value in Sparrell to be "$0.00" was

---

[26] This is also around the same time that Brendan obtained a Type 3Certified Funeral Director's License (a Type 3 License is required to own a funeral home).

[27] The Sparrell-Note has not been repaid in full.

untruthful.  (Facts ¶5). At deposition the Debtor could not to explain the basis for the claim the

$0.00 value stated in the Schedules.[28]  Facts ¶52.  More specifically, he responded "I don't

know."  Facts ¶52.  The Debtor also admitted that he did nothing to verify whether or not

Sparrell was worth $0.00. Facts ¶52. Nor did he consult with anyone to confirm that Sparrell was

worth $0.00. Facts ¶52.

## II.    **Argument**

### A.  **Summary Judgment Standard**

Motions for summary judgment in adversary proceedings are "governed by the same

standards applicable to motions under Fed. R. Civ. P. 56" In re Staley-Snow, 405 B.R. 11, 17

(B.A.P.  1st Cir. 2009); Fed.R. Bankr. P. 7056.  Summary judgment is therefore appropriate

where no genuine issues of material fact exist and the moving party is entitled to judgment as a

matter of law.  Fed.R.Civ.P. 56(a).  See Desmond v. Varrasso, 37 F3d 760, 763 (1st Cir. 1994)

(applying Rule 56 standard.)[29]  The "mere existence of some alleged factual dispute between the

parties," however, "will not defeat an otherwise properly supported motion for summary

judgment: the requirement is that there be no genuine issue of material fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  Further, where the movant has produced

"overwhelming" basic evidence to support its asserted fact or reasonable inference therefrom,

and the respondent has failed to produce significantly, "probative" evidence countering those

facts and reasonable inferences, the Court may accept the movant's interpretation of the facts in

---

[28] The deposition was a joint deposition taken of the Debtor individually and as Sparrell's designated Rule 30(b)(6) witness Facts ¶52.  Individually and as Rule 30(b)(6) designee of Sparrell, the Debtor was evasive and unable to provide any satisfactory explanation for the value claimed in his Schedules despite having  all of the documents that he produced in response to Plaintiff's discovery request on the issue.  Facts ¶52.

[29] In In re Varrasso, the court's application was pursuant to Fed.R.Civ.P. 56(c), which was amended effective December 1, 2010.  The same summary judgment standard now appears in subsection (a) of Rule 56 (rather than at subsection (c).  However, the amended rule did not change the standard for summary judgment. See  Farmers Inc. Exch. V. RNK, Inc., 632 F. 3d 777, 782 n. 4 (1st Cir. 2011).

granting summary judgment.  *See* First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S.

253, 285-286 (1986); In re Tully, 818 F.2d 111, 118 (1st Cir. 1987) (affirming summary

judgment.)  Bald denials or generalized recollections unsupported by facts cannot defeat

summary judgment.  Miller v. Solem, 728 F.2d 1020, 1024 (8th Cir. 1984), cert. den., 469 U.S.

841 (1984) (conclusory assertions or ultimate fact are accorded little weight at summary

judgment).  As detailed below, the undisputed material facts in this adversary proceeding warrant

summary judgment in favor of the Plaintiff.

### B.  Denial of discharge is warranted

Plaintiff's Complaint objects to the Debtor's Chapter 7 discharge on the grounds of 11

U.S.C. § 727(a)(4)(A), (a)(5) and (a)(2).  These code sections justify a denial of the Debtor's

discharge for the following circumstances applicable here:

Count I:   Debtor knowingly and fraudulently, in or connection with his Chapter 7 case
made one or more false oaths or accounts. 11 U.S.C. § 727(a)(4)(A);

Count II:   Debtor has failed to explain satisfactorily the loss of assets or deficiency of
assets to meet his liabilities. 11 U.S.C. § 727(a)(5); and

Count III:   Debtor, with intent to hinder, delay or defraud one or more of his creditors or
an officer of the estate charged with custody of property under this title,
transferred, removed, destroyed, mutilated, or concealed, or has permitted to
be transferred, removed, destroyed, mutilated, or concealed property of the
Debtor, within one year before the date of filing the Chapter 7 petition. 11
U.S.C. § 727(a)(2)(A).

### (i)    Count I - 11 U.S.C. § 727(a)(4)(A)

#### (a)  Multiple false oaths and accounts were made.

To sustain a claim under § 727(a)(4), a creditor must prove by a preponderance of the

evidence that the Debtor knowingly and fraudulently made a false oath or account in connection

with his case.  *See* In re Gill, 159 B.R. 348, 353 (1993).  "To trigger section 727(a)(4)(A), the

false oath must relate to a material matter and must be made willfully with intent to defraud." In
re Tully, 818 F.2d 111, 118 (1st Cir. 1987)(affirming summary judgment); Perry v. Warner, 247
B.R. 24, 26 (B.A.P. 1st Cir 2000); In re Davidson, 296 B.R. 841, 847 (Bankr. D. Kan.
2003)(granting summary judgment) aff'd, No. 01-23974-4, 2004 WL 2852352 (B.A.P. 10th Cir.
June 29, 2004).   It is well established that a "debtor's Schedules and Statement of Financial
Affairs are the equivalent of a verification under oath." Perry v. Warner, 247 B.R. 24, 26 (B.A.P.
1st Cir. 2000).  A debtor's false statements or misrepresentations in bankruptcy financial
schedules constitute a false oath under § 727(a)(4)(A) because those documents are signed "under
the penalty of perjury." In re Grondin, 232 B.R. 247, 276 (B.A.P. 1st Cir. 1999); In re Sowers,
229 B.R. 151, 158 (Bankr. N.D. Ohio 1998) (granting summary judgment).

A preponderance of the evidence detained in the Background section of this
Memorandum (*Section I, B, supra*) shows that the Debtor's Schedules and SOFA contain
numerous false oaths regarding the Debtor's interests in Sparrell.  The Debtor's claim that his
ownership interest in Sparrell had a value of "$0.00" in response to Question 19 of Schedule A/B
Part 4 constitutes a false oath under § 727(a)(4)(A).   Similarly, Debtor's statement that he had
no undisclosed financial assets or business-related property in response to Questions 37 and 44
of Schedule A/B Part 5 also constitute false oaths under § 727(a)(4)(A). (Facts ¶¶ 7-8).
Discharge under § 727(a)(4) can be denied for a debtor's failure to schedule his interest in a
separate business entity.  Palatine National Bank v. Olson (In re Olson), 916 F.2d 481, 484 (8th
Cir. 1990)(debtor's omission of interest in dinner theater was material because it related to his
business transactions and the extent of his estate) Here, on its face, the Debtor's claim that
Sparrell was worth "$0.00" was an intentional disregard of the $225,000 Sparrell-Note that
added value to the Debtor's interest in Sparrell (*the Debtor even collected upon the Sparrell-Note*

*directly for at least five months*).   Even though Sparrell may have had other liabilities (*such as*

*the open Line of Credit with Eastern Bank*), the value of the Sparrell-Note was undoubtedly

greater than the payoff balance of the Line of Credit.[30]   Furthermore, the Debtor was completely

unable to explain how he came up with the $0.00 value and also admits that he did nothing to

verify the $0.00 value nor did he consult with anyone to confirm that Sparrell was worth $0.00.

Facts¶ 52.  "It is not for the Debtor to determine the value of the assets or to determine if the

assets do not have value."  In re Gill, at 352, citing In re Ingersoll, 124 B.R. 116 (Bankr. M.D.

Fla. 1991).  Creditors are entitled to full and complete disclosure and the right to make that

determination.  *See* In re Gill, at 352, citing In re Kaiser, 94 B.R. 777 (Bankr. S.D. Fla. 1988).

Reckless indifference to the truth is the equivalent of fraud for § 727(a)(4)(A) purposes.  *See* In

re Tully, 818 F.2d 106, 111 (1st Cir. 1987).   The Debtor's false statements and

misrepresentations concerning the value of his interests in Sparrell are undisputable.[31]

Moreover, evidence of Sparrell's filing financial statements with Live Oak Banking Company in

connection with its Acquisition Loan in September 2016, sufficiently demonstrates that the

Debtor's representation that "No" financial statements were given to anyone about Sparrell

within 2 years before he filed bankruptcy in response to SOFA Question 28 was indeed another

false oath under § 727(a)(4)(A).  Facts ¶11.

### (b)   The false oaths and accounts were knowingly and fraudulently made.

Courts recognize that a debtor rarely gives direct evidence of fraudulent intent but, this

should not bar summary judgment because intent to defraud can be proven by circumstantial

---

[30] As of April 2017 when the Debtor filed Chapter 7, the Line of Credit had a payoff balance of approximately $45,167.82 (Facts ¶44) and there was an excess of $220,000 due and owing on the Sparrell-Note. Facts ¶54.

[31] It could even be argued that the Debtor's claim that he was "unemployed" is also false. Facts ¶¶ 43 and 50.

evidence.  *See* In re Fustolo, 597 B.R. 1, 43 (1st Cir. 2019) citing In re Varraso, 37 F.3d 760, 764

(1st Cir. 1994) *see also* In re Donahue, B.A.P.  No. NG 11-026, 2011 WL 673704, at * 12-13 (1st

Cir. Dec. 20, 2011 ("Because a debtor is unlikely to admit directly that his intent was improper,

courts may look to circumstantial evidence and draw inferences from a course of conduct to

establish that the debtor acted with fraudulent intent.") citing In re Lang, 246 B.R. 463, 468

(Bankr. D. Mass. 2000), aff'd, 256 B.R. 539 (B.A.P. 1st Cir. 2000).  Here, the Debtor's

underreporting the value of Sparrell as "$0.00",  failing to disclose financial assets or business-

related property (*such as the $225,000 Sparrell-Note*) and falsely claiming that Sparrell did not

provide financial statements to a lender less than two years before filing Chapter 7 (*for a loan to

purchase real estate worth $1.811 Million that was flipped to an insider*) shows a pattern of

multiple inaccuracies and falsehoods that rise to the level of reckless indifference to the truth that

can amount to the functional equivalent of an intent to deceive. *See* In re Bren, 303 B.R. 610,

614 (B.A.P. 8th Cir. 2004), Cadel Co. v. Mitchell (In re Mitchell), 102 Fed. Appx. 860 (5th Cir.

2004) (six mistakes in debtor's schedules evidenced a sufficiently reckless disregard for the truth

to warrant denial of discharge under § 727(a)(4)(A)).  The inference of fraud from the summary

judgment record in this case is particularly strong considering that (i) the Debtor's stock and

ownership interests in Sparrell is an asset of his estate, (ii) there was a chance that, making false

oaths and accounts about Sparrell's $0.00 value and withholding information about the Sparrell-

Note and Sparrell's transfers and other transactions, would deter creditors and the Chapter 7

Trustee from conducting costly probes and investigations into the Debtor's business and

financial affairs; and (iii) if matters concerning the asset were unexplored, the Debtor could

resume direct collection of the buyout payments on the Sparrell-Note (similar to what he was

caught doing pre-petition).  Additionally, the Debtor's and Sparrell's inability to provide a

satisfactory explanation for why Sparrell had a $0.00 value is further evidence that the oaths and

accounts in the Debtor's Schedules and SOFA were knowingly and fraudulently made.

    **(ii)**      <u>**Count II - 11 U.S.C. § 727(a)(5)**</u>

    Section 727(a)(5) provides that the court shall grant the debtor a discharge, unless "the

debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet

the debtor's liabilities[.]" 11 U.S.C. §727(a)(5).  Exceptions to discharge under this section of the

Code also only requires proof by a preponderance of the evidence.  <u>Barclays/American Bus.</u>

<u>Credit, Inc. v. Adams (in re Adams)</u>, 31 F.3d 389, 394 (6th Cir. 1994) *cert* denied, 513 U.S. 1111

(1995).   As explained in <u>Aoki v. Atto Corp. (in re Aoki)</u>, 323 B.R. 803 (B.A.P. 1st Cir. 2005):

> The plaintiff has the initial burden of producing some evidence that the debtor no longer
> has assets which he previously owned. *See* <u>Ehle v. Brie (In re Brien)</u>, 208 B.R. 255, 258
> (1st Cir. BAP 1997).  Once the plaintiff has established the loss of an asset, it is up to the
> debtor to provide a satisfactory explanation for the loss or deficiency of the asset.  <u>Krohn</u>
> <u>v. Cromer (In re Cromer)</u>, 214 B.R. 86, 95 (Bankr. E.D. N.Y. 1997) … What constitutes a
> "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court.
> *See* <u>Baum v. Earl Millikin, Inc.</u>, 359 F.2d 811, 814 (7th Cir. 1966) … A debtor's
> explanation need not be comprehensive, but it must meet two criteria: First, it must be
> supported by at least some corroboration.  *See, e.g.,* <u>Wortman v. Ridley (In re Ridley)</u>,
> 115 B.R. 731, 737 (Bankr. D. Mass. 1990) (undocumented explanations are not
> satisfactory for §727 (a)(5) purposes)(citing <u>Chalik v. Moorefield (In re Chalik)</u>, 748 F.2d
> 616 (11 Cir. 1984); <u>First Tex. Sav. Ass'n v. Reed (In re Reed)</u>, 700 F.2d 986 (5th Cir.
> 1983)).  Second, the corroboration must be sufficient to eliminate the need for any
> speculation as to what happened to all of the assets. <u>Id</u>.  A debtor's explanation must
> consist of more than "a vague or indefinite references, evidence or explanations, or an
> uncorroborated hodgepodge of financial transactions."  <u>Id</u>. (citations omitted).  "A jumble
> of vague, unasserted memoranda, checks, bank statements, and bills" is insufficient.  <u>Id</u>.
> at 738 (citing <u>Jackson v. Menick</u>, 271 F.2d 806, 809 (9th Cir. 1959)).  Therefore,
> discharge will be denied when a debtor makes only a vague evidentiary showing that the
> missing assets involved have been used to pay unspecified creditors, or where the debtor
> fails to provide corroborative documentary evidence to confirm his explanation.  <u>Id</u>. at
> 737-38 (citations omitted).

<u>Aoki</u>, 323 B.R. at 817-18.

    Here, the Debtor's claim that his stock in Sparrell is worth $0.00 is uncorroborated.  In

discovery, Debtor produced over a thousand pages of records to the Plaintiff alleging they

supported his claim that Sparrell was worth $0.00 at the time of bankruptcy however, when

asked to explain how the document dump supported his position, the neither the Debtor nor

Sparrell was able to provide any explanation.  <u>Facts ¶52</u>.  Consequently, summary judgment for

the Plaintiff against the Debtor is appropriate on Count II.

**(iii)**      <u>**Count III - 11 U.S.C. § 727(a)(2)**</u>

  **(a)** <u>**Debtor's apparent retention of Sparrell's stock should not preclude denial of**</u>
<u>**discharge under § 727(a)(2)(A)**</u>

Count III of the Plaintiff's Complaint objects to discharge under Section 727(a)(2)(A)

which provides:

> (a) The court shall grant the debtor a discharge, unless –
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer
> of the estate charged with custody of property under this title, has transferred,
> removed, destroyed, mutilated, or concealed, or has permitted to be
> transferred, removed, destroyed, mutilated,  or  concealed –
>
> (A) property of the debtor, within one year before the date of the filing of the
> petition ….

11 U.S.C. § 727(a)(2)(A).

Thus, the elements of the Plaintiff's claim under Count III of the Complaint require a

showing that the Debtor made: "(1) a transfer or concealment of property (2) that belonged to the

debtor (3) less than a year before the bankruptcy petition (4) with actual intent to hinder, delay,

or defraud a creditor."  *See* <u>Marrama v. Citizens Bank of Massachusetts (In re Marrama)</u>, 445 F.

3d 518, 522 (1st Cir. 2006); <u>Razzaboni v. Schifano (In re Schifano)</u>, 378 F.3d 60, 66-67 (1st Cir.

2004).  Discharge can be denied under § 727(a)(2)(A) when a debtor causes his solely owned

corporation to be transferred to an insider for much less than its fair market value five months

before filing bankruptcy.   *See* <u>In re DeLoreto</u>, 266 Fed.App. 140 (2008).[32]   Here, the summary

judgment record factually shows the Debtor and his son Brendan taking clear steps to drain all

assets from Sparrell and shift them to Brendan's entities (*BM McNamara and BM Mack*) for less

than adequate consideration.   Presumably, Debtor merely retained ownership of Sparrell and

shifted all corporate assets to Brendan's newly formed companies as a strategic attempt to

circumvent the technicalities of § 727(a)(2)(A) (*only applicable to assets in which the debtor has

a direct proprietary interest*).   However, the doctrine of piercing the corporate veil provides

equitable remedies that would preclude the Debtor from defrauding his creditors in this manner

and the Plaintiff's Complaint contains sufficient allegations to state a claim for relief under this

doctrine.   *See* Complaint at ¶¶ 11, 12, 19, 20, 22, 24, 36-45.

### (b) <u>Piercing the corporate veil</u>

Generally, corporations and their shareholders, or different corporations with common

shareholders, are deemed to be distinct legal entities but, when there is unusual circumstance for

cause, a court may look beyond the corporate legal structure and its property to find legal

accountability in others for actions taken in the corporate name. *See* <u>Berger v. H.P. Hood, Inc.</u>,

416 Mass. 652, 657, 624 N.E.2d 947 (1993) *see also* <u>My Bread Baking Co.</u>, 353 Mass. 614, 618

(the corporate form may be disregarded to defeat fraud or remedy an injury.)   The doctrine of

piercing the corporate veil and alter ego are equitable principles employed to hold a shareholder

liable for corporate acts. *See* <u>Butler v. Candlewood Road Partners, LLC (In re Raymond)</u> 529

B.R. 455, 471 (Bankr. D. Mass. 2015).   While the doctrines of veil piercing and alter ego are

---

[32] The denial of discharge in <u>In re DiLoreto</u> was affirmed on appeal as the bankruptcy court's reverse-piercing of corporate veil analysis determined that the assets of the debtor's entities at issue should have been included in his bankruptcy estate and although the purchaser was ostensibly unaffiliated, there were insider ties to the debtor by virtue of on-going business relations.   <u>Id</u>.

interrelated and litigants often use the terms interchangeably this court summarized in In re Blast Fitness Group, LLC, No. 16-10236-MSH, 2019 WL 1978344, at *15 (Bankr. D. Mass. Apr. 30, 2019) that there is a distinction – veil piercing "… asks a court to hold A vicariously liable for B's debts" and alter ego "… asserts that A and B are the same entity and therefore liability is direct." Id. citations omitted.

The doctrine of "reverse veil piercing" involves the claims of creditor seeking to satisfy the liabilities of the owner/shareholder by targeting the assets of the entity/corporation of that owner/shareholder. See In re Raymond, 529 B.R. 455, n. 13 (2015) citing ALT Hotel, LLC, 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012). The doctrine of reverse piercing of a corporate veil has two characterized forms – one as an "outsider" reverse veil piercing involving a third party creditor piercing the corporate veil in the reverse to reach the assets of the corporation to satisfy the debt of a corporate insider and the other an "insider" reverse veil piercing which involves an insider of the corporation seeking to disregard the corporate form of his own corporation for his own benefit. See In re Howland, 516 B.R. 163, 166 (Bankr. E.D. Ky. 2014), aff'd, 579 B.R. 411 (E.D. Ky. 2016), aff'd, 674 F. App'x 482 (6th Cir. 2017). As noted by the Court in In re Raymond, Massachusetts law rejects reverse veil piercing when "insiders" attempt to reverse pierce. Id. at 475-476. (the plaintiff/trustee in In re Raymond unsuccessfully sought to amend its complaint on theory of "insider" reverse piercing in connection with certain defendant trusts). Contrary to In re Raymond, the claims of Plaintiff's Count III the facts invoke alter ego "outside" reverse veil piercing. Courts often look through the corporate form when there is "an element of dubious manipulation and contrivance [and] finagling" Id. quoting Evans v. Multicon Constr. Corp., 30 Mass.App.Ct. 728, 736 (1991) Here the summary judgment record shows that

the Debtor did just that when he exercised pervasive control of Sparrell, its accounts and assets by:

(i)      paying personal expenses for himself and his family including his and Alice's mortgages, student loans for his adult children, personal auto and pleasure boat expenses and dues for his memberships at various country clubs and yacht club. Facts¶¶22(i)-(v);

(ii)     paying off the judgment under which he and Alice were personally liable in excess of $42,000. Facts¶27(i);

(iii)    paying off his personal liability with respect to the "mismanaged" Pre-needs in the sum of $175,000. Facts¶27(i);

(iv)    collecting payments on the Sparrell-Note, personally. Facts¶46;

(v)     continuing to draw on Sparrell's Line of Credit while claiming the company ceased operations, had no assets and was defunct. Facts¶44;

(vi)    permitting Brendan's alleged entities to conduct business operations under Sparrell's insurance coverage, professional licensure and use its operating accounts for an extended period of time. Facts¶¶40, 41 and 42; and

(vii)   transferring and/or "gifting" the Cohasset and Norwell Properties, physical assets and goodwill to entities controlled by his son Brendan for less than adequate consideration in effort to prevent himself from having any valuable assets available to pay his creditors.  Facts¶28 (Intent to Gift) and ¶¶ 29-32.

Under these circumstances, equity warrants piercing the veil.

### (c) **Intent to defraud.**

There is no requirement that the debtor intend to hinder, delay, or defraud *all* of his

creditors, "the statute requires only the debtor make the transfer with intent to hinder, delay or

defraud 'a creditor.'" Aweida v. Cooper (in re Cooper), 150 B.R. 462, 467 (D.Colo. 1993)(citing

First Beveraly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir.1986).  In this case,

the Debtor plainly stated at deposition that he transferred the funeral home to his son Brendan to

avoid claims from his bother John.  Facts ¶ 53.  However, even if the Debtor had not made this

admission, there is sufficient circumstantial evidence in the record that exposes his fraudulent

intent.

Evidence of intent to hinder, delay, or defraud creditors can be weighed by "objective

indicia" consisting of:

> (1) Insider relationships between the parties; (2) the relationship of possession,
> benefit of use of the property in question; (3) the lack or inadequacy of consideration
> for the transfer; (4) the financial condition of the [debtor] both before and after the
> transaction at issue; (5) the existence or cumulative effect of the pattern or series of
> transactions or course of conduct after the incurring of the debt, onset of financial
> difficulties, or pendency or threat of suits by creditors; (6) the general chronology of
> the events and transactions under inquiry; and (7) an attempt by the debtor to keep the
> transfer a secret.

In re Marrama, 445 F.3d at 522 (quoting Groman v. Watman (In re Watman), 301 F.3d 3 8 (1st

Cir. 2002); *see also* Kaplan v. Salvador (In re Salvador), 570 B.R. 460, 473 (Bankr.D. Mass.

2017), *aff'd* 277 F.Supp. 3d 154 (D.Mass.2107).  Here, the Debtor's transactions concerning

Sparrell were marked with numerous "badges" or indicia of fraud, including his close insider

relationship with his son Brendan and Brendan's entities, Debtor's continued involvement in the

business (*working wakes and funerals, running business errands, use of BM McNamara's check*

*book and accounts, allowing Brendan's business to operate under Sparrell's insurance policy*

*for an extended period, use its operating accounts to conduct business for an extended period,*

*obtaining a new funeral director's license to continue working, allowing Brendan to continue operations under Sparrell's license with the State*) running payments for personal expenses through BM McNamara's accounts, collecting payments on the Sparrell-Note directly and shifting of assets.

Denial of discharge is justified.

### III.    Conclusion

WHEREFORE, for all of the foregoing reasons, Plaintiff requests that this motion be ALLOWED and that the Court grant summary judgment in favor of the Plaintiff against the Debtor as to all Counts of the Complaint and such relief as this Honorable Court deems justified under the circumstances.

The Plaintiff,

The Bank of Canton

By its Attorneys,

Dated: July 2, 2019

/s/ Michael A. Wirtz

_____

Jack J. Mikels, BBO# 345560
Michael A. Wirtz, BBO# 636587
JACK MIKELS & ASSOCIATES, LLP
1 Batterymarch Park, Suite 309
Quincy, MA  02169-7454
Tel:  617-472-5600
Email: Lawoffice@jackmikels.com