**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: Robert R. McNamara,<br>Debtor | Chapter 7<br>Case No. 17-11329 – MSH |
| The Bank of Canton<br>　　　　Plaintiff,<br>v.<br><br>Robert R. McNamara,<br>　　　　Defendant. | Adversary Proceeding No. 18-01022 |

### AFFIDAVIT OF ROBERT R. MCNAMARA IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Robert R. McNamara, the debtor in the above captioned chapter 7 case and defendant in the above captioned adversary proceeding (the "Debtor"), state under oath:

1. I am an individual, the debtor in a chapter 7 case (no. 17-11329) in the United States Bankruptcy Court for the District of Massachusetts and the defendant in adversary proceeding no. 18-1022.

2. All statements herein are based upon my personal knowledge, my review of certain documents and so far as such statements are based on information and belief, I believe them to be true.

3. I submit this affidavit in support of the opposition to the Plaintiff's motion for summary judgment.

4. On April 13, 2017, my attorney filed, on my behalf, a petition for relief under Chapter 7 of the Bankruptcy Code. (ECF document no 1).

5. On April 28, 2017, my attorney filed, on my behalf Schedules A-J, a Summary of Schedules, and a Statement of Financial Affairs. (ECF doc 12).

6. I was, on April 13, 2017, the owner of 100% of the interest in Sparrell Funeral Services, Inc. ("Sparrells") (ECF doc # 12, p. 5 ¶ 19, ).

7. I attended Boston State Teachers College for approximately four years. I do not have a degree.

8. After I attended Boston State I attended the New England Institute of Anatomy and Embalming for approximately one year.

9. I started working, part time, in the funeral home business approximately 55 years ago when I was eighteen.

10. For approximately 30 years, I was in business with my brothers, John McNamara and Paul McNamara. John McNamara and I were co-owners of Sparrells, which operated three funeral homes and John McNamara, Paul McNamara and I were the co-owners of McNamara Associates, LLC, which owned the real estate used by the funeral homes.

11. In 2011, at my brother John's insistence, I entered into a settlement agreement, which is attached as Exhibit K to the affidavit of Michael Wirtz submitted in support of the Plaintiff's Motion for Summary Judgment.

12. As a result of that settlement agreement, I transferred my stock in McNamara Associates, LLC to my brother John, he transferred his stock in Sparrells to me, and Sparrells, which operated funeral homes at 1 Summer Street, Cohasset, MA (the "Cohasset

Property"), and at 30 Central Street, Norwell, MA (the "Norwell Property"), entered into a lease with McNamara Associates, Inc. (the lease is attached as Exhibit L to the affidavit of Michael Wirtz submitted in support of the Plaintiff's Motion for Summary Judgment).

13. The lease between McNamara Associates, LLC and Sparrells included an option for Sparrell to purchase the Cohasset and Norwell properties.

14. The settlement agreement also had references to claims that my brother John asserted against me involving obligations of Sparrells, my brother John and myself for alleged "mismanagement" of funds paid to Sparrells by customers for pre-need funeral arrangements during the time that it was owned and operated by my brother John and myself. Pursuant to the settlement agreement, Sparrells and I agreed to indemnify and hold harmless my brother John and entities of his from any claims regarding any failure to adequately fund the pre-needs funeral accounts.

15. After the settlement agreement with my brother John was entered into, Sparrells was responsible for both paying rent on two locations to McNamara Associates, LLC and for the pre-paid funeral obligations that had been incurred by Sparrells prior to the settlement agreement.

16. My son Brendan McNamara ("Brendan") started working part time at Sparrells while he was still in high school and, in approximately 2004, starting working full time at Sparrells.

17. Over time, Brendan became involved in managing the finances of Sparrells. After the settlement agreement with my brother John was entered into, Brendan assumed day to day responsibility for managing the financial affairs of Sparrells, though I remained as the sole shareholder and officer of Sparrells.

18. At some point prior to 2015, my personal financial situation began to deteriorate, I believe, at least in part, because of the agreement that I made with my brother John.

19. By 2015, my wife and I had defaulted on our personal obligations to the Plaintiff, the Plaintiff had foreclosed on our home, (Exhibit G to the affidavit of Michael Wirtz) and the Plaintiff had sued both my wife and myself (See docket for Norfolk Superior Court case attached as Exhibit F to the Wirtz affidavit).

20. Sparrells lease with McNamara Associates, Inc. (Exhibit L to the affidavit of Michael Wirtz) had an initial five year term, which was set to expire in 2016. The lease had an option to renew, but the lease if extended, would be at a "market rate" which I did not think that Sparrells could afford to pay.

21. The lease also had an option for Sparrells to buy the Norwell and Cohasset Properties. Sparrells did not have the financial resources to exercise the option without obtaining financing, which I believed would require that I, as the sole owner and officer of Sparrells would have to personally guarantee. Because of my financial condition in 2016 and the foreclosure of the mortgage on my home in 2015, I did not believe that Sparrells would qualify for financing to exercise the option.

22. I believed that, if Sparrells could not exercise the option to purchase the Norwell and Cohasset Properties it would have no other choice but to close its doors and cease operations.

23. In 2016, Sparrells had obligations to various creditors, including an obligation to Eastern Bank on a line of credit, an obligation to Harbor One Bank, ECF doc 12, page 18,

¶ 4.4, 4.5, page 25 ¶ 3.6, 37 and Exhibit AP to the Wirtz affidavit, and the pre-paid funeral obligations.

24. If Sparrells was unable to exercise the option and was forced to close its doors, I believed that Sparrells would be unable to pay its obligations.

25. During 2016, Sparrells arranged, through the efforts of my son Brendan, for financing from Live Oak Banking Company, to finance its exercise of the option and purchase of the Norwell and Cohasset Properties.

26. My son Brendan and his wife, agreed to personally guarantee financing obtained by Sparrells to exercise the option to purchase. They did so based upon our agreement that in return for Brendan and his wife's guaranty of the Live Oak Banking Company financing, after the option was exercised, Sparrells would transfer its assets, including the real estate, to entities to be set up by and owned Brendan to own the real estate and operate the funeral homes.

27. On or about September 26, 2016, Sparrells purchased the Cohasset and Norwell Properties from McNamara Associates. See the deeds attached as Exhibits I and J to the Wirtz Affidavit.

28. In order to acquire the properties, Sparrells obtained a $1.39 Million loan through Live Oak Banking Company secured by a mortgage on the Cohasset and Norwell Properties. See the note and mortgage attached as Exhibits W and X to the Wirtz affidavit.

29. Sparrells obligations to Live Oak Banking Company were guaranteed by me, by Brendan and by Brendan's wife, Melissa. See September 23, 2016 guarantees filed herewith as Exhibit A.

30. As part of the transaction by which Sparrells acquired the Cohasset and Norwell Properties from McNamara Associates, McNamara Associates paid an obligation of myself and my wife to the Plaintiff in the amount of $42,069.61. See Settlement Statement attached hereto as Exhibit B, at line 505 and Exhibit F to the Wirtz affidavit.

31. As part of the transaction by which Sparrells acquired the Cohasset and Norwell Properties from McNamara Associates, McNamara Associates also paid $175,000 to fund the pre-paid funeral obligations of Sparrells, for which both my brother and myself were also liable. See Settlement Statement attached hereto as Exhibit B, at line 507.

32. After the transaction by which Sparrells acquired the Cohasset and Norwell Properties from McNamara Associates was closed, neither I nor Sparrells had any further financial obligations to my brother John or any of his entities.

33. On or about November 7, 2016, Sparrells transferred the Cohasset and Norwell Properties to BM Mack Properties, LLC ("BM Mack"), a company owned by Brendan and his wife Melissa. See deeds attached as Exhibits AE and AF to the Wirtz affidavit.

34. Also on or about November 7, 2016, Sparrells transferred it personal property to BM McNamara Funeral Services, Inc. ("BM McNamara"). Brendan is the owner of BM McNamara.

35. BM Mack and BM McNamara executed a promissory note payable to Sparrell in the sum of $225,000 (the "Sparrell Note.") See Exhibit AI to the Wirtz Affidavit.

36. The consideration for Sparrells transfer of the Norwell and Cohasset Properties and its personal property to BM Mack or BM McNamara was Brendan and his

wife and, I understand, BM Mack and BM McNamara's guarantee of and promise to pay the Live Oak loan that both Sparrells and I are liable for, and the Sparrell note.

37. The payments on the Sparrell note are being used to pay Sparrell's obligation to Eastern Bank.

38. The Plaintiff is not a creditor of Sparrells. When Sparrells transferred the Norwell and Cohasset Properties and its personal property to BM Mack and BM McNamara, neither my brother John or any of his entities was a creditor of Sparrells.

39. Sparrells transferred its assets to BM Mack and BM McNamara primarily to ensure that the Live Oak Bank obligation could be paid (by BM Mack and BM McNamara) and so that Sparrells would have an income stream to enable it to pay Eastern Bank and its other obligations.

40. I have been, since on or about November 7, 2016, retired. My only income is from social security. ECF doc 12, page 28, ¶8.E.

41. I renewed my funeral directors license in 2017.

42. I have, on occasion, gone to either the Norwell or Cohasset Properties to help my son Brendan by either assisting him in conducting funerals or running other errands for his company such as picking up copies of death certificates.

43. I am not, and never have been, an employee of BM Mack or BM McNamara and I am not paid or in any way financially compensated for any assistance I provide to my son Brendan or to his companies.

44. I do not have and never have had any ownership interest in either BM Mack or BM McNamara and have no anticipation of ever having any ownership interest in either entity.

45. In the schedules that were filed in my bankruptcy case, I listed the value of my 100% interest in Sparrells as having a value of $0.00. Sparrells") (ECF doc # 12, p. 5 ¶ 19). On the date that I filed bankruptcy, the only significant asset that Sparrells owned was the Sparrells note which I understood had a value of approximately $220,000. At the same time, Sparrells was obligated to Eastern Bank on a line of credit in the amount of $45,436.07 (ECF doc 12, page 18, ¶4.4 and page 25, ¶3.6), to Harbor One Bank in the amount of $4167.12 (ECF doc 12, page 18, ¶4.5 and page 25, ¶3.7) and to Live Oak Bank in the amount of $1,230,000.00 (ECF doc 12, page 18, ¶4.6, page 22 and page 25, ¶3.8, Wirtz Affidavit, Exhibit W). It was my belief that, where the value of Sparrell's assets was more than a million dollars less than the amount of its liabilities my equity interest in Sparrells had no value.

46. In the schedules that were filed in my bankruptcy, there was a question that asked if I owned any legal or equitable interest in any business-related property (ECF doc 12, page 8, ¶37. I answered that question no because I listed my interest in Sparrells elsewhere in that schedule and I believed and still believe that I do not own any business-related property.

47. In the schedules that were filed in my bankruptcy, there were questions that asked if there were any financial assets not already listed that I had not already listed (ECF 12, p. 8, ¶35) and if there was any business related property that I had not already listed (ECF doc 12, page 9, ¶44). I answered those questions no. I believe that I listed all of my financial assets accurately in response to questions 16 through 34, including my interest in Sparrells and that, while Sparrells may have owned business related property, I believed and still believe that I do not own any business-related property.

48. I understand that the Plaintiff has alleged that I failed to list the Sparrell Note as an asset in my schedules and that my failure to do so was a knowing and intentionally false statement. My understanding was, and is, that the Sparrell Note was an asset of Sparrells, and not my asset. I believed that I had complied with my obligation to disclose all of my assets by listing my equity interest in Sparrells.

49. I understand that the Plaintiff has alleged that I have failed to list a lifetime membership at the Scituate Harbor Yacht Club as an asset in my schedules. My "lifetime" membership is an agreement that I do not have to pay annual dues to the Scituate Harbor Yacht Club but instead pay for any service or facility that I use when I use it. I cannot sell or transfer the membership. Where I could not sell or transfer it, when I signed the schedules I did not understand that the membership might be considered to be an asset.

50. In the statement of financial affairs that was filed in my bankruptcy, there was a question that asked if within 2 years before I filed for bankruptcy, I had given a financial statement to anyone about my business. (ECF doc 12, page 46, ¶28). I answered that question no. As is set forth above, starting no later than 2011, Brendan had been primarily responsible for the day to day operations of Sparrells and it was through Brendan's efforts that the financing with Live Oak Bank was arranged. Brendan also assisted me in preparing the schedules and statement of financial affairs. I am now aware that a Balance Sheet for Sparrells as of March 31, 2016 was submitted by Sparrell to Live Oak Bank. I believe that the Balance Sheet was given by Brendan to Live Oak Bank during 2016. At the time that I signed the statement of financial affairs I had no knowledge that the statement had been

submitted and only learned of it when the motion for summary judgment was filed.

Signed under the penalties of perjury, August 9, 2019.

_____
Robert R. McNamara