## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>Robert R. McNamara,<br>　　　　Debtor | Chapter 7<br>Case No. 17-11329-MSH |
| THE BANK OF CANTON<br>　　　　Plaintiff,<br>v.<br><br>ROBERT R. MCNAMARA,<br>　　　　Defendant. | Adversary Proceeding<br>No: 18-1022 |

## PLAINTIFF, THE BANK OF CANTON'S, PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's Order of February, 19, 2020, Plaintiff, The Bank of Canton (the "Plaintiff" and/or "Bank") proposes the following findings of fact and conclusions of law with respect to the proceedings on its Complaint to deny the Defendant/Debtor, Robert R. McNamara (the "Debtor") a bankruptcy discharge under 11 U.S.C. § 727(a)(4) for using, making and presenting false oaths and accounts and withholding information and records(Count I), under 11 U.S.C. § 727(a)(5) for failure to satisfactorily explain loss of assets(Count II) and under 11 U.S.C. § 727(a)(2) for fraudulent transfer or concealment of property(Count III).  Based on the record of evidence presented at trial and within the proceedings of this case[1], a finding in favor of the Plaintiff is warranted on all Counts pursuant to Fed. R. Bankr. P. 7052.

## I.　　Overview

A two day trial was held on February 18 ("Day-1") and 19 ("Day-2"), 2020, for the claims alleged in the Plaintiff's Complaint.  Two witnesses testified: (i) Michael Lindberg

---

[1] The Court may take judicial notice of the public records within its files including documents in the Debtors' case. *See* In re O'Neal, No. 10-22931-JNF, 2011 Bankr. LEXIS 2074, at *2 n.1 (Bankr. D. Mass. May 23, 2011) (citations omitted).

("Lindberg") who is the Senior Vice President and Senior Lending Officer for the Bank and also

the head of its workout group involving troubled loans; and (ii) Brendan McNamara

("Brendan"), the Debtor's son.  The Debtor was unavailable to appear at trial due to illness and

the Parties each offered select portions of the transcripts from the Debtor's depositions which

were admitted into the record.  *See* Supplement to Joint Pretrial Memorandum ("Supp.JPT"),

Docket 99.[2]   Certain facts were admitted to by the Parties in their Joint Pretrial Memorandum

and are referenced herein as Admitted Fact ("AF"). *See* Docket 95, at Section J.  Other evidence

referenced herein is established by the trial Exhibits ("Ex."), trial testimony of the witnesses,

sworn statements of the Debtor during other court proceedings that were admitted as evidence at

trial and court filings of this case including the Debtor's Affidavit in Opposition to Plaintiff's

Summary Judgment (the "Debtor's Affidavit").[3]

## II.   Findings of Fact (*General Background*)

### A.  Relationship of the Parties

1.      Plaintiff is a Massachusetts corporation having its usual place of business at 490

Turnpike Street, Canton, MA.  AF 1.

2.      Debtor is an individual residing at 273 Chief Justice Cushing Highway, Scituate,

MA. AF 2.

3.      The Debtor and his wife Alice E. McNamara ("Alice") had certain loan

obligations with the Bank that went into payment default in July 2014 and resulted in years of

litigation between them.  Lindberg, 28:12-15.

4.       The loans consisted of:

---

[2] Debtor suffered a stroke several months before trial and was physically unable to appear.

[3] All citations to the trial transcript are herein cited as "Witness Name, Page #:Line #"  Unless otherwise specified, the trial day transcript reference is Day-1.

(a) A promissory Note in favor of the Bank dated November 9, 2007, in the original principal amount of $746,250 ("Note-1") that was secured by a first Mortgage on the Debtor and Alice's former residence at 31 Central St., Norwell MA (the "Mortgaged Property"). AF 8, AF 9, Lindberg, 26:6-27:9, Ex 1, Ex 2; and

(b) A promissory note in favor of the Bank dated February 1, 2008, in the original principal amount of $50,000 ("Note-2") that was secured by a second Mortgage on the Mortgaged Property.  AF 10, Lindberg, 27:13-23, Ex 3.

5.    The Bank's efforts to workout a repayment scheduled for the loans were unsuccessful.  Lindberg, 29:7 and 30:20.

6.    On or about June 11, 2015, the Bank foreclosed on its first Mortgage on the Mortgaged Property by way of a public auction (the "Foreclosure Sale.") AF 17, Lindberg, 33:6-8, Ex 4.

7.    At the Foreclosure Sale, the Bank made a successful bid of $600,000 and acquired the Mortgaged Property under Foreclosure Deed.  AF 18, Lindberg, 34:9, Ex 4.

8.    As result of the Foreclosure Sale, the Bank alleges a deficiency resulted in the amount of $156,732.44 (the "Deficiency") as to Note-1.  AF 19, Lindberg, 34:22 – 35:7, Ex 9.

9.    The Debtor and Alice did not voluntarily surrender the Mortgaged Property after the Foreclosure Sale forcing the Bank to take costly and protracted eviction measures, including a summary process action in the Housing Court which the Debtor appealed and, despite a settlement, a physical removal by constable was necessitated (the "Eviction Process").  Lindberg, 36:16 – 40:1.

10.     During the Eviction Process the Debtor and Alice trashed the Mortgaged Property and upon departure, left the premise in extremely poor condition having stripped, removed and stolen the kitchen and bathroom fixtures from the property as well as anything else of value. Lindberg, 40:7 – 41:7.

11.     During the Eviction Process, the Parties were engaged in two other on-going collection cases:

(a)     On or about November 18, 2015, the Plaintiff brought suit against the Debtor and Alice to enforce the obligations of Note-2 in the Norfolk Superior Court, Case No. 1582CV01506, resulting in judgment against the Debtor and Alice in the sum of $43,615.37 on or about June 29, 2016 (the "Norfolk-Judgment.") AF 20, Lindberg, 44:7 – 48:1, Ex 5, Ex 7.  In this action ("Suit on Note-2"), the Bank obtained an injunction precluding the Debtor form dissipating his ownership interests in businesses which he had an interest, Sparrell Funeral Services, Inc. ("Sparrell") and McNamara Associates, LLC ("McNamara Associates") and restraining Sparrell from paying any monies to the Debtor outside of wages due so that the interests and funds could eventually be reached and applied to the indebtedness on Note-2 (the "Injunction")  Ex 6, Lindberg 46:10 – 47:11.

(b)     On or about August 15, 2016, Plaintiff commenced civil action against the Debtor and Alice in the Norfolk Superior Court, Docket No. 1682CV01049, seeking judgment for the Deficiency balance and reach and apply equitable claims involving Debtor's interest in Sparrell  (the "Deficiency Action.") AF 21, Lindberg 49:25 – 50:12, Ex 9.

4

12.     On or about April 13, 2017 (the "Petition Date"), the Debtor filed a petition

seeking relief under Chapter 7 of the Bankruptcy Code case No. 17-11329-MSH (the "Ch.7

Case") AF 37, Ex 30.

13.     The Bank's Deficiency Action was automatically stayed by the Debtor's Ch. 7

Case.  Lindberg 51:10 -18.

**B.     The Debtor's Ch. 7 Schedules and Statement of Financial Affairs:**

14.     On or about April 28, 2017, the Debtor filed Scheduled A-J, Summary of

Schedules, and Statement of Financial Affairs in the Ch. 7 Case.  AF 38, Ex 31.

15.     In response to Question 19 of Schedule A/B regarding Debtor's financial assets in

non-publicly traded stock and interests in incorporated and unincorporated businesses, including

an interest in an LLC, partnership, and joint venture, the Debtor identified having "100%"

ownership in "Sparrell Funeral Services, Inc." ("Sparrell") and that the current value of the

portion owned by the Debtor was "$0.00."  AF 39, Ex 31.

16.     The Debtor stated "No" in response to Question 35 of Schedule A/B regarding

any financial assets you did not already list.  AF 39, Ex 31.

17.     The Debtor stated "No" in response to Question 37 of Schedule A/B asking "do

you own or have any legal or equitable interests in any business-related property?"  AF 40, Ex

31.

18.     The Debtor stated "No" in response to Question 44 of Schedule A/B regarding

any business-related property you did not already list.  AF 41, Ex 31.

19.     The Debtor stated "No" in response to Question 53 of Schedule A/B asking "Do

you have other property of any kind you did not already list? *Examples*: Season tickets, country

club membership.  AF 42, Ex 31.

20.     The Debtor stated "No" in response to Question 28 of the Statement of Financial Affairs asking "within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties." <u>AF 44</u>, <u>Ex 31</u>.

C.     **<u>Sparrell:</u>**

(i) **<u>Pre-2011 Operations and Fallout from Misappropriated Pre-Needs</u>**

21.     Sparrell Funeral Services, Inc. ("<u>Sparrell</u>") is a Massachusetts corporation organized on July 27, 1983 by the Debtor and his now deceased brother, John B. McNamara ("<u>John</u>").  From the date of its organization in 1983 until 2011, the Debtor and John each held equal ownership of Sparrell.  <u>AF 3</u>, <u>Brendan, 106:25 – 107:1</u> and <u>Day-2, 277:17-25</u>.

22.     McNamara Associates, LLC ("<u>McNamara Associates</u>") was a Massachusetts limited liability company that was organized on July 28, 1999.  From 1999 through 2010 John and the Debtor were the Managers of McNamara Associates.  <u>AF 4</u>.

24.     The Debtor and John were equal owners of McNamara Associates.  <u>Brendan 106:21</u> and <u>Brendan, Day-2, 277:17-25</u>.

25.     Sparrell and McNamara Associates had been engaged in the business of owning and operating certain funeral home businesses doing business as McNamara-Sparrell Funeral Homes with locations in Cohasset at 1 Summer Street, Cohasset, MA (the "<u>Cohasset Property</u>"), Norwell at 30 Central Street, Norwell, MA (the "<u>Norwell Property</u>") and Brighton, MA.  <u>AF 5</u>, <u>Brendan 105:3</u>.

26.     The Debtor, through Sparrell, operated the funeral homes at the Cohasset Property and Norwell Property. <u>AF 6</u>.

27.     The Debtor and John acquired the Cohasset and Norwell Properties in 1983 and held title as joint individual owners until 1999 when they transferred the properties to McNamara Associates.  Brendan 165:21, Ex. 87.

28.     Ownership of the real estate at the Cohasset Property and Norwell Property was held by the McNamara Associates since on or about 1999.  AF 7, Brendan 106:10.

29.     In connection with its business practices, Sparrell offered pre-need arrangements allowing clients to pre-pay and plan their funeral services in advance of death.  Legally and contractually, Sparrell was obligated to hold any pre-need funds it received in trust until such time that the funeral services needed to be performed as triggered by the client's death.  Brendan 114:24 – 115:16.  The laws governing pre-need arrangements strictly dictates that the ownership of the pre-need funds (the "Pre-Needs") remains with the families even though deposited with Sparrell in trust under a corresponding pre-need contract.  Brendan 190:2-24.

30.     In 2011, it was discovered that roughly $243,000 of Pre-Needs funds deposited with Sparrell was missing.  Brendan 114:20.

31.      At the time, the Debtor was under probation with the Board of Registration of Funeral Directors and Embalmers (the "Licensure Board") for an incident involving a forged death certificate.  Ex 27 E (*see internal Consent Agreement*).  One of the Debtor's employees notified an inspector at the Licensure Board about the forgery and triggered an investigation.  *See* Debtor's Deposition of March 8, 2019 attached as Exhibit B to Supp,JPM (Docket 99) ("Depo.3/8/19") at 21:7.  The Licensure Board brought a formal Compliant resulting in sanctions against the Debtor which included a year suspension of the his license to practice as an embalmer and a two year probation which he was serving when the misappropriation of the Pre-Needs was discovered.

32.     At deposition, the Debtor acknowledged that he was "scared stiff" that the misappropriations had been discovered.  <u>Depo.3/8/19</u> at 86:11.

### (ii)     <u>Debtor's Indemnification of John and Settlement Agreement</u>

33.     On or about February 7, 2011, the Debtor and John entered an Asset Purchase Agreement in which John was, in all respects, disengaging from Sparrell and selling his common stock in Sparrell to Robert or Sparrell (the "<u>Asset Purchase Agreement</u>").  <u>Ex 10</u> (*see second WHEREAS clause*).[4]

34.     The brothers engaged professional accountants and appraisers to provide a value of the two businesses (Sparrell and McNamara Associates) and their respective interests in both. <u>Ex 10</u> (*see third WHEREAS clause*).

35.     The Debtor was not financially able to buyout John's 50% stock interests in Sparrell as required by the Asset Purchase Agreement.  <u>Ex 10</u> (*at fourth WHEREAS clause*), <u>Brendan 109:10</u>, <u>Depo.3/8/19, 85:4-17</u>.

36.     On or about August 31, 2011, the Debtor entered a Settlement Agreement with John, Sparrell, McNamara Associates and MHF Liquidating Company, Inc. (the "<u>Settlement Agreement</u>").  <u>AF 11</u>, <u>Ex 10</u>.

37.     In part, the dispute to which the Settlement Agreement pertains involves certain claims that John asserted against the Debtor for mismanagement which could result in liability for John.  According to the Debtor, as of August 2011, the liability consisted of approximately $246,000 for prepaid funeral obligations for which Sparrell could not account (the "<u>Pre-needs Obligations</u>").  <u>AF 12</u>, <u>Ex 10</u>, *see also* <u>Brendan 111:17and 112:16.</u>

---

[4] The Asset Purchase Agreement was not produced to Plaintiff during discovery.  <u>Brendan 104:2.</u>

38.     Under the Settlement Agreement, the Debtor agreed to indemnify John for all claims involving the misappropriated the Pre-needs Obligations ("John's Indemnification"). Brendan 114:16.

39.     The Debtor wanted to continue operations of Sparrell but couldn't afford to buy out John's interests under the Asset Purchase Agreement accordingly he entered the Settlement Agreement which provided a mechanism for the Debtor to proceed with Sparrell's business at the Cohasset and Norwell Properties.  Ex 10 (*see fourth – seventh WHEREAS clauses).*

40.     Pursuant to the Settlement Agreement, the Debtor transferred his membership interest in McNamara Associates to John, John transferred his stock in Sparrell to the Debtor and the Debtor and Sparrell agreed to indemnify and hold harmless John and certain entities controlled by John from any and all claims, liabilities, actions, causes of actions, losses, or damages of any kind or nature arising out of or threatened by any person for Debtor's and Sparrell's failure to have adequately funded and appropriately evidenced the Pre-Needs Obligations.  AF 13, Ex 10.

41.     In connection with the Settlement Agreement, Sparrell and McNamara Associates entered a written Lease Agreement dated August 31, 2011 whereby McNamara Associates agreed to lease the Cohasset Property and Norwell Property to Sparrell (the "Lease").  AF 14, Ex. 11.

42.     The Lease had an initial five-year term, with an option to extend under certain conditions specified in the Lease. The Lease included an option for Sparrell to purchase the Norwell and Cohasset Properties from McNamara Associates. AF 15, Ex 11.

43.     The Lease had triple net obligations requiring Sparrell to pay all expenses of the properties, plus monthly payments due directly to Eastern Bank under a preexisting mortgage

and an additional monthly base rent in the amount of $2,000.00 due to McNamara Associates.

Ex 11, Brendan 118:17-19, 119:4 – 12.

44.     The Option to Purchase provision of the Lease, established an agreed to purchase price for the Cohasset and Norwell Properties in the total sum of $1,322,000.  The option also provided that all rent and mortgage payments made by Sparrell would be credited against the purchase price if exercised.  Ex 11, Brendan 118:14.

**(ii)   Post-2011 Settlement**

**(a) Operations and payment of personal expenses**

45.     Under the 2011 settlement, the Debtor took 100% ownership of Sparrell.

Brendan, Day-2, 296:14.

46.     At all relevant times following the 2011 Settlement Agreement until November 7, 2016, the Debtor's son, Brendan McNamara ("Brendan") was employed by Sparrell.  AF 16.

47.     While under their management and control, the Debtor and Brendan paid various personal expenses through Sparrell's business accounts, including:

(i)     Personal Mortgage payments due from the Debtor and Alice on their Mortgaged Property to the Plaintiff under Note-1 and Note-2.  Lindberg 60:1-7, Brendan, Day-2, 269:16, 270:9 -11, Ex 91;[5]

(ii)    Personal student loans for the Debtor's adult children due to the following creditors: AES, ACS, Sallie Mae and Navient.  Brendan, Day-2, 270:21- 271:32;[6]

---

[5] Trial Exhibits 33 – 42 consist of Sparrell's operating account General Ledgers from 2011 to 2017 (the "General Ledgers").  The General Ledger further evidence Debtor's payment of personal Mortgage payments to the Bank through Sparrell's business account.  *See*:   Ex 33 at pp. 2, 6, 8 17, 26, 28, 37 and 40;  Ex 34, at pp. 6, 12,16, 25 and 28; Ex 35, at pp. 3, 7, 11, 15, 18 and 21; Ex 36 at pp. 3, 15, 19, 22; and Ex 37 at pp. 8, 13, 18 and 21.

[6] As admitted by Brendan, the General Ledgers further evidence that the student loans for his siblings were made through Sparrell's business accounts from 2011 forward.  *See* General Ledgers at Ex 33 at pp.2, 6, 7, 18, 24, 25, 31 and 40;  Ex 34, at p. 21;  Ex 37 at pp. 3 and 6;  Ex 38 at pp. 5 and 6; and  Ex 40, at p. 8 and 9.

(iii)   Personal dues and fees to maintain Brendan's membership at the Scituate Country

   Club. <u>Brendan, Day-2, 272:1 and 13</u>;[7] and

(iii)   Personal dues and fees to maintain Debtor and Brendan's memberships at the

   Scituate Harbor Yacht Club. <u>Brendan, Day-2, 272:3 and 13.</u>[8]

### (b)  <u>Acquisition of the Cohasset and Norwell Properties and Use of Corporate Loan Proceeds to Payoff Personal Obligations</u>

### (i)  <u>Loan needed to complete the buy out</u>

48.   Under the Settlement Agreement, the Debtor was required to provide John an

accounting of the missing Pre-need Obligations and repay and fund the misappropriated Pre-need

Obligations in full as a precondition to exercising the Option to Purchase. <u>Ex 10</u> (at ¶11),

<u>Brendan 121:10 -24.</u>

49.   In 2016, the Debtor and Brendan unsuccessfully attempted to exercise an option

to extend the term of the Lease and enlarge the time in which they could exercise the Option to

Purchase. <u>Brendan 122:14 – 123:2.</u>[9]

50.   Between 2011 and 2016 Brendan and the Debtor were able to partially reduce the

liability of the Pre-need Obligations by working preneed funeral services as needed without

giving notice to those clients that their Pre-Need funds had been misappropriated. <u>Brendan</u>

<u>116:8-13</u>, <u>Depo.3/8/19,  96:5-18.</u>

---

[7] Payments are further evidenced by the General Ledgers. *See* <u>Ex 33</u> at pp.2, 14, 26, 28, 40 and 44;  <u>Ex 34</u>, at pp. 6, 11, 17, 22, 25.

[8] *See also* General Ledgers: <u>Ex 33</u> pp. 6, 9, 19 and 26; and <u>Ex 34</u>, at pp. 11 and 13.

[9] At the time, John was ill and his wife was applying pressure and threatening to sell the Cohasset and Norwell Properties to third parties if the Debtor could not exercise the Option to Purchase. <u>Brendan 123:2-4,  Debtor Depo.3-8-19 85:4-17.</u>

51.     By September 2016, the amount of outstanding Pre-need Obligations was reduced to $175,000.  Depo.3/8/19, 95:24, Brendan 179:19.

52.     As the Option to Purchase deadline approached, the Debtor and Sparrell did not have the financial ability to fund the outstanding Pre-need Obligations necessary to exercise the Option to Purchase and needed to obtain a loan that was sufficient to fund the purchase of the real estate and satisfy the $175,000 outstanding Pre-need Obligations.  Brendan 126:11, Brendan, Day-2, 343:7.

**(ii)**     **Acquisition Loan and application process and closing**

53.     To fund its purchase of the Cohasset and Norwell Properties, Sparrell obtained a loan through Live Oak Banking Company (the "Acquisition Loan") secured by mortgages on the Cohasset and Norwell Properties. AF, 24.[10]

54.     Brendan's brother-in law, Angelo Medici, was a lending officer at Live Oak Banking Company and assisted Brendan and the Debtor in obtaining the Acquisition Loan. Brendan 128:15 – 129:9.  Angelo Medici's assistance was needed because the Debtor had zero credit and no standing to guarantee anything. Brendan 135:16.

55.     In connection with the Acquisition Loan, Sparrell provided financial documents including business tax returns, balance sheets and profit and loss financial statements to Live Oak Banking Company. AF 26.

56.     Numerous financial statements concerning Sparrell were provided to Live Oak Banking Company in connection with the Acquisition Loan application process including:

(i)     Sparrell's tax returns.  Brendan 134;12;

---

[10] The Acquisition Loan was also guaranteed by the Debtor, Brendan and by Brendan's wife, Melissa McNamara. AF, 25.

(ii)     Completed on-line forms including a Borrower Information Form by Sparrell signed by the Debtor and dated May 31, 2016, requiring certification of the truth and accuracy of information provided in the application and supporting documents. Ex 59, Brendan 134;12, 136:24 – 138:2;

(iii)    Personal Financial Statement by the Debtor and Alice dated May 31, 2016. Ex 76, Brendan 138:9 – 140:9;

(iv)     Management resume concerning Sparrell signed by the Debtor dated May 31, 2016.  Ex 77,  Brendan 140:12-22;

(v)      Business Debt Schedule for Sparrell signed by the Debtor dated May 31, 2016. Ex 79, Brendan 141:3-21;

(vi)     Sparrell's Profit and Loss statement January – May 2016. Ex 75, Brendan 142:13-143:2;

(vii)    Sparrell's Profit and Loss statement January – March 2016. Ex 81, Brendan 142:8-19;

(viii)   A Call Activity, Market Share and Pre-Need Summary detailing Sparrell's call activities from 2012 to May 31, 2016, Outstanding Pre-need contracts in backlog and Pre-Need contract dollars in backlog as was audited by the State's inspection in April 2016.  Ex 90, Brendan, Day-2, 212:4 – 213:15;

(ix)     Request for Transcript of Tax Return authorizing the IRS to release Sparrell's tax returns for tax years 2012, 2013, 2014 and 2015, bearing the Debtor's signature dated July 26, 2016.[11]  Ex 78, Brendan 149:14- 150:8;  and

---

[11] Brendan acknowledged that the Debtor gave Brendan permission to sign Debtor's name and that the Debtor was aware it was being completed in order to expedite the loan process.  Brendan 150:5-7.

(x)     A Certification of Tax Return/Financial Statement as to Sparrell's Tax Returns for

2011, 2012, 2013, 2014 and 2015, Balance Sheet as of 3/31/2016 and Profit and

Loss statement for January 1, 2016 – March 31, 2016 and January 1, 2016 – May

31, 2016 bearing the Debtor's signature dated July 22, 2016. Ex 83, Brendan

159:18 – 160: 1.

57.     Certain of the foregoing information, forms and documents were uploaded and

submitted to Live Oak Banking Company via an on-line portal. Brendan 134:17.

58.     The Debtor was aware of the application process with Live Oak Banking

Company and kept aware of it.  Brendan 140:18-23.

59.     The Debtor was aware that Brendan was signing certain loan application

documents on his behalf and submitting them to Live Oak Banking Company. Brendan 151:1-8,

153:2 – 154:8, 158:19, and 161:12 and Ex. 86.

60.     The Debtor also signed a loan commitment letter with Live Oak Banking

Company dated July 15, 2016, acknowledging among other things Sparrell's financial reporting

requirements. Ex 69, Brendan 144:5–14, and 146:24- 148:14.

61.     The Acquisition Loan closed on or about September 23, 2016.  Brendan 169:10.

62.      At the closing, the Debtor signed a numerous loan documents acknowledging the

transaction and his awareness of the transaction, including:

(i)     A corporate vote by Sparrell. Ex 60, Brendan 169:25;

(ii)    Assignments of Architect's Contracts on behalf of Sparrell. Ex 62, Brendan

170:3;

(iii)   Assignment of Construction Contracts on behalf of Sparrell. Ex 63, Brendan

170:6;

14

(iv)    U.S. Small Business Administration Assurance of Compliance for

Nondiscrimination on behalf of Sparrell. Ex 64, Brendan 170:10;

(v)     Borrower's Certification on behalf of Sparrell acknowledging, among other things

that *"[t]here has been no adverse change in [Sparrell's] financial condition,*

*organization, operations, or fixed assets since the date the loan application was*

*signed"*. Ex 67, Brendan 169:15 - 171:11;

(vi)    Construction Loan Agreement on behalf of Sparrell.  Ex 70, Brendan 171:15;

(vii)   Cooperation Agreement individually and on behalf of Sparrell.  Ex 71, Brendan

171:24;

(viii)  Promissory Note in the original principal amount of $1,390,000 on behalf of

Sparrell in favor of Live Oak Banking Company. Ex 14;

(ix)    Mortgage and Security Agreement on behalf of Sparrell in favor of Live Oak

Banking Company for the Cohasset Property and the Norwell Property. Ex 15 and

16; and

(x)     A Settlement Statement (HUD-1) on behalf of Sparrell as borrower to the loan

transaction.  Ex 17; Brendan 173:2.

**(iii)    Proceeds of Sparrell's Acquisition Loan used to pay Debtor's personal
obligations**

63.    The following disbursements are included in the Settlement Statement (HUD-1)

for the closing on the Acquisition Loan and Sparrell's purchase of the Cohasset and Norwell

Properties:

(i)     $42,069.61 paid to the Plaintiff for the sums due from the Debtor and Alice on the

Norfolk Judgment; and

(ii)     $<u>175,000.00</u> paid to Forethought to satisfy the Pre-Needs Obligations.

<u>AF</u>, 28, <u>Ex. 17</u>.

64.     The $175,000 outstanding Pre-Needs Obligations needed to payoff off John's

Indemnification was a personal obligation of the Debtor.  <u>Depo.3/8/19 89:10</u>.

**(c) <u>Pre bankruptcy shifting and siphoning of assets to an insider with the intent to diminish Sparrell's value.</u>**

**(i)     <u>Sparrell's Assets</u>**

**(a) <u>Real Estate Holdings valued at $1,811,000</u>**

65.     In connection with the Acquisition Loan, Live Oak Banking Company obtained

appraisals which stated that as of August 12, 2016, the Norwell Property had an appraised value

of $811,000.00 and the Cohasset Property had an appraised value of $1,000,000.00.  <u>AF 27</u>,

<u>Brendan 188:2</u>.

66.     On or about September 27, 2016, Sparrell acquired the Norwell Property from

McNamara Associates for consideration of $440,000.00 pursuant to a Quitclaim Deed recorded

at the Plymouth County Registry of Deeds.  <u>AF 22</u>, <u>Brendan 125:9</u>, <u>Ex 13</u>.

67.     On or about September 27, 2016, Sparrell acquired the Cohasset Property from

McNamara Associates for consideration of $660,000.00 pursuant to a Quitclaim Deed recorded

at the Norfolk County Registry of Deeds. <u>AF 23</u>, <u>Brendan 124:9</u>, <u>Ex 12</u>.

**(b)     <u>Other business assets</u>**

68.     Debtor's Personal Financial Statement to Live Oak Banking Company and the

U.S. Small Business Administration submitted in connection with the Acquisition Loan certified

that as of May 31, 2016, the value of his 100% ownership interest in Sparrell was $475,000.  <u>Ex</u>

<u>76</u>, <u>Brendan 138:14 – 140:9</u>.

69.     Sparrell's Balance Sheet as of March 31, 2016 states that the value of its Goodwill was $100,000 (Ex 82) which Debtor certified to be "true and correct." Ex 83.

70.     As of April 2016, Sparrell reported that it held 60 pre-need contracts that had a total receivable value of $369,809.63.  This information was included in the Call Activity, Market Share and Pre-Need Summary that was disclosed to Live Oak Banking Company during the application process for the Acquisition Loan and was allegedly compiled in connection with a preneed audit routinely compiled by the State. Ex 90, Brendan, Day-2 212:4 – 213:15.

**(ii)     Evidence of Debtor's Intent to Gift Sparrell to Brendan**

71.     On or about May 1, 2016, the Debtor and Brendan executed a Letter of Intent to Gift Business which was delivered to Live Oak Banking Company.  AF 29, Ex 19.

72.     The Letter of Intent to Gift Business expressly states the Debtor's desire and intent to gift Sparrell to Brendan and that:

> This gift shall be inclusive if any business, property, assets, etc., and all aspects relating  to.  There will be no cash exchange or sale price; this business will be 100% gifted.
>
>  The final agreement arranged between myself and Brendan M. McNamara at a date no later than September 12, 2016, but may occur any time before that.

Ex. 19.[12]

73.     In addition to the Letter of Intent to Gift Business, other representations were made to Live Oak Banking Company acknowledging that the Debtor "is fully aware he has to stay on the [Acquisition Loan] as a guarantor" and that the Debtor "would stay on fully as guarantor after the gifting of the business as required."  Ex 87 (*e-mail from Brendan Wed, Jul 6, 2016 at 11:52 AM*).

---

[12] The Letter of Intent to Gift Business is executed by the Debtor, Brendan and a third party witness.  Brendan testified that he signed the document for both he and the Debtor and that the Debtor was aware of the Letter of Intent to Gift Business. Brendan 182:8-14.

**(iii)** **Draining Sparrell**

74.    In preparation of the plan to flip Sparrell's assets, Brendan organized a new realty

holding company and an operating entity:

(i)    On or about October 5, 2016, Brendan and his wife Melissa McNamara

("Melissa") organized BM Mack Properties, LLC ("BM Mack") a Massachusetts

limited liability company engaged in the business of commercial property

management.  AF 30; and

(ii)    On or about October 19, 2016, Brendan organized BM McNamara Funeral

Services, Inc. ("BM McNamara") a Massachusetts corporation engaged in the

business of burial, cremation and funeral services.  AF 31, Brendan 183:16 –

184:2.

75.    In effort to give the appearance that the siphoning of assets was a transaction with

fair consideration, the Debtor and Brendan executed certain transfer agreements on behalf of

their respective companies:

(i)    Sparrell and BM Mack executed a Real Estate Purchase and Sale Agreement

dated November 7, 2016 concerning the Cohasset and Norwell Properties (the

"P&S").  AF 32, Brendan 185:20 – 186:20, Ex 22; and

(ii)    Sparrell and BM McNamara executed an Asset Purchase Agreement dated

November 7, 2016 concerning substantially all of Sparrell's assets (the "Asset

Agreement").  AF 33, Brendan 188:12 – 191:6, Ex 23.

76.    Per the Asset Agreement, the assets being transferred from Sparrell to BM

McNamara included Sparrell's goodwill and the right to use all names and tradenames,

equipment, fixtures, signage, prepaid expenses, including its domain name McNamara-

Sparrell.com and the contents of the website, customer lists and any existing right to the

customer accounts, all existing advertising contract with all vendors, trade secrets, all stationary

and business forms relating to Sparrell's business, sales data and records, including accounting

records, property records, production records, contract records, personnel records of Sparrell's

employees, all rights to telephone numbers used in the operation of the business.  Ex. 23, pp. 2-3,

Brendan 189:18-25.

77.     Additionally, letters were sent to all parties to pre-need contracts with Sparrell

requesting permission to transfer the pre-needs to BM McNamara, of which only "one or two"

declined the transfer. Brendan 190:6-20.

78.     No cash was exchanged between any of the entities in connection with the

transfers under the P&S and Asset Agreement.  Instead, as documented by the agreements, the

arrangement called for:

(i)     The total purchase price for the Cohasset and Norwell Properties was only

$1,615,000 consisting of:

(a)     BM Mack's assumption of payments due to Live Oak Banking Company

under the $1,390,000 Acquisition Loan (referenced in the P&S as the

"Bank Debt").  Ex 22 (*at pp. 2 and 4*); and

(b)     $100,000 per property (total $200,000) which was made payable under a

promissory note.

(ii)    The purchase price for Sparell's assets being transferred under the Asset

Agreement was only $25,000 which was made payable under a promissory note.

Ex 23 (*at p.5*).

79.     Under the Asset Purchase Agreement BM McNamara agrees to indemnify and

hold Sparrell and the Debtor (*as its stockholder, officer, employee and director*) harmless from

claims and liabilities relating to the Acquisition Loan. In relevant part, the Asset Purchase

Agreement provides as follows:

> "[BM McNamara] shall indemnify, defend and hold [Sparrell] and its stockholders,
> officers, directors, employees and affiliates of any kind or description (collectively,
> "Seller Indemnitees") harmless from, against and in respect of any and all losses,
> claims, damages, actions and liabilities, including costs and expenses (including
> without limitation, reasonable attorney's fees) that [Sparrell] or Seller Indemnitees
> may suffer, incur, sustain, or be subject to or relating to or arising out of relating to (i) any claims
> of or liability to any third parties which relate to the conduct of the Business,
> products sold or services provided by [BM McNamara] after the Closing, (ii) **any
> failure by [BM McNamara] to pay or discharge any liability of [BM
> McNamara], incluing without limitation the Assumed Liabilities…**"

Ex 23 (*at p.12*) emphasis added.

80.     By its express terms, the Asset Agreement provides that "Assumed Liabilities"

means "…that a portion of the purchase price herein is being paid by [BM McNamara] through

the assumption of the Bank Debt.  Ex 23 (*at p. 8*).  Elsewhere in the Asset Agreement, "Bank

Debt" is described as "… recently [Sparrell] borrowed funds in the amount of $1,390,000 (the

"Bank Debt"); for the business locations and operations of the business, which was personally

guaranteed by Brendan McNamara, the principal of [BM McNamra] and [BM Mack Properties]

LLC."  Ex 23 (*at p.1*).

81.     BM Mack and BM McNamara executed a Promissory Note dated November 7,

2016 payable to Sparrell in the principal amount of $225,000 (the "Sparrell Note.")   AF 36, Ex

24.[13]

---

[13] The $225,000 principal amount of the Sparrell Note consists of the $100,000 sale price per property (total
$200,000) plus the $25,000 sale price for the business assets under the Asset Agreement.  Brendan 187:7, Brendan
Day-2 215:23.

82.     On or about November 7, 2016, Sparrell executed a Quitclaim Deed transferring the Norwell Property to BM Mack for stated consideration of $100,000.00 pursuant to a Promissory Note which was recorded at the Plymouth County Registry of Deeds on November 8, 2016 (the "Norwell Deed.")  AF 34, Ex 21.

83.     On or about November 7, 2016 Sparrell executed a Quitclaim Deed transferring the Cohasset Property to BM Mack for stated consideration of $100,000.00 pursuant to a Promissory Note which was recorded at the Norfolk County Registry of Deeds on November 8, 2016 (the "Cohasset Deed.")  AF 35, Ex 20.

### (iii)     Post-draining Operations from November 7, 2016 – October 25, 2018

84.     BM McNamara obtained its own Funeral Establishment License on or about October 25, 2018.  Previously the businesses at the Cohasset and Norwell Properties had been operated under Sparrell's license.  AF 47.

85.     Applications to Change Ownership for the funeral establishments operating at the Cohasset and Norwell Properties from Sparrell to BM McNamara were not filed with the State's Licensure Board until July 18, 2018. Ex 27A and Ex 27C (the "Change of Ownership Applications"), Brendan, Day-2, 218:5.

86.     In his summary judgment affidavit, the Debtor swore that he was retired since on or about November 7, 2016.  *See* Affidavit of Robert R. McNamara in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Debtor's Affidavit") at ¶40 (Docket 84).

87.     At deposition on July 10, 2017, the Debtor testified that his current involvement with Sparrell was "None."  *See* Debtor's Deposition of July 10, 2017 attached as Exhibit C to Supp. (Docket 99) ("Depo.7/10/17") at 17:3.

88.    Brendan testified that on November 7, 2016, Sparrell ceased operations,[14] that as of that date, Sparrell's functions were "None", that Sparrell was "a defunct company" and that November 7, 2016 was Brendan's last day of employment with Sparrell.  Brendan, Day-2, 216:15 – 217:8.[15]

89.    Brendan also testified that from November 7, 2016, his entity, BM McNamara, was conducting funerals at the Cohasset and Norwell Properties.  Brendan, Day-2, 219:25.[16]

90.    On September 7, 2018, a Compliance Officer for the Licensure Board inspected the Cohasset and Norwell Properties and compiled Inspection Reports in connection with the Change of Ownership Applications.  Ex 27B and Ex 27D.  The Inspection Reports clearly indicate that as of September 7, 2018, Sparrell remained in operation – the reports include:

(i)    The Funeral Establishment Numbers (FE Number 386 and 371 respectively) for Sparrell;

(ii)   List the Debtor as the licensee (Lic# 5569) with ownership interests in the locations;

(iii)  Brendan as Sparrell's employee;

(iv)   Notations affirming that the establishment certificate was posted; and

(iv)   An affirmative notation ("OK") that "[a]fter review of location, signage, internal documents, and the establishment certificate, is the funeral home consistently representing itself as the name that appears on the Establishment Certificate"

---

[14] Brendan's Affidavit in Support of Defendant's Opposition to Summary Judgment previously filed in this case also states the same. (Docket 85) at ¶ 27.

[15] During discovery of this case, Brendan avoided deposition as Sparrell's Rule 30(b)(6) designee claiming that he refused to consent to this designation because he was no longer an employee.  *See* Plaintiff's Motion to compel, opposition and audio recording of hearing, Docket 51-55 and 67.

[16] Brendan's claim that the Licensure Board gave him permission to continue operating under Sparrell's license, is not credible nor is there any evidence in the record to support it.

Further no "…discrepancies" were noted to ensure that the Division records

accurate reflect the operating name of the business.[17]

 Additionally, Brendan signed the Inspection Report as the funeral director or employee on site

during the inspection.  Ex 27B and Ex 27D, Brendan, Day-2, 228:20 – 233:3.

91.     From November 7, 2016 the Debtor from time to time assists at the funeral

homes, runs errands and picks up death certificates.  AF 52.

92.     It was legally necessary for the Debtor to be present at the funeral homes and

continue operating under Sparrell's licenses because under the Code of Massachusetts

Regulations, (specifically, 239 CMR 3.04),  BM McNamara was lawfully prohibited from

engaging in the business of embalming and funerals at the Cohasset and Norwell Properties prior

to obtaining its Funeral Establishment License.  Unlike Sparrell, BM McNamara's majority

stockholder (Brendan) did not hold a required Type 3 license and was not operating under the

required direction and control of a Type 3 licensee who would be responsible for ensuring that

the entity complies with all applicable laws and regulations governing embalming and funeral

directing.  Brendan, Day-2, 223:24 – 226:13.

93.     Brendan acknowledged that, legally, the longest period in which a Type 6 licensee

could operate a funeral establishment without a Type 3 licensee available was 90 days. Brendan,

Day-2, 225:14.  He further admitted that there were legal limitations on a Type 6 licensee

handling preneed contracts (Brendan, Day-2, 225:18-22) and limitations on signing and being

listed on death certificates (Brendan, Day-2, 225:3-6).

94.     Debtor's attempt to downplay his involvement at the funeral homes, claiming that

he was merely turning on lights, emptying trash and opening the doors because he  was "just

---

[17] BM McNamara held no Establishment License at the time of the inspection and remarkably the Inspection
Reports are devoid of any comments concerning BM McNamara's operation under Sparrell's license.

trying to supplement", "wasn't employed" but would "just go and see if there was any way [he] could help" was intentionally misleading.  *See*  Depo.7/10/17 16:7-16.

95.     Not only did operations continue under Sparrell's Funeral Establishment Licenses, but also, all financial business transactions continued running through Sparrell's operating account at Eastern Bank, its general expense account at Hingham Institution for Savings and its line of credit at Eastern Bank.   Brendan, Day-2, 254:19 – 255:3.

96.     All receivables and accounts payable for the business continued through Sparrell's operating account after November 7, 2016 (Brendan, Day-2, 254:22.  *See also General Ledgers* Ex 41 (2016) and Ex 42 (2017) and evidence also shows that a number of draws were made on Sparrell's line of credit at Eastern Bank through July 18, 2017.  Ex 28, Brendan, Day-2, 264:4 – 267:18.

97.     Monthly payments due to Sparrell under the Sparrell-Note were paid directly to the Debtor on or about December 22, 2016 in the sum of $950.00 and on or about March 12, 2017 in the sum of $3,800.00.  AF 45, Ex 32.

### (d) **BM McNamara Operations**

98.     Debtor acknowledged that Brendan's companies were operating no different than Sparrell did when it was in operation.  Depo.7/10/17, 22:11 – 20.

### (i) **Debtor's continued involvement**

99.     BM McNamara's Application for Change of Ownership, identifies the Debtor as the only anticipated employee for the Norwell Property.  Ex 27A (at p. 8/13).

100.     On or about October 18, 2018, the Debtor applied for a new Type 6 license with the Licensure Board.  Ex 27E.

101.    On or about January 2, 2019, the Debtor obtained a new Funeral Director and

Embalmer License from the Licensure Board.  <u>AF 51</u>.

102.    At deposition, the Debtor admitted that the purpose for obtaining a new license

was to cover funerals when Brendan is unavailable.  <u>Depo. 3/8/19, 16:22</u>.[18]

103.    As of March 2019, Debtor acknowledged going to the Cohasset and Norwell

Properties regularly as he had free access and the pass codes to enter each location he further

admitted that he continued working wakes and funerals.  <u>Depo.3/8/19 13:22 – 16:22 and 31:8 –

34:22</u>.

104.    On February 19, 2019, the Debtor (*not Brendan*) appeared as representative at a

public meeting before the Licensure Board seeking an extension of time for a deadline to

complete certain construction at the Cohasset Property.  <u>Ex 27C</u> (*at internal Minutes from

Licensure Board Meeting of 2/19/19 at p. 1 and 3*)

**(ii)**    **BM McNamara's checking account and Debtor's improper activities**

105.    BM McNamara did not open its own checking account until April or May 2017.

<u>Brendan, Day-2, 254:19 – 255:6.</u>

106.    Brendan was the only authorized person to sign checks from BM McNamara

account (*Debtor had no signing authority*) <u>Trial Day-1, 77:21</u> (*portion Debtor's deposition

transcript 3/18/19 read into record*).

107.    Evidence showed that the Debtor had access to and regularly wrote checks from

BM McNamara's checking account but was not truthful on this issue when questioned at

deposition:

---

[18] At trial, Brendan purported that it was important for his father to obtain a new funeral director's license (*even
though allegedly unemployed*) in order to "maintain a shred of dignity."  <u>Brendan, Day-2. 243:23</u>. Brendan's
testimony is not credible.

(i)  Debtor lied under oath about signing Brendan's name on BM McNamara Check No. 2546 dated January 14, 2019 payable to the Debtor's dentist.  Ex 44 (at 16th page) *see and compare* Trial Day-1 99:15 – 100:20  and Brendan, Day-2, 263:14–17; [19]

(ii)  There were multiple instances where Debtor signed his own name to checks that were written from BM McNamara's account in connection with matters for the funeral home business, including:

(a)  Check No. 258 dated May 1, 2017, Ex. 44, (1st page),  Trial Day-1, 83:20 – 84:13 and Brendan, Day-2, 258:3-8;

(b)  Check No. 1432 dated February 8, 2018, Ex. 44, (6th page),  Trial Day-1, 85:14 – 86:23 and Brendan, Day-2, 260:21 – 261:3;

(c)  Check No. 2067 dated September 12, 2018, Ex. 44 (9th page), Trial Day-1 91:4 – 92:19 and Brendan, Day-2, 261:23 – 262:1;

(d)  Check No. 2066 dated September 12, 2018, Ex. 44 (10th page), Trial Day-1 93:11–25 and Brendan, Day-2, 262:4–9; and

(e)  Check No. 2068 dated September 12, 2018, Ex. 44 (10th page), Trial Day-1 94:12 – 95:12 and Brendan, Day-2, 262:10-12;

(iii)  Debtor filled out BM McNamara checks for employees and other payables, and denied that he did so under oath at deposition, including:

(a)  Check No. 1313 dated December 23, 2017, Ex. 44, (at 5th page), Trial Day-1, 83:20 – 84:13 and Brendan, Day-2, 258:10 – 259:178;

---

[19] Brendan confirmed that Debtor signed Brendan's signature and Debtor denied it.

      (b)    Check No. 1314 dated December 29, 2017, Ex. 44, (at 3rd page), <u>Trial Day-1, 84:14 – 85:4</u> and <u>Brendan, Day-2, 260:9-15</u>; [20] and

      (c)    Check No. 1315 dated December 29, 2017, Ex. 44, (at 3rd page), <u>Trial Day-1, 85:5 – 10</u> and <u>Brendan, Day-2, 260:17-20</u>.

(iv)    Debtor signed Brendan's name to checks and denied that he did so while under oath at his deposition, including:

      (a)    Check No. 15[6]2 dated April 7, 2018, Ex. 44, (at 7th page), <u>Trial Day-1, 89:24 – 90:13</u> and <u>Brendan, Day-2, 261:4 – 9</u>;

      (b)    Check No. 1958 dated August 13, 2018, Ex. 44, (at 8th page), <u>Trial Day-1, 90:14 – 91:3</u> and <u>Brendan, Day-2, 261:16 – 21</u>; and

      (c)    Check No. 2331 dated November 8, 2018, Ex. 44, (at 14th page), <u>Trial Day-1, 97:19 – 98:23</u> and <u>Brendan, Day-2, 263:4–8</u>.

108.  In at least one other instance, it was discovered that the Debtor "stole" a check from BM McNamara's account, forged Brendan's name and lied about doing so while under oath at deposition.  Specifically, Check No. 2321, was for a personal expense dated November 1, 2018 payable to C.V.S.  <u>Ex 44</u> (at 13th page) *see and compare* <u>Trial Day-1 76:25 – 79:6</u> and <u>Brendan, Day-2, 256:5 – 257:17 and 263:4</u>; [21]

(iii)   **<u>The Pass-through Account</u>**

109.  On or about July 18, 2017, a new checking account was opened in the name of Sparrell at Eastern Bank in which Brendan was the only authorized signor (the "<u>New Account.</u>")

---

[20] The Debtor denied it was his handwriting at his deposition, even though the check bore his authentic squiggle mark and Brendan suggested it was the Debtor's handwriting.

[21] Debtor lied at deposition claiming that Brendan gave him the check.  Debtor even embellished his lie claiming that Brendan said " .. I love you Dad" … "Take a check. Here's a check", that the check was filled out and signed by Brendan and flat out denied forging Brendan's signature.  Brendan acknowledged that the check was stolen and that the signature was not Brendan's.

AF 48.  Brendan was the only authorized signatory on the New Account, even though the Debtor

was 100% owner of Sparrell. Brendan, Day 2, 268:11.

110.    In or around March 2018, the New Account was set on automatic loan payment to

make monthly payments of installments due on Sparrell's Credit Line to Eastern Bank.  AF 49.

111.    In April 2018, BM McNamara obtained a $60,000 SBA loan from Eastern Bank

(the "SBA Loan") and deposited $39,319.53 from the SBA Loan proceeds into Sparrell's New

Account.  AF 50.

112.    The New Account was set up as a pass-through account to mask the fact that BM

McNamara was paying Sparrell's obligations due on the Eastern Bank line of credit.  Brendan,

Day-2, 267:19 – 269:8.

### D.      Additional Relevant Matters as of the Petition Date

113.    As of the Petition Date, Sparrell's obligations were limited to (i) Eastern Bank on

the line of credit in the amount of $45,436.07, (ii) Harbor One Bank in the amount of $4,167.12

and (iii) Live Oak Banking Company in the amount of $1,230,000.  Debtor's Affidavit, ¶45, *see

also* ruling on Plaintiff's Motion in Limine (Docket 106).

114.    At the time of filing Chapter 7, the Debtor had an active lifetime membership to

the Scituate Harbor Yacht Club.  AF, 54.


### III.    Proposed Conclusions of Law and Analysis per Count

### A.  COUNT I

### (1) Proposed Conclusions of Law

115.    It is widely recognized that a core purpose of the Bankruptcy Code is to provide a

fresh start for honest debtors. *See, e.g.,* Gannet v. Carp (In re Carp.), 340 F.3d  15, 25 (2003).

116.    Yet, discharge is a privilege reserved for debtors who fulfill their "unconditional, absolute obligation to make full disclosure of all matters relevant to the administration of the estate." In re Whitehead, 278 B.R. 589, 594 (Bankr. M.D. Fla. 2002).

117.    11 U.S.C. § 727(a)(4) prohibits a Debtor from obtaining discharge through the making, presenting or using a false oath, and provides:

the debtor knowingly and fraudulently, in or in connection with the case—

(A)    made a false oath or account;
(B)    presented or used a false claim;
(C)    gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
(D)    withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

118.    A party asserting a § 727(a)(4)(A) & (B) claim must show that (1) the Debtor knowingly and fraudulently made, presented or used a false oath (2) relating to a material fact in connection with the case. In re Tully, 818 F.2d 106, 110 (B.A.P. 1st Cir. 1987). The burden requires that this be demonstrated by a preponderance of the evidence. Nickless v. Fontaine (In re Fontaine), 467 B.R. 267, 270 (Bankr. D. Mass. 2012).

119.    Once it "reasonably appears" that the oath is false, "the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." In re Mascolo, 505 F.2d 274, 276 (1st Cir. 1974) (citing Shanberg v. Saltzman, 69 F.2d 262 (1st Cir. 1934)).

120.    Non-discharge under § 727(a)(4) may be based on a single false oath. See In re Grondin, 232 B. R. 274, 277 (B.A.P. 1st Cir. 1999). Yet, a pattern of multiple inaccuracies and falsehoods can also rise to the level of reckless indifference to the truth that can amount to the functional equivalent of an intent to deceive. See In re Bren, 303 B.R. 610, 614 (B.A.P. 8th Cir.

2004), <u>Cadel Co. v. Mitchell (In re Mitchell)</u>, 102 Fed. Appx. 860 (5th Cir. 2004)(six mistakes in

debtor's schedules evidence a sufficiently reckless disregard for the truth to warrant denial of

discharge under §727(a)(4)(A)).

121.    It is well established that a "debtor's Schedules and Statement of Financial Affairs

are the equivalent of a verification under oath."  <u>Perry v. Warner</u>, 247 B.R. 24, 26 (B.A.P. 1st Cir.

2000).

122.    A debtor's false statements or misrepresentations in bankruptcy financial

schedules constitute a false oath under § 727(a)(4)(A) because those documents are signed

"under the penalty of perjury."  <u>In re Grondin</u>, 232 B.R. 247, 276 (B.A.P. 1st Cir. 1999); <u>In re</u>

<u>Sowers</u>, 229 B.R. 151, 158 (Bankr. N.D. Ohio 1998).

123.    "Omissions as well as affirmative misstatements qualify as false statements for

[§] 727(a)(4)(A) purposes."  <u>Republic Credit Corp. v. Boyer (In re Boyer)</u>, 367 B.R. 34, 45

(Bankr. D. Conn. 2007).

124.    Discharge under § 727(a)(4) can be denied for a debtor's failure to schedule his

interest in a separate business entity.  <u>Palatine National Bank v. Olson (In re Olson)</u>, 916 F.2d

481, 484 (8th Cir. 1990)(debtor's omission of interest in dinner theater was material because it

related to his business transactions and the extent of his estate).

125.    A material false oath under § 727(a)(4)(A) is one that has "a non-trival effect

upon the estate and the creditors," <u>In re Fontaine</u>, 467 B.R. at 272.

126.    The requirement that a false oath be material is satisfied "if the false oath bears a

relationship to the debtor's business transactions or estate, or concerns the discovery of assets,

business dealings, or the existence and disposition of the debtor's property." <u>In re Johnson</u>, 82

B.R. 801, 805 (Bankr. E.D.N.C. 1988), *citing* <u>In re Williamson v. Fireman's Fund Insurance</u>

<u>Co.</u>, 828 F.2d 249, 251-52 (4th Cir. 1987)(*citing* <u>In re Chalik</u>, 748 F.2d 616 (11th Cir. 1984)).

127.    Knowingly and fraudulently made false statements exist if a debtor "knows the

truth and nonetheless willfully and intentionally swears to what is false." <u>In re Mukerjee</u>, 98

B.R. 627, 629 (Bankr. D. N.H. 1989)(*citations omitted)*.

128.    "[B]ecause a debtor rarely gives direct evidence of fraudulent intent, intent to

defraud a creditor may be established by circumstantial evidence or inferred from a course of

conduct." <u>Singh Educ. Servs. V. McCarthy (In re McCarthy)</u>, 488 B.R. 814, 826 (B.A.P. 1st Cir.

2013); *see also* <u>Desmond v. Varraso (In re Varraso)</u>, 37 F.3d 760, 764 (1st Cir. 1994).

129.    The intent required by § 727(a)(4)(A) is satisfied "by a showing of reckless

disregard for the truth" which "may nonetheless be found based in the cumulative effect of a

series of innocent mistakes." <u>In re MacDonald</u>, 50 B.R. 255, 259 (Bankr. D. Mass. 1985).

130.    In the discharge and dischargeability context, "'a determination concerning

fraudulent intent depends largely upon an assessment of the credibility and demeanor of the

debtor.'" <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 785 (1st Cir. 1997) (*quoting* <u>Commerce Bank &</u>

<u>Trust Co. v. Burgess (In re Burgess)</u>, 955 F.2d 134, 137 (1st Cir. 1992).

131.    "The very purpose of . . . 11 U.S.C. § 727(a)(4)(A), is to make certain that those

who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with

the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable

information is put forward at the outset of the proceedings, so that decisions can be made by the

parties in interest based on fact rather than fiction . . . Neither the trustee nor the creditors should

be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.

. . . .  A discharge is a privilege and not a right and therefore the strict requirement of accuracy is

a small quid pro quo. The successful functioning of the bankruptcy code hinges upon the

bankrupt's veracity and his willingness to make a full disclosure." <u>Hamo v. Wilson (In re</u>

<u>Hamo)</u>, 233 B.R. 718, 725-726 (B.A.P. 6th Cir. 1999) *citing* <u>Hillis v. Martin, Martin v. Martin</u>

<u>(In re Martin),</u> 124 B.R. 542, 545, 547-58 (Bankr. N.D. Ind. 1991) (*quoting* <u>In re Tully</u>, 818 F.2d

106, 110 (1st Cir. 1987) and <u>In re Krich</u>, 97 B.R. 919, 924 (Bankr. N.D. Ill. 1988)).

(**2**)      **Analysis (Count I)**

    (**a**)      **The False Oaths and Accounts**

A preponderance of the evidence demonstrates that the Debtor's Schedules and Statement

of Financial Affairs contain multiple false oaths which the Debtor failed to overcome:

    (**i**)      **Schedule A/B, Question 19:**  Debtor's claim that his ownership value of Sparrell

was "$0.00" was fraudulent.  Six months prior to filing Ch. 7, the Debtor took certain measures

to dilute the value of his stock in Sparrell by transferring title of the Cohasset and Norwell

Properties and all business assets to Brendan's companies.  Claiming that the current value of

Debtor's 100% interest in Sparrell was $0.00 as of the Petition Date was false.  As of the Prtition

Date Sparrell was holder of the Sparrell Note which had an unpaid principal balance of

approximately $220,000.[22]  <u>Debtor's Affidavit</u>, ¶45.  At that same time, Sparrell had three

liabilities: (i) a sum of $45,436.07 due to Eastern Bank on its line of credit; (ii) a sum of

---

[22] While not critical to the analysis, it is noted that as of the Petition Date, the evidence suggests that the exact
outstanding balance on the Sparrell Note was $220,250.  Based upon entries in the General Ledgers and other
supporting evidence, the only two payments made on the Sparrell Note were the payment of $950 made on or about
December 22, 2016 and $3,800 made on March 12, 2017 both to the Debtor, personally.  <u>AF</u>, 45.

$4,167.12 due to Harbor One Bank; and the amount due to Live Oak Bank on the Acquisition

Loan in the sum of $1,230,000.  Debtor's Affidavit, ¶45.

Even though Sparrell was not released from the Acquisition Loan its repayment of that

debt was negated by the contractual obligations of Brendan's companies which were assets to

Sparrell.  Under the P&S, BM Mack agreed to assume payment of the Acquisition Loan as a

portion of the Purchase Price for the Cohasset and Norwell Properties (Ex. 22 at p. 4) which

Brendan confirmed was assumed by a loan modification with Live Oak Bank. Brendan, Day-2,

324:17-22.   Additionally, under the Asset Agreement, BM McNamara agreed to indemnify,

defend and hold Sparrell (*and the Debtor*) "… harmless from, against and in respect of any and

all losses, claims, damages, actions and liabilities, including costs and expenses (including

without limitation, reasonable attorney's fees) that [they] may suffer, incur, sustain or be subject

to or arising out of …. any failure by Buyer to pay or discharge any liability of Buyer, including,

without limitation [the Acquisition Loan].  Ex. 23, at pp 11-12.   An indemnification is an

intangible asset with value.  *See* Sweepster, Inc. v. Scio Twp., 225 Mich. App. 497, 501 (1997)

(hazardous waste indemnification deemed to be a value influencing factor in a real estate sale

transaction because it was intended to relieve the buyer of the property from the financial

consequences of a contamination.)   Here, the evidence shows that the Debtor knew of the

importance and value of the agreements between Sparrell and Brendan's companies.  The

Debtor's Affidavit states that "Sparrells transferred its assets to BM Mack and BM McNamara

primarily to ensure that the Live Oak Bank obligation could be paid (by BM Mack and BM

McNamara) and so that Sparrells would have an income stream to enable it to pay Eastern Bank

and its other obligations." Debtor's Affidavit, at ¶39.   When BM Mack's loan assumption and

BM MacNamara's indemnification are taken into consideration, Sparrell had a positive value in

excess of $170,000 as of the Petition Date:

| | Liabilities | Assets |
|---|---|---|
| Eastern Bank line of credit: | $     45,436.37 | |
| Harbor One loan: | $       4,167.12 | |
| Live Oak Banking Company  - Acquisition Loan: | $ 1,230,000.00 | |
| BM McNamara's indemnification and BM Mack's assumption of the Acquisition Loan: | | $ 1,230,000.00 |
| Sparrell Note | | $  220,000.00 |
| | $1,279,603.40 | $1,450,000.00 |

$1,450,000.00 (Assets) - $1,279,603.40 (Liabilities) = **$170,396.60**[23]

At deposition, the Debtor admitted that, prior to bankruptcy, he never had Sparrell's

value appraised (Depo.3/8/19 129:6-9) and that he never consulted with anyone to confirm

whether Sparrell was worth zero (Depo.3/8/19 135:14).  When questioned by Plaintiff's counsel

as to where he came up with the zero value for Question 19, the Debtor response was "I don't

know."  Depo.3/8/19 132:19.[24]  Five months after giving these evasive responses at deposition,

the Debtor filed an affidavit in opposition to summary judgment claiming that "[i]t was [his]

belief that, where the value of Sparrell's assets was more than a million dollars less than the

amount of its liabilities [his] equity interest in Sparrells had no value."  Debtor's Affidavit, at

¶45.  "It is not for the Debtor to determine the value of the assets or to determine if the assets do

not have value."  Island Bank v. Gill (In re Gill), 159 B. R. 348, 352, 7 Fla. L. Weekly Fed. B

---

[23] This total excludes the cash on hand that was in Sparrell's operating account at Eastern Bank as of the Petition Date, which, according to the General Ledger (Ex. 42, at p. 7/45), was in excess of $8,000.

[24] When further asked at deposition to explain the documents that he produced to the Plaintiff to support his contention that the value was "$0.00" the Debtor was unable to do so.  Depo.3/8/19, 133:6 – 136:14.  The deposition taken on March 8, 2019 was a joint deposition taken of the Debtor, individually, and as the designee of Sparrell under Fed.R. Civ. P. 30(b)(6), as Brendan refused to appear on Sparrell's behalf.

268 (Bankr. M.D. Fla. 1993) (*citing* <u>In re Kaiser</u>, 94 B.R. 777 (Bankr. S.D.Fla. 1988).  Creditors

are entitled to full and complete disclosure and the right to make that determination.  *See* <u>In re</u>

<u>Gill</u>, at 352, *citing* <u>In re Kaiser</u>, 94 B.R. 777 (Bankr. S.D. Fla. 1988).  Debtor's bankruptcy

filings claiming that his interest in Sparrell was worth nothing was, at best, a reckless

indifference to the accuracy and completeness of his bankruptcy filings which is the equivalent

of fraud for § 727(a)(4)(A) purposes.  *See* <u>In re Tully</u>, 818 F.2d 106, 111 (1st Cir. 1987).

> **(ii)**     <u>**Schedule A/B, Question 37:**</u>  The Debtor's "No" response to Question 37 asking

if he owns or has any legal or equitable interests in any business-related property was false.  As

of the Petition Date, the Debtor had a legal and equitable interest in the Sparrell Note and the

indemnification from BM McNamara which he concealed.

> **(iii)**     <u>**Schedule A/B, Question 35**</u>:  The Debtor's "No" response to Question 35 seeking

information as to any financial assets he did not already list was false given the existence of

interest in the Sparrell Note.  Evidence at trial supported that the Debtor was aware that the

Sparrell Note was a financial asset in which he had an interest.  Prior to bankruptcy, the Debtor

(individually) accepted and retained at least $4,750 of payments due under the Sparrell Note

which he did not disclose in his Ch. 7 filings. <u>AF</u>, 45, <u>Ex</u>. 32.  Additionally, Brendan

acknowledged that it was their hope that the Debtor would receive payments due on the Sparrell

Note when Sparrell's obligations were met.  <u>Brendan, Day-2, 338:24 – 339:2, 339:9 and 340:11-</u>

<u>16.</u>[25]

---

[25] This is the closest that Debtor or Brendan would come to openly admitting to the Plaintiff that the Sparrell Note was truly intended to provide the Debtor with an income stream that was strategically designed to circumvent disclosure in the bankruptcy.  Presumably, this is why their attorney told them to stop making payments of the Sparrell Note directly to the Debtor from Sparrell's operating account when he learned of it in advance of the Ch. 7 filing.  <u>Brendan, Day-2, 249:17 – 250:2.</u>

**(iv)** **Schedule A/B, Question 44**: The "No" response to Question 44 seeking information as to any business-related property the Debtor did not already list was false because the Debtor did not disclose the Sparrell Note or indemnification from BM McNamara in his filings.

**(v)** **Statement of Financial Affairs, Question 28:** The Debtor falsely responded "No" to the question asking "within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties." There was overwhelming evidence showing that numerous financial statements concerning Sparrell were provided to Live Oak Banking Company in connection with the Acquisition Loan application process within two years of the Petition Date. *See* Plaintiff's Proposed Facts at ¶¶ 55, 56 (i)-(x), 60 and 62(i) –(x). Certain of those financial statements were signed by Debtor or by Brendan on behalf of the Debtor with Debtor's knowledge.[26] Brendan 151:1-8, 153:2 – 154:8, 158:19, and 161:12 and Ex. 86. The Debtor also signed a loan commitment letter with Live Oak Banking Company dated July 15, 2016, noting, among other things, that there were certain financial reporting requirements of Sparrell. Ex. 69, Brendan 144:5–14, and 146:24- 148:14. According to Brendan, the Debtor was aware of the application process with Live Oak Banking Company and was kept aware of its progress. Brendan 140:18-23. Evidence further established that the Debtor attended a closing for the Acquisition Loan at which he signed a numerous loan documents acknowledging the transaction and his awareness of it. Brendan, 169:18. One of the many documents that the Debtor signed at closing was a

---

[26] The documents include: (i) the Borrower Information Form, Ex 59, Brendan 134;12, 136:24 – 138:2; (ii) Personal Financial Statement Ex 76, Brendan 138:9 – 140:9, (iii) Management resume, Ex 77, Brendan 140:12-22; (iv) Business Debt Schedule for Sparrell, Ex 79, Brendan 141:3-21; (v) Request for Transcript of Tax Return, Ex 78, Brendan 149:14- 150:8; (x) A Certification of Tax Return/Financial Statement as to Sparrell's Tax Returns for 2011, 2012, 2013, 2014 and 2015, Balance Sheet as of 3/31/2016 and Profit and Loss statement for January 1, 2016 – March 31, 2016 and January 1, 2016 – May 31, 2016, Ex. 83, Brendan 159:18 – 160: 1.

Borrower's Certification on behalf of Sparrell acknowledging, among other things that *"[t]here has been no adverse change in [Sparrell's] financial condition, organization, operations, or fixed assets since the date the loan application was signed"*. Ex. 67, Brendan 169:15 - 171:11.[27]

"It is well established that the use of sophistication [of the Debtor] is appropriate in determining fraudulent intent …" Rossi v. Moreo, No. 07-71258, 2008 WL 5110967, at *4 (Bankr. E.D.N.Y. Dec. 2, 2008)(*citations omitted*). Here, evidence shows that the Debtor was educated having attended four years of college in addition to a year's program at Boston State and New England Institute of Anatomy and Embalming. Debtor's Affidavit ¶¶ 7-8. He was also in business for 55 years, 30 years of which he was a co-owner of the funeral homes and the commercial properties at which they were located. Debtor's Affidavit ¶¶ 9-10. As an educated business man and 100% owner of an entity that borrowed $1,390,000 from a financial institution, there is thin credibility to the Debtor assertion that he wasn't aware that financial information concerning Sparrell had been submitted to Live Oak Banking Company in connection with the Acquisition Loan. See Debtor's Affidavit ¶50.[28]

   **(vi)  Schedule A/B, Question 53**:  Debtor's answer "No" was a false response to the question "Do you have other property of any kind you did not already list? *Examples*: Season tickets, country club membership.  The record evidence established that as of the Petition Date,

---

[27] Some of the other loan closing documents include: (i) Sparrell's corporate vote Ex. 60, Brendan 169:25; (ii) Assignments of Architect's Contracts on behalf of Sparrell. Ex. 62, Brendan 170:3; (iii) Assignment of Construction Contracts on behalf of Sparrell. Ex. 63, Brendan 170:6; (iv) U.S. Small Business Administration Assurance of Compliance for Nondiscrimination on behalf of Sparrell. Ex. 64, Brendan 170:10; (v) Construction Loan Agreement on behalf of Sparrell.  Ex. 70, Brendan 171:15; (vi) Cooperation Agreement individually and on behalf of Sparrell. Ex. 71, Brendan 171:24;(vii) the promissory note in the original principal amount of $1,390,000 on behalf of Sparrell, Ex. 14;  (viii) the Mortgage and Security Agreement on behalf of Sparrell for the Cohasset and Norwell Properties, Ex. 15 and 16; and (ix) the Settlement Statement (HUD-1) on behalf of Sparrell as borrower to the loan transaction.  Ex. 17; Brendan 173:2.

[28] Debtor's Affidavit clearly establishes that he was aware of the Acquisition Loan.  Debtor's Affidavit 28, 29, 36 and 39.

had an active lifetime membership to the Scituate Harbor Yacht Club.  Despite Debtor's claim

that he did not understand that the membership might be considered an asset since it could not be

sold  or transferred (*see* Debtor's Affidavit, ¶49) the question clearly seeks disclosure of " other

property of any kind.." with no exceptions.  The membership should have been disclosed.  *See*

Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999) (a debtor's assertion

that omitted information concerns a worthless business asset is a specious defense) *citing* Chalik

v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11 Cir. 1984).

      **(b)**     **Debtor lacks credibility.**

     Although the Court did not have the opportunity to witness the Debtor's demeanor and

credibility first hand at trial, there is a clear record establishing that the Debtor generally lacks

credibility, has a history of participating in dishonest activities, has been deceptive and untruthful

in his representations to other courts of law and was misleading and less than forthcoming while

under oath in this proceeding as follows:

     **(i)**  **Debtor lied at his Deposition** when questioned under oath about forging Brendan's

signature to multiple checks from BM McNamara's account (one of which Brendan says the

Debtor "stole")[29]. *See* Plaintiff's Proposed Facts at ¶¶ 107-108.

     **(ii)**  **Debtor lied at the Injunction hearing before the Norfolk Superior Court on**

**November 30, 2015** when, in an effort to avoid the entry of the Injunction, the Debtor

represented to the Court that Brendan was (as of that date) Sparrell's "**new owner**" and that the

funeral homes were then "operated and **owned**" by Brendan. Trial Day-1, 69:3 and 15.[30]

---

[29] The Debtor even embellished his lie about the stolen check claiming that Brendan gave him the check with
expressions of love.

[30] A portion of the transcript from the Injunction hearing was read into the record.

However, in this case, Debtor claims that Brendan (*through his entities*) did not acquire ownership of Sparrell until November 7, 2016. AF 32 and 33.  If Debtor's representations to the Norfolk Superior Court concerning the timing of Brendan's ownership were truthful, then, his representations in this case are not.

     **(iii)**  **Debtor deposited payments from Sparrell to a secret bank account to circumvent the Injunction.**  In order to preserve the status quo of the Debtor's assets for payment of the Norfolk Judgment the Norfolk Superior Court granted the Bank an Injunction that, among other things, enjoined Sparrell from paying any monies (other than wages due) to or on behalf of the Debtor.  The Injunction also enjoined the Debtor from withdrawing, collecting, receiving his interest in monies (other than wages due) to him from Sparrell.  Ex 6.  In an effort to evade the Court's Order, the Debtor arranged for payments due to him from Sparrell to be deposited into an account that was owned by Brendan and Alice.  Brendan 246:16 – 248:10. Evidence shows that the deposits made to this secret account included one of the payments that the Debtor received under the Sparrell Note on or about December 22, 2016, while the Injunction was in effect.[31]  Ex 32, Brendan, Day-2, 246:13 – 247:21.

     **(iv)**  **Debtor withheld disclosure of his 100% ownership interest in Sparrell in his Affidavit of Indigency to the Court in the Eviction Process.**  During the Eviction Process, the Debtor unsuccessfully claimed to be indigent seeking to avoid posting an appeal bond with the Massachusetts Appeals Court.  Lindberg 36:23 – 37:5.  In connection with his claim, Debtor filed an Affidavit of Indigency with the Court requiring him to describe his assets.  Ex. 85.  The Affidavit of Indigency was signed by the Debtor under the penalties of perjury, dated May 10,

---

[31] Clearly, the payments on the Sparrell Note were not "wages due" which were excluded from the Injunction.

2016, and is devoid of any disclosure of Debtor's 100% ownership interest in Sparrell yet, 21

days later, in a Personal Financial Statement submitted to Live Oak Banking Company and the

SBA, he disclosed that his "100% owner" interests in Sparrell had a value of $475,000.  *See* <u>Ex</u>.

76.  Evidently, the Debtor was aware of his ownership interest in Sparrell and its value at the

time he filed the Affidavit of Indigency with the Court, yet he withheld the information in an

effort to misrepresent his financial condition and avoid the cost of posting an appeal bond.  His

actions were clearly dishonest.

**(v)  <u>Debtor stripped and stole fixtures from the Mortgaged Premises</u>.**  All kitchen

and bathroom fixtures, cabinets, sinks and appliances were stripped, stolen and removed from the

Mortgaged Premises in advance of the Bank's physical eviction of the Debtor and Alice.

<u>Lindberg 40:14 – 41:7</u>.  At deposition, Debtor admitted that eventually his son sold the fixtures

to a "Chinese fellow from Quincy".  <u>Depo.7/10/17 13:5 – 14:1</u>.

**(vi)  <u>Debtor was suspended and placed on probation by the Licensure Board</u>**

**<u>involving forgery of a death certificate</u>.**  In connection with the supervision of an employee of

Sparrell, Debtor was sanctioned by the Licensure Board for a claim involving forgery of a death

certificate which the employee reported to the Licensure Board.  <u>Ex 27E</u>, <u>Depo.3/8/2019 20:12 –</u>

<u>21:8</u>.

**(vii)  <u>Debtor misappropriated $246,000 of Pre-Need Obligations from his business</u>.**

*See* Plaintiff's Proposed Facts at ¶¶30 and 37.  The Debtor's misappropriation of the Pre-Need

Obligations was not only dishonest to clients but also to his business partner (his own brother

John).

**(viii)  <u>No evidence of debtor's medical inability to tell the truth</u>**  Throughout this case, the defense intimated that the Debtor may have had an illness which was often used as an attempt to excuse his evasiveness at depositions.  However, <u>NO</u> credible evidence was ever presented in this case to support such a claim, to justify the repeated false oaths contained in the Debtor's Ch. 7 filings or the other dishonest acts he had engaged in.[32]  At deposition, the Debtor confirmed that he was not under the influence of any medication and had never been diagnosed with dementia or memory loss problems.  <u>Depo.3/8/19 121:18 – 122:4</u>.[33]  Evidence also shows that the Debtor was capable of continuing to work funerals and wakes (Depo.3/8/19 13:22-16), assisting at the funeral homes, running errands and picking up death certificates (<u>AF 52</u>), attending meetings at the Licensure Board for matters involving construction at the Cohasset Property (<u>Ex 27C</u>) and even obtained a new Funeral Director and Embalmer License from the Licensure Board in January 2019.  <u>Ex 27E</u>.  Plaintiff suggests that the reason why the Debtor was evasive and often presented himself as being confused at depositions is because the narrative of his story in this case did not align with the facts.  This was best exemplified when Plaintiff's counsel asked the Debtor a simple question concerning the date that Sparrell ceased operations:

| | |
|---|---|
| Q: | When was the last time Sparrell Funeral Services, Inc. operated? |
| A: | I don't know. The date? I have no idea. I don't recall. |
| Q: | Do you know the year? |
| A: | I don't really recall the year. |
| Q: | Season? |
| A: | I don't know. I can't answer the question. |
| Q: | Do you recall the date that you filed bankruptcy? |

---

[32] The illness that rendered the Debtor unavailable for trial was a stroke that he had suffered shortly before trial causing partial paralysis that prevented the Debtor from appearing for trial.  <u>Brendan, Day-2, 335:6</u>.  This unfortunate event occurred after the events that lead to the filing of this case and after the close of discovery.

[33] In an attempt to joke, Debtor claimed that he had only "[b]een accused of being stupid."  <u>Id</u>.

A:     I know it happened. I can't recall the date.

Q:      If I was to suggest it was April 13th of 2017, does that ring a bell for you?

A:      No, it doesn't.

Q:     Do you know how long before filing bankruptcy Sparrell Funeral Services -- well, let me ask it this way: Is Sparrell Funeral Services, Inc. still operating?

A:     No. It's under BK. It's -- it's under Brendan now.

Q:      Okay. So do you know if Sparrell Funeral Services, Inc. went under BK or Brendan before or after you filed bankruptcy?

A:     I don't know.

Depo.3/8/19 p. 20:19 – 24:18 (*note that this was conducted as a combined deposition of the Debtor, individually and also of Sparrell under Rule 30(b)(6) at which the Debtor appeared as the designee because Brendan refused.*)

Clearly, the Debtor was uncertain how to answer this simple question because at his prior deposition taken on July 10, 2017 he testified that his current involvement was "None" (Depo.7/10/17 17:33) and Brendan had also swore under oath that Sparrell ceased operations on November 7, 2016 (Brendan, Day-2, 216:15 – 217:8 (acknowledging deposition testimony). Yet, Change of Ownership Applications were not filed with the Licensure Board until July 18, 2018 (Ex 27A and Ex 27C) and as of September 7, 2018, the Debtor and Brendan were still representing to the Licensure Board that Sparrell remained in operation.  *See* Ex 27B and Ex 27D.   The story that the Debtor and Brendan were telling in the Ch.7 case was legally problematic for them with the Licensure Board since BM McNamara was prohibited from engaging in the business of embalming and funerals at the Cohasset and Norwell Properties prior to obtaining its Funeral Establishment License.  *See* 239 CMR 3.02 and 239 CMR 3.04. Circumstantial evidence can be sufficiently potent to establish fraudulent intent beyond hope of contradiction. *See* Putnam Resources v. Pateman, 958 F.2d 448, 459 (1st Cir. 1992) ("It is black letter law that fraud may be established by inference from circumstantial facts."); *see also* In re

<u>Roco Corp.</u>, 701 F.2d 978, 984-85 (1st Cir. 1983) (affirming a finding of fraudulent intent on the basis of circumstantial evidence). The circumstantial evidence in this case demonstrates that the Debtor intended to mislead creditors into falsely believing that his most valuable asset (Sparrell) was defunct and worth $0.00.

(c)     **<u>Brendan was is not a credible witness.</u>**

Brendan was the defense's only witness. As an active participant in the siphoning of Sparrell's assets and post draining operations of the business Brendan, his companies and Melissa have potential transferee liability. *See e.g.* <u>Richman v. Leiser</u>, 18 Mass. App. Ct. 308, 315 n.6 (1984) (A transferee who knowingly participates in a fraudulent conveyance may be individually liable for the value of the assets placed beyond the creditor's reach.) The file docket in this case shows that as the Bank began to bear down on substantive issues in discovery Brendan made himself unavailable for deposition as he refused to accept service of the Plaintiff's deposition subpoena of Sparrell and refused to consent to being Sparrell's Rule 30(b)(6) designee. *See* Docket 51-55 and 67. At trial, Brendan's testimony often conflicted with the evidence or was not credible. Some examples include:

- Brendan's claim that he identified the Debtor as BM McNamara's only anticipated employee in the Change in Ownership Application filed with the State's Licensure Board in July 2018 but had no intend for the Debtor to continue working for the business (<u>Brendan, Day-2 223:7 – 10</u>) yet the Debtor admits that he obtained a new Type-3 license in 2019 in order to cover wakes and funerals when Brendan was unavailable (<u>Depo 3/8/19 16:22</u>);

- Brendan's claim that Sparrell ceased operations on November 7, 2016 and that BM McNamara simply operated the business under Sparrell's Funeral

Establishment's license for two years with knowledge by the Licensure Board.

Brendan, Day-2, 240:2 – 242:21.  Brendan's claim is inconsistent with the

Inspection Reports which make no reference to this special accommodation (Ex

27B and 27D), inconsistent with the time of filing and information included in the

Applications for Transfer of Business (Ex. 27A and 27C),  and contrary to the

governing law. *See*  239 CMR 3.04 (governing the ownership of licensed funeral

establishments, disclosures and public display of ownership);

- Brendan's claim that he had "off the record" discussions with Live Oak Banking
  Company making them aware that he was signing the Debtor's name to sworn
  statements being submitted to the government (the SBA) in connection with the
  Acquisition Loan. Brendan, Day-2, 160:21 – 25;

- Brendan's claim that his uncle John agreed to pay the Debtor's personal
  obligations for the Norfolk Judgement  ($42,069.61), the Pre-Needs Obligations
  ($175,000) and consulting fees owed by Sparrell to Chuck Medici ($24,035) at
  the closing of the Acquisition Loan (Brendan, 178:25 – 180:24) even though the
  evidence supports that John paid no money at closing and charged the Debtor and
  Sparrell a $10,000 late fee because they delayed the closing one day.  Brendan
  180:8; and

- Brendan's claim that he did not physically threaten Mr. Lindberg when he was on
  site trying to take photographs of the Mortgaged Property after the foreclosure or
  physically threaten his father's accountant who needed to call the police to
  remove Brendan from his office when Brendan was trying to remove his files.
  Brendan, Day-2, 337:3.

**(3)  Conclusion  (Count I)**

The Plaintiff proved that the Debtor's bankruptcy filings contain false oaths.  The Debtor's claim that the false oaths were unintentional lack merit.   He has his documented history of involvement with in instances of forgery, misrepresentations to courts at hearings and in affidavits, lying at deposition, stealing property that belonged to the Bank and misappropriating funds of clients to the potential detriment of his own brother.  Under the circumstances it is unquestionable that the Debtor false oaths were intended to defraud his creditors to avoid paying his debts including the Deficiency ($156,732.44) still due to the Bank on Note-1.   For the foregoing reasons, judgment in favor of the Plaintiff on Count I of its Complaint is warranted and the Debtors' discharge should be denied under 11 U.S.C. § 727(a)(4).

**B.  COUNT II**

**1.  Proposed Conclusions of Law**

131.    11 U.S.C. § 727(a)(5) provides that the court shall grant the debtor a discharge, unless "the debtor has failed to explain satisfactorily  . . . any loss of assets or deficiency of assets to meet the debtor's liabilities[.]"

132.    11 U.S.C. § 727(a)(5) is "broadly drawn and gives the bankruptcy court broad power to decline to grant a discharge in bankruptcy when the debtor does not adequately explain a shortage, loss, or disappearance of assets."  Grossman v. Garabedian (In re Garabedian), 520 B.R. 326, 329 (Bankr. D. Mass. 2014).

133.    Exceptions to discharge under §727(a)(5) only requires proof by a preponderance of the evidence.  Barclays/American Bus. Credit, Inc. v. Adams (in re Adams), 31 F.3d 389, 394 (6th Cir. 1994) cert denied, 513 U.S. 1111 (1995).

134.    Under § 727(a)(5), a plaintiff must establish: (1) that the debtors have experienced a loss of assets or deficiency of assets; and (2) that the debtors cannot provide a satisfactory explanation for such loss. There are two stages of proof with respect to this section. First, the plaintiff must produce evidence that the debtor no longer has assets which he previously owned. Once the plaintiff has established the loss of an asset, it is up to the debtor to provide a satisfactory explanation for the loss or deficiency of the asset. Aoki v. Atto Corp. (In re Aoki), 323 B.R. 803, 817-18 (B.A.P. 1st Cir. 2005).

135.    Debtor's explanation "must be supported by at least some corroborating evidence" and "must be sufficient to eliminate the need for any speculation as to what happened to all of the assets."  In re Aoki, at 817.   "Vague or indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial transactions" do not satisfy the debtor's burden. Id.

136.  11 U.S.C. § 727(a)(5) does not require proof of intent. Id.

**(2)    Analysis -  Count II**

The Debtor's claim that his 100% stock in Sparrell was worth $0.00 is uncorroborated. Evidence has established that, based upon its assets and liabilities, Sparrell had a positive net worth of at least $170,396.60 (derived from the value of the Sparrell Note) as of the Petition Date.[34]  During discovery of this case, the Debtor and Sparrell produced documents and were

---

[34] See analysis under Section III(A)(i), supra:

deposed on the issue of Sparrell's value as of April 13, 2017, and specifically, the $0.00 response

to Question 19 of the Debtor's Schedules and the Debtor was unable to provide any satisfactory

explanation:

> Q: [Regarding Question 19] So it's asking nonpublicly traded stock and interest in incorporated and unincorporated businesses, including an interest in an LLC partnership and joint venture, and the answer is yes, and there's an entity listed, Sparrell Funeral Services, Inc., 100 percent owner and value zero. Do you see that?
> A: Yes, I see it.
> Q: Okay. How did you come up with that number --
> A: I don't --
> Q: -- or that value?
> A: I don't know.
> Q: Did you consult with anybody about coming up with that value?
> A: I don't recall.
> Q: Did you fill out these bankruptcy schedules on your own?
> A: I don't recall that I -- I don't recall. I don't remember.
> Q: I'm going to call your attention to what we marked as Exhibit No. 2 and Responses to Document Request No. 1. Do you see that, Mr. McNamara?
> A: Yes.
> Q: And it's asking for all documents that support your contention that as of April 13, 2017 the value of your interest in Sparrell was zero dollars. Do you see that?
> A: Yes.
> Q: Exhibit No. 3, it's your supplemental response to that same inquiry, No. 1. Do you see that?
> A: All documents –
> Q: See that response?
> A: Yes.
> Q: And in the response there are certain documents identified, documents labeled response Nos. 2, 5, 6, 7, 11, 12, 13, 15, 16, 17, 18, 20, 21 and 26. Do you see that?
> A: Yes.
> Q: Can you explain to me how those particular documents indicate that the value of Sparrell as of April 13, 2017 was zero?

---

|  | Liabilities | Assets |
|---|---|---|
| Eastern Bank line of credit: | $    45,436.37 |  |
| Harbor One loan: | $      4,167.12 |  |
| Live Oak Banking Company  - Acquisition Loan: | $ 1,230,000.00 |  |
| BM McNamara's indemnification and BM Mack's assumption of the Acquisition Loan: |  | $ 1,230,000.00 |
| Sparrell Note |  | $  220,000.00 |
|  | $1,279,603.40 | $1,450,000.00 |

$1,450,000.00 (Assets) - $1,279,603.40 (Liabilities) = **$170,396.60**

A:     I don't recall.

Q:     These documents were filed and served on your behalf.

A:     I don't --

Q:     Do you want to take a minute and look through the documents? You've identified them clearly.

A:     I don't know. I've lost complete track. 2, 5, 6, 7? I don't know.

Q:     Well, they're all marked here as exhibits. Do you want to take a minute and tell me how that comes out to zero value for Sparrell?

A:     I don't think I have -- I just thought once John, my brother John made it clear to me that I had nothing, zero, I just went along with that. I don't --

Q:     Okay. But you never did anything to --

A:     Refute? No.

Q:     -- verify whether or not that was accurate?

A:     I never did.

MR. BUTLER: Let him finish his question before you answer, Bob.

Q:     So you never did anything to verify whether or not Sparrell Funeral Services, Inc. was worth zero?

A:     No.

Q:     Did you ever consult with anybody to confirm whether or not Sparrell Funeral Services, Inc. was worth zero?

A:     No. I never did.

Q:     Is it possible that it was worth something?

A:     Only the property maybe, but John had that.

Q:     Okay. If the -- if Sparrell owned the property, would you agree that Sparrell had some value to it?

A:     If Sparrell owned the property, yes.

Depo.3/8/19 132:8 – 135:20.

Neither Debtor nor Sparrell supplemented their production of document responses following the deposition nor did they supplement or correct their testimony.[35] After the close of discovery, the Debtor filed an affidavit in opposition to Plaintiff's motion for summary judgment attempting to meet his burden of satisfactorily explaining the zero value stating, in relevant part:

---

[35] Following the deposition, Plaintiff's motion to compel Sparrell to designate a prepared representative pursuant to Rule 30(b)(6). The Debtor opposed the motion claiming that Brendan refused to be Sparrell's designee and that the Debtor was the only person available to testify on Sparrell's behalf. The Plaintiff's motion denied as the Court found granting the motion would be futile as the Debtor is the only person available for designation by Sparrell and he had already been designated and testified. *See* Docket Nos. 51, 52, 53, 55, 67 and 68.

…On the date that I filed bankruptcy, the only significant asset that Sparrells owned was the Sparrells note which I understood had a value of approximately $220,000. At the same time, Sparrells was obligated to Eastern bank on a line of credit in the amount of $45,436.07… to Harbor One Bank in the amount of $4167.12… and to Live Oak Bank in the amount of $1,230,000.00…It was my belief that, where the value of Sparrell's assets was more than a million dollars less than the amount of its liabilities my equity in Sparrells had no value.

Debtor's Affidavit, at ¶45.

Debtors Affidavit also acknowledges the importance of Brendan's companies assuming

and indemnifying Sparrell's largest obligation (*the $1,230,000 balance due on the Acquisition*

*Loan*):

Sparrells transferred its assets to BM Mack and BM McNamara primarily to ensure that the Live Oak Bank obligation could be paid (by BM Mack and BM McNamara) and so that Sparrells would have an income stream to enable it to pay Eastern Bank and its other obligations."

Debtor's Affidavit, at ¶39.

At trial, Brendan testified that he assisted his father formulating the zero response given

to Question 19 of Schedule A/B.  Brendan's explanation was no different than that of his father's

affidavit:

In discussions with my father we talked about the numbers that were owed based on Sparrell's involvement with certain things, particularly the Live Oak loan, credit that it still had outstanding with Eastern Bank, and several other items with only a $225,000 note payable at the start, it seemed like there was insufficient value.

Brendan, Day-2, 332:25 – 333:5.

Debtor's affidavit is based only on personal "belief".  Brendan's testimony similarly

lacked substance and further establishes that the Debtor cannot provide a satisfactory explanation

for the $0.00 value of Sparrell.  *See* In re Aoki, 323 B.R. at 817; *see also* In re Simmons, 513

B.R. 161, 171 (Bankr. D. Mass. 2014) (denial of discharge under § 727(a)(5) is appropriate

where Debtor's inability to document the basis for being unable to pay the debt he brings into his bankruptcy case was "shocking and disturbing").

### (3)   Conclusion  (Count II)

Under the stages of proof with respect to § 727(a)(5) and in consideration of the documentary evidence (*including the P&S and Asset Agreement, showing that Brendan's companies assumed liability and indemnified Sparrell for payment of the Acquisition Loan*), the Debtor's affidavit concerning Sparrell's liabilities in comparison to the balance due on the Sparrell Note and the lack of credible testimony, there are sufficient grounds warranting denial of the Debtor's discharge under 11 U.S.C. § 727(a)(5).  For the all of foregoing reasons, judgment in favor of the Plaintiff on Count II of its Complaint should be granted.

### C.   COUNT III

### 1.   Proposed Conclusions of Law

137.    11 U.S.C. § 727(a)(2)(A) provides that:

> (a) The court shall grant the debtor a discharge, unless—
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition.

138.    Under § 727(a)(2)(A), a plaintiff must establish four elements by a preponderance of the evidence:

> (1) transfer or concealment of property (2) that belonged to the debtor (3) less than
> a year before the bankruptcy petition (4) with actual intent to hinder, delay, or
> defraud a creditor.

In re Schifano, 378 F.3d 60, 66-67 (1st Cir. 2004); *see* In re Marrama, 445 F.3d 518, 522 (1st

Cir. 2006).

139.    In weighing evidence of fraudulent intent, courts look to the following "objective

indicia" referred to as "badges of fraud:"

> (1) insider relationships between the parties; (2) the retention of possession, benefit
> or use of the property in question; (3) the lack or inadequacy of consideration for
> the transfer; (4) the financial condition of the [debtor] both before and after the
> transaction at issue; (5) the existence or cumulative effect of the pattern or series of
> transactions or course of conduct after the incurring of the debt, onset of financial
> difficulties, or pendency or threat of suits by creditors; (6) the general chronology
> of the events and transactions under inquiry; and (7) an attempt by the debtor to
> keep the transfer a secret.

In re Marrama, 445 F.3d at 522 (*quoting* In re Watman, 301 F.3d 3, 8 (1st Cir. 2002) (*internal

citations omitted*).

140.    Harm to a creditor is not a required element of section 727(a)(2). *See* Keeney v.

Smith (In re Keeney), 227 F.3d 679, 685 (6th Cir. 2000).

141.    Goodwill and business relationships constitute "property" which a debtor can

fraudulently transfer.  *See* e.g. In re Cooley, 87 B.R. 432, 442-43 (S.D. Tex. 1988)(under an 11

U.S.C. § 541(a)(6) analysis, court found goodwill to be an asset of a company that a debtor can

usurp); In re C.R. Stone Concrete Contractors, Inc., 462 B.R. 6, 23 (D. Mass. 2011)(granting

avoidance claim relating to goodwill of a business and other intangible property).

142.    Discharge can be denied under § 727(a)(2)(A) when a debtor causes his solely owned corporation to be transferred to an insider for much less than its fair market value within months of filing bankruptcy.  *See* In re DeLoreto, 266 Fed.App. 140 (2008).

143.    Generally, corporations and their shareholders, or different corporations with common shareholders, are deemed to be distinct legal entities but, when there is unusual circumstances for cause, a court may look beyond the corporate legal structure and its property to find legal accountability in others for actions taken in the corporate name.  *See* Berger v. H.P. Hood, Inc., 416 Mass. 652, 657, 624 N.E. 3d 947 (1993) *see also* My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968) (the corporate form may be disregarded to defeat fraud or remedy an injury.)

144.    Where a debtor uses a wholly-owned business to perpetrate a fraud and hide assets from creditors, a court may disregard the corporate form and deem the company the debtor's alter ego. *See*  In re Aoki, 323 B.R. 803, 811-12 (B.A.P. 1st Cir. 2005); In re Plantation Realty Trust, 232 B.R. 279, 282 (Bankr. D. Mass. 1999); Pepsi- Cola Metro. Bottling Co., Inc. v. Checkers, Inc.,  754 F.2d 10, 15 (1st Cir. 1985); My Bread Baking Co. v. Cumberland Farms, Inc.,  353 Mass. 614 (1968).

145.    The disregard of the corporate form under the piercing veil doctrine is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice. *See* My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620 (1968). In certain situations, the doctrine may also properly be used to carry out legislative intent and to avoid evasion of statutes. See Packard Clothes Inc. v. Director of the Div. of Employment Sec., 318 Mass. 329, 61 N.E.2d 528.

146.     In Massachusetts, the traditional corporate veil piercing doctrine evaluates twelve factors when determining whether piercing the corporate veil is appropriate: "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud." <u>AG v. M.C.K., Inc., 432 Mass. 546, 736 N.E.2d 373, 380 n.19 (Mass. 2000).</u> (using factors in <u>My Bread</u> factors).  It is not necessary for all 12 factors to be satisfied in order to justify the remedy; however, the more factors that are satisfied, the stronger the case warrants piercing of the corporate veil.  *See* <u>Evans v. Multicon Constr. Corp.</u>, 30 Mass. App. Ct. 728, 736, 574 N.E.2d 395 (1991). ("the exercise is, of course, not one in counting.  One examines the twelve factors to form an opinion whether the over-all structure and operation misleads.")

147.     The doctrine of piercing the corporate veil and alter ego are equitable principals employed to hold a shareholder liable for corporate acts.  *See* <u>Butler v. Candlewood Road Partners, LLC</u> (<u>In re Raymond</u>), 529 B.R. 455, 471 (Bankr.D. Mass. 2015).

148.     While the doctrines of veil piercing and alter ego are interrelated and litigants often use the terms interchangeably there are distinctions – veil piercing "…asks a court to hold A vicariously liable for B's debts" and alter ego "… asserts that A and B are the same entity and therefore liability is direct." <u>Cruickshank v. Dixon (In re Blast Fitness Group, LLC)</u>, 602 B.R. 208, 232 (Bankr. D. Mass. 2019) *citing* <u>In re Fustolo</u>, 597 B.R. 1, 47 (Bankr. D. Mass. 2019).

149.   The doctrine of "reverse veil piercing" involves the claims of creditors seeking to satisfy the liabilities of the owner/stockholder by targeting the assets of the entity/corporation of that owner/stockholder.  *See* <u>Butler v. Candlewood Rd. Partners, LLC (In re Raymond)</u>, 529 B.R. 455 (2015) (citations omitted)(comparing rulings and recognition of the doctrine from other jurisdictions).[36]

150.   The doctrine of reverse piercing of corporate veil has two characterized forms – one as an "outsider" reverse veil piercing involving a third party creditor piercing the corporate veil in the reverse to reach the assets of the corporation to satisfy the debt of a corporate insider and the other an "insider" reverse veil piercing which involves an insider of the corporation seeking to disregard the corporate form of his own corporation for his own benefit.  *See* <u>Spradlin</u> v. <u>Beads & Steeds Inns, LLC (In re Howland)</u>, 516 B.R. 163, 166 (Bankr. E.D. Ky. 2014), <u>aff'd</u> 579 B.R. 411 (E.D. Ky. 2016), <u>aff'd</u>, 674 F. App'x 482 (6th Cir. 2017).

151.   Courts often look through the corporate form when there is "an element of dubious manipulation and contrivance [and] finagling..." <u>In re Raymond</u>, at 484, *citing* Scott v. NG U.S. 1, Inc<u>., 450 Mass. 760, 881 N.E.2d 1125 (2008)</u>, *quoting*  <u>Evans v. Multicon Constr. Corp.</u>, 30 Mass. App. Ct. 728, 736, 574 N.E.2d 395 (1991).

**2.**     <u>**Analysis: Count III**</u>

**(a)**     <u>**Reverse Outside Piercing**</u>

Debtor's apparent retention of Sparrell's stock should not preclude denial of discharge under 11 U.S.C. § 727(a)(2)(A).   In <u>In re DeLoreto</u>, the denial of discharge was affirmed on

---

[36] The Judge in <u>In re Raymond</u> (Feeney, J.) notes that piercing corporate veil cases are well recognized in Massachusetts and further comments that although there is an absence of state law precedent in Massachusetts concerning "reverse" piercing, she predicts that, were the Massachusetts Supreme Judicial Court to consider such claims, it would likely view reverse veil piercing, as a remedy akin to direct veil piercing.  <u>Id</u>. at 483.

appeal as the bankruptcy court's reverse-piercing of corporate veil analysis determined that the assets of the debtor's entities at issue should have been included in his bankruptcy estate and although the purchaser was ostensibly unaffiliated, there were insider ties to the debtor by virtue of on-going business relations.  In re DeLoreto, 266 Fed.App. 140 (2008).  Here, there is overwhelming evidence that the Debtor and Brendan took clear steps to intentionally drain all assets from Sparrell and shift them to companies under Brendan's control (*BM Mack and BM McNamara*) for less than adequate consideration within six months of the Petition Date.[37]  In fact, the evidence supports that all of Sparrell's assets were being "100% gifted" to Brendan for "no cash exchange."  *See*  AF 29, Ex 19.   Evidence suggests that the Debtor and his attorney (Joseph Kelleher) strategically arranged for the Debtor to retain ownership of the Sparrell's stock (while stripping the company of all its assets) intending to circumvent the technicalities of § 727(a)(2)(A) which is typically only applicable to assets in which the debtor has a direct proprietary interest. *See* testimony of Brendan in which he explains that the purchase price was "**created** by my father and Joseph Kelleher."  Brendan, Day-2, 318:10.[38]  The doctrine of piercing the corporate veil provides equitable remedies that preclude the Debtor from defrauding his creditors in this manner and the record evidence sufficiently establishes that relief under this doctrine is warranted in this case.

---

[37] This scheme was likely in the works for years because the evidence discloses that the since at least November 30, 2015, the Debtor was representing that Brendan was Sparrell's "new owner."  *See* Debtor's representations to the Norfolk Superior Court at the Injunction hearing Trial Day-1, 69:3 and 15.

[38]Attorney Kelleher is also the same attorney who instructed Brendan and the Debtor to stop making payments of the Sparrell Note directly to the Debtor a month prior to Debtor's filing Ch.7. Brendan, Day-2, 249:17-24. There is conflicting testimony concerning Attorney Kelleher's engagement because while Brendan suggests that Attorney Kelleher was working for his father, the Debtor claims that Attorney Kelleher was retained by Brendan and further alleges that neither he nor Sparrell had any legal represent in connection with the transfers to Brendan. Depo.3/8/2019 24:2 – 25:7.  This is just another one of many examples where the Debtor and Brendan were not forthright with information about the transfers.

(b)     **Badges of Fraud**

(i)     **Insider relationships between the parties:**  The term "insider" is defined under

Bankruptcy Code. *See* 11 U.S.C. § 101 (31)(A) and (B).  "Bankruptcy law recognizes two types

of insiders: those specifically identified in § 101(31), commonly referred to as "per se" insiders,

and those not so identified but who have a sufficiently close relationship with the debtor to be

insiders, commonly referred to as "non-statutory" insiders." Miller Ave. Professional &

Promotional Servs. v. Brady (In re Enter. Acquisition Partners, Inc.), 319 B.R. 626, 629 (B.A.P.

9th Cir. 2004).  As explained in Smith v. Lynch (In re Lee), 2010 BNH 29:

> According to the legislative history, "[a]n insider is one who has a sufficiently
> close relationship with the debtor that his conduct is made subject to closer
> scrutiny than those dealing at arms [sic] length with the debtor." See S. Rep. No.
> 95-989, 2d Sess., at 25 (1978); accord H.R. Rep. No. 95-595, 1st Sess., at 312
> (1977). U.S. Code Cong. & Admin. News 1977, pp. 5787, 5963. Persons
> enumerated in section 101(31)(A) are generally referred to as "statutory" insiders.
> In providing that the term insider "*includes*" the statutory insiders, Congress made
> clear that the statutory list is not exhaustive and it is for the courts to define the
> limits of non-statutory insider status. *See* Schreiber v. Emerson (In re
> Emerson), 244 B.R. 1, 31 (Bankr. D.N.H. 1999) ("the classification of insiders is
> not restricted to the statutory definition."). When faced with an alleged non-
> statutory insider, courts must look at the closeness of the relationship between
> the debtor and alleged insider to determine if that closeness prevented
> the debtor and insider from dealing with each other at arm's length. *See* In re
> Emerson, 244 B.R. at 32 ("Cases that have considered the insider issue generally
> have focused on two factors in making the determination of whether a transferee
> is an insider: (1) the closeness of the relationship between the transferee
> and  the debtor, and (2) whether the transactions between the transferee and
> the debtor were conducted at arm's length.").

Id.  *See also,* Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.), 554 F.3d 382,

396 (3d Cir. 2009) ("courts have identified a category of creditors, sometimes called 'non-

statutory insiders,' who fall within the definition but outside of any of the enumerated

categories.")  Here, Brendan's relationship to the Debtor and Sparrell could not be closer,

he is the Debtor's son, who is third generation to be involved in the McNamara family

funeral business, and not only worked for Sparrell since he was 16 years old[39] but also

became its managing funeral director in 2011.  Brendan, 103:22.  Brendan is also owner

and principal of BM Mack (the transferee of the Cohasset and Norwell Properties) and

BM McNamara (the transferee of Sparrell's assets) fitting within the non-statutory

definition of an insider.  It is without question that the transfers here were anything but an

arm's length transaction.

**(ii)      Retention of possession, benefit or use of the property in question:**  A

bankrupt's retention and control of an asset in which legal title has been transferred can

constitute continuing concealment.  *See* In re Vecchione, 407 F. Supp. 609 (E.D.N.Y.

1976), *See also e.g.,*  In re Olivier, 819 F.2d 550, 551 (1987) (continued residency,

maintenance of, payment of insurance, and the absence of payments of rent to the

transferee); Friedell v. Kauffman (in re Kauffmen), 675 F.2d 127, 128 (7th Cir. 1987)(use

of the property as collateral for loans and the payment of mortgage, insurance, and taxes

indicative of a secret property interest under the Bankruptcy Act's substantive equivalent

to § 727(a)(2)(A)); Pelham Plate Glass Inc. v. Charette (In re Charette), 148 B.R. 94, 95-

96 (Bankr. D. Mass. 1992) (transfer to relative for one dollar in anticipation of a writ of

attachment, while continuing to live in the property, make mortgage, tax and utility

payments, and mow the lawn).  In this case, the Debtor contends that November 7, 2016

was the operative date in which Sparrell's real estate and assets were transferred to

Brendan's entities and, as of that specific date, he was retired (Debtor's Affidavit, ¶40),

his involvement with Sparrell was "None" (Depo.7/10/17, 17:3) and his only income was

social security (Debtor's Affidavit, ¶40).  Similarly, Brendan testified that on November

---

[39] Brendan, Day-2, 276:17.

7, 2016, Sparrell ceased operations, its functions were "None", it was "a defunct company" and that November 7, 2016 was Brendan's last day of employment with Sparrell.  Brendan, Day-2, 216:15 – 217:8.  Brendan also testified that from November 7, 2016, his entity, BM McNamara, was conducting funerals at the Cohasset and Norwell Properties.  Brendan, Day-2, 219:25.  Yet, documentary evidence from the Licensure Board established a sharp contradiction to these claims.   The Inspection Reports compiled in connection with the Change in Ownership Applications report that as of September 7, 2018, Sparrell was still operating at the Properties.  Ex 27B and Ex 27D.[40] Further, evidence demonstrates that, legally, the Debtor's involvement in the business after November 7, 2016 could not be "None" because he held a Type 3 license to necessary operate the business after November 7, 2017, handle preneed contracts and sign death certificates which Brendan did not obtain until September 18, 2018. *See* Brendan, Day-2, 223:24 – 226:13.

It was also established that after November 7, 2016, Debtor continued going to the Cohasset and Norwell Properties regularly as he had free access and the pass codes to enter each location, (Depo.3/8/19 13:22 – 16:22 and 31:8 – 34:22) he continued working wakes and funerals, running errands, picking up death certificates (AF 52) and in February 2019 appeared before the Licensure Board asking to extend the deadline to complete certain construction at the Cohasset Property (Ex 27C).  As of March 2019, the business website continued posting the Debtor's profile as its funeral director.  Depo.3/8/19  22:4-18.  The business continued operations under Sparrell's insurance for at least six months after the alleged transfers.  *See* AF 46. The evidence also shows that for at least six months after November 7, 2016, all financial

---

[40] Note that the Change in Ownership Applications from Sparrell to BM McNamara had not been filed with the Licensure Board until July 18, 2019.  Ex. 27A and 27C.

transactions for the business continued running through Sparrell's operating accounts including

receivables and accounts payable for the business (Brendan, Day-2, 254:19 – 255:6 , Ex 41 and

Ex 42) and that through July 18, 2017 a number of draws were made on Sparrell's line of credit

(Brendan, Day-2  264:4 – 267:18 and Ex 28).   Furthermore, after BM McNamara opened its own

checking account, the Debtor had access to the account checkbook and was freely drafting and

signing checks for his own personal expenses, and to employees and vendors, even when not

authorized.  *See* Plaintiff's Proposed Facts at ¶107 (i) – (iv) and 108.   Other examples of

Debtor's personal expenses that used to be paid through Sparrell and continue to be paid through

BM McNamara, include his pool fee, tennis court fees, and dining room fees associated with his

membership at the Scituate Harbor Yacht Club (Brendan, Day-2, 272:5-25).  It is without

question that Sparrell's business operations secretly continued as usual despite the purported

transfers on November 7, 2016.  The Debtor even acknowledged at deposition that there was no

difference in operations.  Depo.7/10/17, 22:11 – 20.

    (iii)   **The lack or inadequacy of consideration for the transfer.**  Brendan

clearly knew the transfer lacked fair consideration.  Brendan's brother in law, Angelo

Medici, was a loan officer at Live Oak Banking Company who assisted in the application

for the Acquisition Loan. Brendan, 128:22 – 129:9.   On May 13, 2016, Brendan e-mailed

Angelo Medici stating:

> ".… I am committed to getting it done and know this is a good deal …..
> biz and properties worth 2.2 – 2.5 million for a total tag of 1.1 million.
>
> I am going to make it happen!
>
> Thanks for the help!

Ex 89.

The Acquisition Loan was instrumental to acquiring the business real estate.

Sparrell's goodwill and long established business at the Cohasset and Norwell Properties

was needed to secure approval of the Acquisition Loan and was leveraged along with the

real estate.[41]   Before the Acquisition Loan was approved, the Debtor and Brendan were

planning to flip the business to Brendan for no consideration. *See* Letter of Intent to Gift

Business, Ex. 19 and Brendan, Day-2, 209:19.

 Other evidence, in addition to Brendan's e-mail (Ex. 90), establishes that the

consideration was inadequate.  In his Personal Financial Statement as of May 31, 2016

the Debtor reported that Sparrell's value was $475,000 (*without real estate*). Ex. 76.  As

of August 12, 2016, the Norwell Property had an appraised value of $811,000.00 and the

Cohasset Property had an appraised value of $1,000,000.00.  AF, 27, Brendan 188:2.

| | | |
|---|---|---|
| Business Assets: | $ | 475,000.00 |
| Norwell Property: | $ | 811,000.00 |
| Cohasset Property: | $ 1,000,000.00 | |
| | $2,286,000.00 | |

The total consideration for the transfers to Brendan's companies between the parties was

documented as only $1,615,000 – which consisted of the assumption and indemnification of the

Acquisition Loan ($1,390,000) plus the Sparrell Note ($225,000).  AF 32 and 33, Ex 22 and 23.

Consequently, the transaction was at least $671,000 less than fair value.[42]

**(iv)    The financial condition of the debtor both before and after the**

**transaction at issue.**  By way of the evidence, the Debtor's ownership interests in

---

[41] During the loan approval process Live Oak Banking Company examined Sparrell's tax returns from 2011 - 2015, the Debtor's management resume, Sparrell's Business Debt Schedule, Profit and Loss Statements, Call activities and audited Pre-Need contract summary, and ran a number of other financial assessments of the business.  *See* Plaintiff's Proposed Facts at ¶56(i)- (x).  In addition to securing repayment of the Acquisition Loan with a mortgage on the real estate, Live Oak Banking Company was also collateralized with a lien on all of Sparrell's business assets.  Ex 69.

[42] Note that this information does not include the Pre-need contract receivables of $369,809.63 identified in the Call Activity Report as of May 31, 2006 (Ex 90) that BM McNamara assumed from Sparrell with the transfer.

Sparrell before November 7, 2016 was at least $671,000 greater than it was after the transfers which left his 100% interest in Sparrell valued at "$0.00" and resulted in Debtor's insolvency.

(v)     **The existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of the debt, onset of financial difficulties, or pendency or threat of suits by creditors.**  At all times relevant to the transfer, the Debtor was indebted to the Plaintiff for the Deficiency due on Note-1 in excess of $156,732.44.  <u>AF 19</u>, <u>Lindberg, 34:22 – 35:7</u>.  The evidence shows a pattern of the Debtor engaging in dishonest activities to avoid repayment of his obligations to the Bank:

- Debtor misrepresented to the Norfolk Superior Court that Brendan was the owner of Sparrell in 2015 in an effort to avoid the Injunction; <u>Trial 69:3 and 15</u>;

- Debtor deposited funds from Sparrell to a secret account set up in the name of Brendan and Alice to circumvent the Injunction. <u>Ex 6</u>, <u>Ex 32, Brendan 246:16 – 248:10 and Day-2 246:13 – 247:21</u>;

- Debtor gave incomplete information in his Affidavit of Indigency in order to avoid paying the appeal bond while trying to drag out the Eviction Process through appeal.  <u>Ex. 85</u> (*Affidavit is devoid of any information of Debtor's ownership interests in Sparrell*); and

- Debtor stripped the Mortgaged Property of all fixtures and things of value following foreclosure which he then allowed his son to sell.  <u>Lindberg 40:14 – 41:7</u>, <u>Depo7/10/17 13:5 – 14:1</u>.

Additionally, the record contains an acknowledgement from the Debtor that he transferred the funeral home to Brendan to avoid claims from John and John's family who the Debtor claims were "chasing" him – "trying to sell the funeral home from underneath" him and "making [his] life miserable." Depo.3/8/19. 27:6 – 17.   Intent does not require a debtor's intent to hinder, delay, or defraud *all* of his creditors, "the statute requires only the debtor make the transfer with intent to hinder, delay or defraud 'a creditor.'" Aweida v. Cooper (in re Cooper), 150 B.R. 462, 467 (D.Colo. 1993)(citing First Beveraly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir.1986).  Despite the Debtor's claim that he made the transfer to avoid "just [his] brother", there is sufficient evidence to support his intent to shake loose his indebtedness of the Deficiency.

**(vi)      The general chronology of the events and transactions under inquiry.**

The chronology of the events at issue in this case expose the Debtor's fraudulent intent. Prior to the Debtor (and Brendan's) siphoning of Sparrell's assets, the Plaintiff commenced the Deficiency Action seeking a judgment against the Debtor in excess of $156,732.44.  AF 19, Lindberg, 34:22 – 35:7 and 49:25- 50:12, Ex. 9.   Sparrell was a "reach and apply" defendant in the Deficiency Action, subject to a permanent injunction to restrict Sparrell and the Debtor from alienating the Debtor's ownership interests in Sparrell so that the interests could be assumed and liquidated by the Plaintiff to satisfy the Deficiency.  Ex 9 at Count II.  Faced with these pending claims, the Debtor (and Brendan) proceeded to drain Sparrell of its assets.[43]

---

[43] As transferees, BM Mack (its principals, Brendan and Melissa) and BM McNamara (its principal) have potential liability to the Plaintiff for their participation in the fraudulent transfers.  The Plaintiff's Complaint seeks authorization to pursue derivative claims against Sparrell and the recipients of the fraudulent conveyances.

The reach and apply claims also sought to enjoin the Debtor from receiving
payments from Sparrell (other than wages due) which is why the Sparrell Note was likely
devised as part of Brendan's purchase price to Sparrell – rather than a note payable
directly to the Debtor (even though he was taking the payments) - or a purchase of the
Debtor's stock in Sparrell by Brendan.

   **(vii)    An attempt by the debtor to keep the transfer a secret.**  Debtor's lack
of transparency and false statements made in connection with his Ch. 7 exemplify his
attempt to hide the transfers, including:

   (a)    A claim that his "100%" ownership in Sparrell was "$0.00" in response to
          Question 19 of Schedule A/B (<u>AF 39</u>, <u>Ex 31</u>);

   (b)    The "No" responses he made to questions in Schedule A/B that should
          have disclosed interests in the Sparrell Note, such as:  Question 35
          regarding any financial assets not already listed (<u>AF 39</u>, <u>Ex 31</u>), Question
          37 inquiring about legal or equitable interests in any business-related
          property (<u>AF 40</u>, <u>Ex 31</u>) and  Question 44 seeking disclosure of any
          business-related property not already listed (<u>AF 41</u>, <u>Ex 31</u>);

   (c)     The "No" response to Question 28 of the Statement of Financial Affairs asking
          whether he gave a financial statement to anyone including financial institutions
          and creditors about his business within 2 years before filing bankruptcy which
          would have divulged transactions with Live Oak Banking Company and
          representations of Sparrell's financial condition prior to the transfers and his
          intent to gift the company to Brendan for no cash exchange (<u>AF 44</u>, <u>Ex 31</u>); and

(d)     The evasive, false and/or misleading responses that he made during Plaintiff's

depositions of the Debtor and Sparrell in this case concerning their financial

affairs and transactions, including the Sparrell Note and transfer of Sparrell's

assets that drained the value of its stock.

**(c)     <u>Piercing the Veil</u>**

The record shows that the Debtor exercised pervasive control of Sparrell, its accounts and

assets, particularly after taking full ownership of the company in the 2011 Settlement with his

brother John:

**(i)     Debtor paid personal expenses through Sparrell's corporate account.**   The

facts show that while under his management, the Debtor used the corporate account for his own

benefit, running various personal expenses through Sparrell's business accounts, including:

(a)  Mortgage payments that he and Alice owed on their residence to the Plaintiff.

<u>Lindberg 60:1-7, Brendan, Day-2, 269:16, 270:9 -11, Ex 91;</u>[44]

(b)  Student loans for his adult children.   <u>Brendan, Day-2, 270:21- 271:32;</u>[45]

(c)  Dues and fees to maintain Brendan's personal membership at the Scituate Country

Club. <u>Brendan, Day-2, 272:1 and 13;</u>[46] and

(d)  Dues and fees to maintain his and Brendan's memberships at the Scituate Harbor

Yacht Club. <u>Brendan, Day-2, 272:3 and 13.</u>[47]

---

[44] *See also* General Ledgers from 2011 to 2017, <u>Ex 33</u> at pp.2, 6, 8 17, 26, 28, 37 and 40;  <u>Ex 34</u>, at p. 6, 12,16, 25 and 28; <u>Ex 35</u>, at pp. 3, 7, 11, 15, 18 and 21; <u>Ex 36</u> at pp. 3, 15, 19, 22; and <u>Ex 37</u> at pp. 8, 13, 18 and 21.

[45] *See also* General Ledgers entries at <u>Ex 33</u> at pp.2, 6, 7, 18, 24, 25, 31 and 40;  <u>Ex 34</u>, at p. 21; <u>Ex 37</u> at pp 3 and 6;  <u>Ex 38</u> at pp. 5 and 6; and  <u>Ex 40</u>, at p. 8 and 9.
[46] *See also* General Ledgers entries at <u>Ex 33</u> at pp.2, 14, 26, 28, 40 and 44;  <u>Ex 34</u>, at pp. 6, 11, 17, 22, 25.

[47] *See also* General Ledgers: <u>Ex 33</u> pp. 6, 9, 19 and 26; and <u>Ex 34</u>, at pp. 11 and 13.

Brendan's claim that the Debtor's personal expenses were paid by the company to make up for the insufficient salary he drew from the business is not credible nor was there any credible evidence introduced to support Brendan's representation that the expenses were later reported to the taxing authorities as income on the Debtor's personal taxes.  Brendan, Day-2, 293:21 – 294:2.

       **(ii)**       **The Debtor used the Acquisition Loan to satisfy personal liabilities.**  The evidence shows that the Debtor paid off over $217,000 of personal liabilities from the Acquisition Loan in which Sparrell was indebted.  Specifically, disbursements on the Settlement Statement (HUD-1) for the closing on the Acquisition Loan show:

- $42,069.61 was made to payoff the Norfolk Judgment against the Debtor and Alice; and

- $175,000.00 was deposited with Forethought to satisfy the Pre-Needs Obligations of which the Debtor was liable under an indemnification to John.[48]

AF 28, Ex 17.

Brendan's claim that John agreed to payoff the outstanding Pre-Needs Obligations ($175,000) and the Norfolk Judgment ($42,069.61) for the Debtor is not credible nor is it consistent with the evidence.  All of the funds that were disbursed at the closing were derived from the proceeds of the Acquisition Loan.  As confirmed by the HUD and Brendan's testimony, no outside cash was contributed to the transaction at the closing from the Seller (*McNamara Associates /i.e. John*).  Ex 17 (lines 392 and 603), Brendan 175:4 and 178:19.  Furthermore, the evidence shows that John charged the Debtor and Sparrell a $10,000 penalty because they caused

---

[48] The Debtor acknowledged that the $175,000 outstanding Pre-Needs Obligations needed to payoff off John's Indemnification was his own personal obligation.  *See*  Depo.3/8/19 89:10.

a one day delay in the closing.  Brendan 178:4.   Given the apparent contentious relationship

between the Debtor and his brother, it is neither likely nor logical that John would have then

agreed to pay over $217,000 of personal liabilities for Debtor while at the same time charging

him a $10,000 penalty for a one day delay.  Moreover, the transaction in which the Acquisition

Loan was obtained was essentially a completion of the Asset Purchase Agreement between the

Debtor and John further documented by the Settlement Agreement. (Ex 10).  The deal between

the Debtor and John under their Asset Purchase Agreement involved valuations of their

respective stock in Sparrell and McNamara associates.[49]  On its face, the transaction involving

the Acquisition Loan was made to appear as if Sparrell was simply borrowing the funds to

exercise its Option to Purchase the Cohasset and Norwell Properties.  Yet, a closer review of the

arrangement shows that the loan proceeds were used to wrap up Debtor's buyout of John's 50%

interest in the real estate under the Asset Purchase Agreement between them.  Evidence discloses

that John and the Debtor acquired the Cohasset and Norwell Properties in 1983 which they

owned jointly before transferring the properties to McNamara Associates in 1999.  Brendan

165:21, Ex 87.  Per the Settlement Agreement, the undisclosed Asset Purchase Agreement

between John and the Debtor required the Debtor to surrender his interests in McNamara

Associates and fulfill his buyout of John's interests.  The HUD from the closing on the

Acquisition Loan shows proceeds were paid to the Seller (*McNamara Associates LLC, i.e. John*)

---

[49] During discovery, the Asset Purchase Agreement was not produced.  One party to that transaction was dead (John) and the other (the Debtor) claimed to be unable to recall the terms (Depo.3/8/19 93:1) instead claiming that his other brother Paul (also deceased) might know the details and amounts.  Brendan was not involved in the Asset Purchase Agreement or negotiations of the Settlement Agreement and had limited details and ability to testify on the issues.  However, it is clear from the Settlement Agreement that based upon the appraisal of the businesses being spilt between John and the Debtor an even distribution called for funds to run both ways (to John as well as to the Debtor) and whoever retained the assets with the higher value, owed the difference to the other.  The deal was also complex as there were non-business assets included such as a family summer home at 83 Surfside Road, Scitiate.  *See* Ex. 10, ¶7.  At trial, Brendan agreed that the real estate held by McNamara Associates had greater value.  Brendan 107:12.

in the sum of $275,188.49.  *See* Ex 17 at Line 560.  At trial, Plaintiff's counsel demonstrated

that this amount ($275,188.49) was the sum owed to John to buy out his 50% interest in the

Cohasset and Norwell Properties.  The Debtor would have forfeited his original interests in the

Properties if he was unable to complete the purchase – see below:

| | |
|---|---|
| The Purchase Price under the Lease ($1,322,000), less credits for rent paid during the Lease ($120,000) and mortgage payments paid during the lease ($102,000). Ex. 11 (at ¶4.3): | $  1,100,00.00 |
| Less payoff of the existing mortgage to Eastern Bank. Ex. 17 (at line 504), Brendan 176:7: | ($  569,018.60) |
| | $  530,981.40 |

John's 50% interest in the balance ($530,981.40) is $265,490.70.  Plus the $10,000

penalty charged to the Debtor by John for the one day delay in closing equals a total of

$275,490.70.[50]

Consequently, there was no credible evidence introduced to support Brendan's claim that

John paid the Debtor's Pre-Need Obligations ($175,000) and the Norfolk Judgment ($42,069.61)

at the closing – all of the disbursements came from funds obtained by Sparrell under the

Acquisition Loan.

**(iii)    There was a confused intermingling of business activities and assets involving**

**the Sparrell Note.**  The evidence shows that the Debtor personally collected payments made on

the Sparrell Note.  AF 45, Ex 32.

In March 2018, after it was discovered through deposition in this case that the Debtor had

collected the payments due on the Sparrell Note, Brendan set up the New Account and arranged

---

[50] Remarkably, the difference between John's 50% interest in Cohasset and Norwell Properties and the amount paid to Seller under the HUD is only $302.21.

for it to be used as BM McNamara's pass through for payments on Sparrell's open line of credit with Eastern Bank. *See* Plaintiff's Proposed Facts ¶¶109 -112. This was done under the guise that the New Account was funded by payments received from Brendan's companies on the Sparrell Note.

**(vi)    The Debtor engaged Sparrell in activities promoting fraud.** The record indicates that while under the Injunction, the Debtor arranged for payments due to him from Sparrell to be deposited into an account set up in the name of Brendan and Alice to circumvent the Order. Ex. 6, Ex. 32 and Brendan 246:1 3– 248:10.

The record shows that the Debtor carried a number of purported family loans on Sparrell's books and account (in excess of $600,000) as long term liabilities which could not be explained and were arbitrarily "Zeroed out" when the underwriters at Live Oak Bank were seeking explanations. *See* Ex. 88.[51]

**(v)    The Debtor siphoned away Sparrell's assets and now claims it to be insolvent.** After transferring and/or gifting all of Sparrell's assets to Brendan's companies, Debtor claims the value of Sparrell is "$0.00" in his bankruptcy filings. AF, 39, Ex. 31

**(3) Conclusion – Count III**

The record in this case provides ample factual and circumstantial evidence demonstrating dubious manipulation, contrivance and finagling of Sparrell's assets to justify the exceptional circumstances that warrant the unusual outside "reverse" piercing of the corporate

---

[51] Some of these appear to have been reported by the Debtor in Sparrell's corporate tax returns as "Loans from shareholders" in Schedule L to show a loss. See Ex. 55, 56, 57 and 58.

veil.  As a consequence, the Debtor's discharge must be denied under 11 U.S.C. § 727(a)(2).

Judgment in favor of the Plaintiff on Count III of the Complaint should enter.

**IV.**   **Conclusion**

WHEREFORE, for all the foregoing reasons, the Plaintiff respectfully requests that this

Honorable Court grant judgment in favor of the Plaintiff on all three Counts of its Complaint

and

A.      Deny the Debtors discharge pursuant to 11 U.S.C. §§ 727(a)(4), 727 (a)(5)

and 727 (a)(2);

B.      Authorize and/or empower the Plaintiff to pursue derivative claims against

Sparrell for its fraudulent conveyances and the recipient(s) of said

fraudulent conveyances (BM Mack, BM McNamara and their principals,

Brendan and Melissa); and

C.      Grant such other and further relief as justice may require.

Respectfully submitted,

The Plaintiff,

The Bank of Canton

By its Attorneys,

Dated: April 20, 2020

/s/ Michael A. Wirtz

_____

Jack J. Mikels, BBO# 345560
Michael A. Wirtz, BBO# 636587
JACK MIKELS & ASSOCIATES, LLP
1 Batterymarch Park, Suite 309
Quincy, MA  02169-7454
Tel:  617.472.5600
Email: Lawoffice@jackmikels.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of April, 2020, I caused a true copy of the <u>Plaintiff,</u>

<u>The Bank of Canton's Proposed Findings of Fact and Conclusions of Law</u> to be served upon all

parties of record and/or with appearances in the above action, including the following counsel for

the Defendant by electronic means:

> Joseph G. Butler, Esq.
> Law Office of Joseph G. Butler
> 355 Providence Highway
> Westwood, MA 02090
> JGB@JGButlerlaw.com

> /s/ Michael A. Wirtz
> _____
> Michael A. Wirtz, BBO# 636587
> JACK MIKELS & ASSOCIATES, LLP
> 1 Batterymarch Park, Suite 309
> Quincy, MA 02169-7454
> Tel: 617.472.5600
> mwirtz@jackmikels.com