**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 17-11329-MSH |
| ROBERT R. MCNAMARA, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| THE BANK OF CANTON, | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| | ) | No. 18-01022-MSH |
| v. | ) | |
| | ) | |
| ROBERT R. MCNAMARA, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

*I.     Introduction*

The Bank of Canton, a creditor of Robert R. McNamara, the debtor in the main chapter 7

case and the defendant here, initiated this adversary proceeding seeking a denial of Mr.

McNamara's discharge under Bankruptcy Code § 727.[1]  In its complaint, the bank asserts claims

against the debtor in three counts, each invoking a subsection of section 727 of the Code: count I

– false oath or account pursuant to Code § 727(a)(4); count II – failure to satisfactorily explain a

loss or deficiency of assets pursuant to Code § 727(a)(5); and count III – transfer, removal or

destruction of property within one year before the bankruptcy filing pursuant to Code §

---

[1] References to the Bankruptcy Code or the Code are to 11 U.S.C. §§ 101-1532.

727(a)(2). Having completed the trial in this matter, I now set forth my findings of fact and conclusions of law as to Mr. McNamara's entitlement to a discharge.

## II.  Procedural History

The debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this court on April 13, 2017. On April 28, 2017, he filed schedules of assets and liabilities, a statement of financial affairs, and related documents in support of his petition. He appeared and testified under oath at a meeting of creditors conducted pursuant to Code § 341 on May 17, 2017, and a continued meeting of creditors, combined with an examination pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, on July 10, 2017. The bank filed its complaint initiating this adversary proceeding on February 14, 2018, and deposed the debtor on March 8, 2019. A two-day trial was conducted on February 18 and 19, 2020. Two witnesses gave live testimony. The debtor, whose health prevented him from appearing in person, testified by the parties' joint introduction of portions of the transcripts of the various examinations of the debtor under oath. *See* Fed. R. Evid. 804. Over 80 exhibits were admitted into evidence. The parties submitted proposed findings of fact and conclusions of law on April 20, 2020, after which the matter was taken under advisement.

## III.  Findings of Fact

### a.  The Debtor's Business

The debtor has devoted his entire professional career to his family's business, McNamara-Sparrell Funeral Homes. In 1983, the debtor and his brother John B. McNamara founded the business, which operated three funeral homes located in Norwell, Cohasset, and the Brighton neighborhood of Boston, Massachusetts. The business was operated through various entities owned in equal shares by the debtor and John. The Norwell and Cohasset homes were

operated by Sparrell Funeral Services, Inc., and the Brighton home was operated by McNamara

Funeral Home, Inc. The real estate where the Norwell and Cohasset funeral homes were located

was originally owned jointly by the debtor and John. Title to the properties was transferred to

McNamara Associates, LLC in 1999. The Brighton funeral home operated on real estate owned

by the Four Sixty Nominee Trust of which the debtor and John were co-trustees and equal

beneficiaries along with their brother, Paul McNamara.

Around 2011, John discovered that Sparrell could not account for certain funds that

clients had paid in advance (often well in advance) for funerals in the Norwell and Cohasset

homes. Euphemistically referred to as "pre-needs" payments, these funds are required by state

law to be held in trust by funeral homes until funeral services are needed. After an internal

investigation, it was determined that about $250,000 of pre-needs funds were missing. This

exposed the operating entities, as well as the debtor and John personally, to significant monetary

liability, not to mention state regulatory enforcement action and tremendous loss of business

goodwill.

The discovery of the missing pre-needs funds led to a falling-out between the debtor and

John, resulting in the decision to sever their business relationship. On August 31, 2011, they

entered into a settlement agreement pursuant to which the debtor agreed to transfer his

membership interest in McNamara Associates (owner of the Norwell and Cohasset real estate)

and his beneficial interest in the Four Sixty Nominee Trust (owner of the Brighton real estate) to

John and John agreed to transfer his stock in Sparrell (owner of the Norwell and Cohasset funeral

businesses) to the debtor.[2] The debtor and Sparrell agreed to indemnify John and certain of his

---

[2] At some point prior to the settlement, the Brighton funeral business had been sold but
apparently the family retained ownership of the real estate.

affiliates from any claims arising out of the missing pre-needs funds. As a result of the settlement, the debtor became the sole owner of Sparrell (which owned the funeral businesses in Norwell and Cohasset), and John became the sole owner of McNamara Associates (which owned the Norwell and Cohasset real estate). In practical terms, John became the debtor's landlord.

In furtherance of the settlement, Sparrell entered into a lease with McNamara Associates for the Norwell and Cohasset properties. The lease had an initial five-year term with combined base rent for the two properties of $2,000 per month. Under the lease, Sparrell was responsible for mortgage payments, real estate taxes, and utility payments on the properties. The lease contained an option to renew at the end of the initial five-year term with rent to be fixed at the then-prevailing market rate. It also contained an option for Sparrell to purchase the Norwell and Cohasset properties. Critically, the lease required that before the purchase option could be exercised, all missing pre-needs funds had to be fully restored to the funeral homes.

The debtor's son, Brendan, began working as an employee of Sparrell around 2004. Roughly at the time of the 2011 settlement by which the debtor and John parted ways, Brendan became Sparrell's funeral director and took over many of the day-to-day operations of the funeral homes. The debtor, whose income until that time was derived from owner's draws, became a salaried employee of Sparrell. The debtor nevertheless remained the sole officer and shareholder of Sparrell. He also continued to hold the "type 3" license issued by the Massachusetts Board of Registration in Embalming and Funeral Directing under which Sparrell operated and without which no funeral services could be performed. As discussed below, it was not until 2018 that Brendan obtained a type 3 license.

### b.   The Bank of Canton's Claims

On November 9, 2007, the debtor and his wife, Alice, borrowed $746,250 from the Bank of Canton and granted the bank a first mortgage on their home in Norwell to secure repayment ("the First Loan"). On February 1, 2008, they borrowed another $50,000 secured by a second mortgage on their home ("the Second Loan").

In 2014, the debtor and Alice fell into default on both loans. On June 11, 2015, the bank conducted a foreclosure sale of their Norwell home. The bank was the high bidder at the foreclosure sale. After reducing the amount due on the First Loan by the amount of its bid, the bank was left with a deficiency balance on the First Loan of $156,732.44. The bank also retained its claim on the Second Loan, now unsecured as a result of the foreclosure, in the amount of $43,615.37.

The debtor refused to leave his home after the foreclosure sale, compelling the bank to bring an eviction action against the McNamaras in the local housing court. The debtor fought the eviction and after losing in the housing court, took an appeal. The parties eventually reached a settlement in which the McNamaras agreed to be out of the house by July 6, 2016. On July 6, 2016, the McNamaras were still in the house. The bank had to have them, and their belongings forcibly removed. When the bank's personnel entered the vacant house, they discovered that all the kitchen cabinets, appliances and fixtures had been torn out.

On November 18, 2015, the bank brought suit in state court against the debtor and Alice to collect the balance due on the Second Loan. Sparrell was named in the complaint as a reach and apply defendant. On June 29, 2016, the bank obtained a default judgment against the debtor and Alice in the amount of $43,615.37. The bank also obtained an injunction prohibiting the

debtor from transferring certain assets, including his interest in Sparrell, and prohibiting Sparrell from paying any money to the debtor, other than wages, until the bank's judgment was satisfied.

On August 15, 2016, the bank initiated a second suit against the debtor and Alice seeking to collect the deficiency balance on the First Loan and seeking to reach and apply the debtor's interest in Sparrell to satisfy its claim. That suit was stayed as a result of the debtor's bankruptcy filing on April 13, 2017.

### c.   Financing and Transfers of the Real Estate and Funeral Home Business

In 2016, as the end of the initial five-year lease term for the Norwell and Cohasset properties loomed, the debtor and Brendan began discussions about Sparrell's exercising the option to purchase the funeral home properties from John's company. The debtor and Brendan had concluded that Sparrell could not afford to renew the lease based on prevailing market rents, so the purchase option was the only way for Sparrell to continue in business. Sparrell did not have the capital to purchase the properties and to pay the outstanding pre-needs obligations as required by the settlement agreement with John. Sparrell needed financing. The debtor and Brendan knew that any prospective lender to Sparrell would require a personal guarantee. They also knew that as a result of the debtor's defaults, foreclosure and litigation in connection with the Bank of Canton loans, his personal guarantee would be of little or no value. Brendan and his wife, Melissa, agreed to join as guarantors on any loan to Sparrell for acquisition of the properties with the understanding that the debtor would transfer ownership of the properties and the funeral businesses to Brendan at some point after the acquisition.

Brendan set out to find a lender willing to finance Sparrell's purchase of the Norwell and Cohasset properties. He located Live Oak Bank, a lender with a niche in financing funeral businesses, where his brother-in-law was a loan officer.

As part of Live Oak's due diligence, Sparrell was required to submit to Live Oak numerous documents, including financial statements and income tax returns, and the debtor was required to submit a personal financial statement. According to these documents, the debtor valued his 100% ownership interest in Sparrell at $475,000 as of May 2016. Live Oak also obtained appraisals which valued the Norwell property at $811,000 and the Cohasset property at $1,000,000, as of August 2016.

The debtor, as the sole officer and shareholder of Sparrell, was required to electronically sign the loan application to Live Oak on his and Sparrell's behalf and to upload the application and all the supporting financial statements and other documents to Live Oak's electronic portal. The debtor authorized Brendan to e-sign his name and upload the documents on his behalf. The debtor also submitted to Live Oak a letter acknowledging the debtor's intent to gift Sparrell to Brendan for no consideration. Live Oak required this letter due to its concerns about the debtor's ability to operate the business successfully in light of the debtor's personal financial difficulties.[3] Again, the debtor authorized Brendan to sign his name to the letter of intent.

Ultimately, Live Oak approved the loan application and agreed to lend Sparrell $1,390,000. The closing took place on September 23, 2016, and was attended by the debtor who executed by hand the various loan documents. From the loan proceeds, payments were made to John's company, McNamara Associates, for the purchase of the Norwell and Cohasset real estate, to Eastern Bank to discharge existing mortgages on those properties, to an entity known as Forethought to fully replenish the missing pre-needs funds (as required in the settlement agreement between the debtor and John), and to the Bank of Canton to satisfy its outstanding

---

[3] It is also likely that Live Oak required this letter in order to confirm the existence of consideration for Brendan and Melissa's guarantees.

judgment against the debtor and Alice for their liability on the Second Loan. Quitclaim deeds

from McNamara Associates to Sparrell transferring the Norwell property for consideration of

$440,000 and the Cohasset property for consideration of $660,000, were recorded on September

27, 2016. Live Oak simultaneously recorded first mortgages on those properties to secure

Sparrell's obligations under the loan. Live Oak did not take security interests in any other assets

of Sparrell or the debtor.

In October of 2016, shortly after the Live Oak loan closing and Sparrell's acquiring the

Norwell and Cohasset properties, Brendan formed two companies—BM Mack Properties, LLC

and BM McNamara Funeral Services, Inc. BM Mack, a Massachusetts limited liability company,

whose members were Brendan and Melissa, was formed to engage in commercial property

ownership and management. BM McNamara, a Massachusetts corporation, whose sole officer

and director was Brendan, intended to engage in the business of providing burial, cremation, and

funeral services.

On November 7, 2016, Sparrell transferred its newly acquired real estate to BM Mack

and its business assets, tangible and intangible, to BM McNamara. Sparrell sold the Norwell and

Cohasset real estate to BM Mack for consideration consisting of BM Mack's assuming Live

Oak's mortgage debt of $1,390,000 plus $200,000 ($100,000 per property). Sparrell sold all its

business assets to BM McNamara for consideration of $25,000 and BM McNamara's agreeing to

indemnify Sparrell and the debtor for all liability on the Live Oak loan. Thus, the total

consideration, over and above the assumption and indemnification of the Live Oak debt, paid by

Brendan's companies to purchase all the assets of Sparrell was $225,000. None of this was paid

in cash. BM Mack and BM McNamara gave Sparrell a 15-year fixed rate unsecured promissory

note for $225,000 (the "BM Note"), calling for regular monthly payments of $950 based on a 30-year amortization schedule.

Brendan believed that his companies' acquisition of the Sparrell real estate and business assets for $225,000 plus the assumption and indemnification of the $1,390,000 Live Oak debt was a good deal. Based on the Live Oak real estate appraisals and the financial documents submitted to Live Oak, he considered the business and properties to be worth between $2.2 and $2.5 million. His companies were purchasing them for the equivalent of $1,615,000, all of which was financed.

### d.   Operation of the Funeral Business Following the Transfer from Sparrell

For some months following the transfer of Sparrell's real and business property to Brendan's companies, Brendan operated the funeral business as if the transfers had never taken place. BM McNamara used Sparrell's bank accounts and operated under Sparrell's insurance policies after the November 2016 transfers until April or May 2017. Sparrell had a revolving line of credit with Eastern Bank, and Brendan caused Sparrell to draw on the line on multiple occasions between November 2016 and July 2017 and used the loan funds for funeral operations of BM McNamara. BM McNamara did not obtain its own funeral establishment license from the Commonwealth of Massachusetts until July 18, 2018, operating until then under Sparrell's and the debtor's licenses. Until BM McNamara obtained its own license, the debtor continued to be listed as the owner of the funeral business in the state's records.

After the sale to Brendan's companies, the debtor continued to perform duties for the business. He retained complete physical access to the funeral homes and would regularly go there. He would assist with funeral services as a greeter or pallbearer, particularly if he knew the family of the deceased. He would frequently run errands for Brendan and his companies,

including going to local municipal offices to obtain death certificates. He was not compensated

directly for his services but did receive indirect compensation in the form of occasional payments

by BM McNamara of certain of his personal expenses, for example, tabs run up at his yacht club.

In running errands for BM McNamara, such as picking up death certificates, the debtor

sometimes wrote checks from BM McNamara's operating account. While the debtor did not

have check-signing authority, he would on occasion sign checks. Generally, he would sign

Brendan's name but in a few instances the debtor signed his own name on the checks and

Brendan would authorize the bank to process the checks as written.

The evidence included a BM McNamara check for personal expenses of the debtor

payable to CVS Pharmacy on which it appeared the debtor signed Brendan's name. The debtor

had a distinctive way of writing checks adding "squiggle" symbols in various places as

flourishes. In deposition testimony that was admitted into evidence at trial, the debtor denied

signing the check, insisting that Brendan had signed it and given it to him as a gesture of love.

Brendan, however, testified that the debtor had stolen the check and forged his signature.

The BM Note given by Brendan's companies to Sparrell for the purchase of its assets in

November 2016 called for payments to Sparrell of $950 per month. Copies of checks introduced

at trial show that the first five note payments, for November through March, were made directly

to the debtor rather than to Sparrell. Brendan testified that this was a mistake which was rectified

as to all subsequent payments. It is noteworthy that the mistake was rectified just around the time

the debtor filed his bankruptcy petition.

Brendan testified that the BM Note payments were ultimately intended to enable Sparrell

to provide the debtor with a steady income. Initially, Sparrell would need the money generated

from the BM Note to service its debt obligations consisting of $45,426.07 owed to Eastern Bank

and $4167.12 owed to HarborOne Credit Union. Any sums remaining after monthly payments on those debts would be available to be distributed to the debtor. In April 2018, BM McNamara borrowed $60,000 from Eastern Bank and deposited $40,000 into an account Brendan had previously set up for Sparrell. Brendan, who had sole check signing authority on this new Sparrell account, arranged for automatic monthly withdrawals from that account to service Sparrell's Eastern Bank debt. This freed up most of the monthly BM Note payments for distribution to the debtor.

Sparrell's outstanding liabilities as of the debtor's April 13, 2017 bankruptcy filing date consisted of the debts to Eastern Bank, HarborOne, and Live Oak. While both Sparrell and the debtor remained liable for the Live Oak debt, after the transfer of Sparrell's assets to Brendan's companies, Live Oak modified its loan documents to add BM Mack as an obligor under the note. In addition, BM McNamara took on the primary responsibility to pay Live Oak each month and also indemnified Sparrell from any liability to Live Oak.

On the other side of the ledger, Sparrell's assets on the debtor's bankruptcy filing date consisted of the BM Note plus a small bank account balance of approximately $8,000. Putting aside Sparrell's liability on the Live Oak loan which was subject to indemnification and was being serviced by BM McNamara, Sparrell's assets exceeded its liabilities by approximately $180,000.

### e.   Debtor's Filings Under Oath in His Bankruptcy Case

On the schedules of assets and liabilities filed by the debtor in support of his bankruptcy petition and signed by him under the pains and penalties of perjury, the debtor listed as an asset his 100% ownership interest in Sparrell which he valued at zero. On schedule A/B, he answered "No" in response to item 53, which asked, "Do you have other property of any kind you did not

already list? Examples: Season tickets, country club membership." The debtor stated on schedule

I that he was not employed and that his sole income was from social security.

On his statement of financial affairs, which the debtor also signed under the pains and

penalties of perjury, he answered "No" in response to question 28 which asked, "Within 2 years

before you filed for bankruptcy, did you give a financial statement to anyone about your

business? Include all financial institutions, creditors, or other parties." In response to question 5

asking for all income received since January 1, 2017, the debtor listed only his social security

income.

### IV.     Legal Standard

#### a.   Applicable Law Generally

Bankruptcy Code § 727(a) provides that "[t]he court shall grant the debtor a discharge,

unless" one of several enumerated exceptions applies. The bank claims that the debtor's

discharge should be denied pursuant to Code § 727(a)(4)(A), § 727(a)(5), and § 727(a)(2)(A),

each of which is discussed in turn below. A plaintiff bears the burden of proof on an objection to

a debtor's discharge. Fed. R. Bankr. P. 4005. The denial of a debtor's discharge under Code §

727 requires proof sufficient to establish grounds for such relief by a preponderance of the

evidence. *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 (6th Cir.

1994) (applying the rationale of *Grogan v. Garner*, 498 U.S. 279, 291 (1991) to § 727 actions).

"[T]he statutory right to a discharge should ordinarily be construed liberally in favor of the

debtor." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

#### b.   Count I - § 727(a)(4)(A)

Code § 727(a)(4)(A) mandates denying a discharge to a debtor who "knowingly and

fraudulently, in or in connection with the case . . . made a false oath or account." In *Lussier v.*

*Sullivan (In re Sullivan)*, 455 B.R. 829, 837 (B.A.P. 1st Cir. 2011), the United States Bankruptcy

Appellate Panel for the First Circuit reiterated the well-settled standard adopted by the United

States Court of Appeals for the First Circuit in *In re Tully* for complaints under § 727(a)(4)(A).

> The First Circuit has dissected the language of § 727(a)(4)(A) into two parts: (1)
> the plaintiff must show that the debtor knowingly and fraudulently made a false
> oath; and (2) the false statement must relate to a material fact. *See In re Tully*, 818
> F.2d at 110. Further, "the burden of proof rests with the [plaintiff] but once it
> reasonably appears that the oath is false, the burden falls upon the [debtor] to come
> forward with evidence that he has not committed the offense as charged." *Id.* (citing
> *In re Shebel*, 54 B.R. 199, 202 (Bankr. D. Vt. 1985) and quoting *In re Mascolo*, 505
> F.2d 274, 276 (1st Cir. 1974)) (internal quotation marks omitted).

*In re Sullivan*, 455 B.R. at 837 (alterations in original).

For § 727(a)(4)(A) purposes, a debtor makes oaths in the debtor's schedules and

statement of financial affairs, as well as through the debtor's statements during the creditor

meeting under § 341. *See Perry v. Warner (In re Warner)*, 247 B.R. 24, 26 (B.A.P. 1st Cir. 2000)

(citing 28 U.S.C. § 1746); *Freelife Int'l, LLC v. Butler (In re Butler)*, 377 B.R. 895, 922 (Bankr.

D. Utah 2006); Fed. R. Bankr. P. 1008. False oaths can include affirmative misrepresentations as

well as omissions of assets, income, and transfers. *See Olympic Coast Inv., Inc. v. Wright (In re

Wright)*, 364 B.R. 51, 73 (Bankr. D. Mont. 2007) (citing *Fogal Legware of Switzerland, Inc. v.

Wills (In re Wills)*, 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999)).

False oaths are made knowingly and fraudulently when the truth is known but the debtor

"'nonetheless willfully and intentionally swears to what is false.'" *JP Morgan Chase Bank, N.A.

v. Koss (In re Koss)*, 403 B.R. 191, 213 (Bankr. D. Mass. 2009) (quoting *Gordon v. Mukerjee (In

re Mukerjee)*, 98 B.R. 627, 629 (Bankr. D.N.H. 1989). They are also so made if the debtor shows

reckless disregard for or indifference to the truth. *Robin Singh Educ. Servs., Inc. v. McCarthy (In

re McCarthy)*, 488 B.R. 814, 826 (B.A.P. 1st Cir. 2013); *In re Tully*, 818 F.2d at 112; *see also In

re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (concluding that "not caring whether some

representation is true or false" satisfies the applicable intent standard). A debtor's mere

inadvertence or mistake is generally not sufficient. *In re Mukerjee*, 98 B.R. at 629; *In re Tully*,

818 F.2d at 110. Yet, the "'cumulative effect of a series of innocent mistakes'" can demonstrate

reckless disregard. *In re McCarthy*, 488 B.R. at 826 (quoting *Discenza v. MacDonald (In re*

*MacDonald)*, 50 B.R. 255, 259 (Bankr. D. Mass. 1985)). The debtor's intent may be proven

through direct or circumstantial evidence. *Neugebauer v. Senese* (*In re Senese)*, 245 B.R. 565,

575 (Bankr. N.D. Ill. 2000) (noting that circumstantial evidence could include "a pattern of

concealment and errors").

Finally, a false oath is material if its subject matter "'bears a relationship to the

bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings,

or the existence and disposition of his property.'" *In re Tully*, 818 F.2d at 111 (quoting *Chalik v.*

*Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)); *see also In re Sullivan*, 455 B.R.

at 839 (noting materiality's low threshold).

> c.   *Count II - § 727(a)(5)*

Code § 727(a)(5) denies a discharge to a debtor who "has failed to explain satisfactorily,

before determination of denial of discharge under this paragraph, any loss of assets or deficiency

of assets to meet the debtor's liabilities."

> Under § 727(a)(5), a plaintiff must establish: (1) that the debtors have experienced
> a loss of assets or deficiency of assets; and (2) that the debtors cannot provide a
> satisfactory explanation for such loss.
>
> There are two stages of proof with respect to this section. The plaintiff has the
> initial burden of producing some evidence that the debtor no longer has assets
> which he previously owned. Once the plaintiff has established the loss of an asset,
> it is up to the debtor to provide a satisfactory explanation for the loss or deficiency
> of the asset.

*Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005). The debtor's

explanation "must be supported by at least some corroboration" and "must be sufficient to

eliminate the need for any speculation as to what happened to all of the assets." *Id.* "'[V]ague or

indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial

transactions'" do not satisfy the debtor's burden. *Id.* (quoting *Wortman v. Ridley (In re Ridley)*,

115 B.R. 731, 737 (Bankr. D. Mass. 1990)).

> ### d.  Count III - § 727(a)(2)(A)

Code § 727(a)(2)(A) provides for denying a discharge to a debtor who,

> with intent to hinder, delay, or defraud a creditor or an officer of the estate charged
> with custody of property under this title, has transferred, removed, destroyed,
> mutilated, or concealed, or has permitted to be transferred, removed, destroyed,
> mutilated or concealed . . . property of the debtor, within one year before the date
> of the filing of the petition[.]

Under this section, a plaintiff must establish: "(1) a transfer or concealment of property (2) that

belonged to the debtor (3) less than a year before the bankruptcy petition (4) with actual intent to

hinder, delay, or defraud a creditor." *Marrama v. Citizens Bank (In re Marrama)*, 445 F. 3d 518,

522 (1st Cir. 2006) (citing *Razzaboni v. Schifano (In re Schifano)*, 378 F. 3d 60, 66-67 (1st Cir.

2004)); *see also Groman v. Watman (In re Watman)*, 301 F.3d 3, 7 (1st Cir. 2002) (noting that

plaintiff's burden of proof is preponderance of evidence). The requisite intent may be established

through direct evidence but is more often established through circumstantial evidence involving

"objective indicia that, taken together, strongly indicate fraudulent intent." *In re Watman*, 301

F.3d at 8.[4]

---

[4] The *Watman* Court set forth several such indicia previously identified by other courts:

> (1) insider relationships between the parties; (2) the retention of possession, benefit or use
> of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4)
> the financial condition of the party sought to be charged both before and after the
> transaction at issue; (5) the existence or cumulative effect of the pattern or series of

V.   *Applying the Law to the Facts*

    a.  *Count I - § 727(a)(4)(A)*

Despite the debtor's stating under the penalties of perjury that his schedules of assets and liabilities and statement of financial affairs were accurate, they were not. The value placed by the debtor on his 100% ownership interest in Sparrell (zero) on schedule A/B was false. At the time of the debtor's bankruptcy filing Sparrell was a shell company. It had sold all its assets to Brendan's companies and ceased operating. It held approximately $8,000 in a bank account and had a regular monthly income stream provided by the fully performing $225,000 BM Note. It owed Eastern Bank and HarborOne Credit Union approximately $50,000. By any reasonable valuation approach, the debtor's ownership interest in Sparrell had value. Whether that value was $180,000 (the difference between the sum of its bank balance and the $225,000 balance due on the BM Note less its debt to Eastern Bank and HarborOne) or something less, based on a present value discount of the BM Note, it certainly was not zero.

The debtor claims that he came up with the zero value because Sparrell's liabilities consisted not only of the $50,000 owed to Eastern Bank and HarborOne, but also the $1,390,000 owed to Live Oak. The debtor's approach to valuing his ownership interest in Sparrell was simplistic and misleading. True, Sparrell was an obligor on the Live Oak loan, but after completion of the sale to Brendan's companies, Live Oak amended its loan documents to add BM Mack as an obligor and BM McNamara assumed primary responsibility to pay and was in fact paying debt service on the loan. Also, BM McNamara fully indemnified Sparrell for any

---

transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by debtor to keep the transfer a secret. *In re Watman*, 301 F.3d at 8 (citations omitted).

liability to Live Oak. In addition, Live Oak held first mortgages on the Norwell and Cohasset

real estate which were worth more than the loan amount.

Brendan's testimony at trial established that the purpose of the BM Note was to provide a

source of income to the debtor. The plan was for Sparrell to use the income stream from the BM

Note to service the debts to Eastern Bank and HarborOne with the residue available for a

shareholder distribution to the debtor. In fact, this plan was so ingrained in Brendan that initially

and up until the debtor's bankruptcy filing, the BM Note payments were made directly to the

debtor rather than to Sparrell, the payee on the note. A year after the debtor's bankruptcy, BM

McNamara borrowed $60,000 from Eastern Bank and used $40,000 of that money to open an

account in Sparrell's name so that Sparrell could pay debt service to Eastern Bank, thus freeing

up substantially all the BM Note payments for distribution to the debtor.

The simple reality as to what actually was going on when the debtor filed his bankruptcy

petition, and after, debunks the debtor's claim that his interest in Sparrell was worthless and that

he believed it was worthless. Sparrell had become the conduit by which the debtor was able to

continue to earn income from the funeral business. Sparrell had value.

The debtor also failed to disclose his membership in the Scituate Harbor Yacht Club in

response to item 53 on his schedule A/B which asked, "Do you have other property of any kind

you did not already list? Examples: Season tickets, country club membership." The debtor's

justification for his omission—namely that the membership had no value and so he didn't think

he needed to list it—is both irrelevant and incredible. The debtor clearly knew he had to list all

his assets, even those he believed had a zero value, or he wouldn't have listed his supposed

valueless interest in Sparrell.

Additionally, the debtor failed to disclose on his statement of financial affairs, in answer to question 28, that he had given Sparrell's financial statements to Live Oak within two years of his bankruptcy filing. Those financial statements were submitted over the debtor's signature in connection with the loan application to Live Oak. While Brendan may have signed the debtor's name to the loan application and uploaded it and the supporting financial statements to Live Oak's electronic document portal, the evidence at trial established that the debtor knew and approved of Brendan's doing so. Furthermore, the debtor admitted that he attended the loan closing and personally signed the numerous closing documents which would have included documents regarding Sparrell's financial condition as of the closing date. Finally, the trial testimony established that Brendan assisted the debtor with the preparation of his schedules of assets and liabilities and statement of financial affairs filed with the debtor's bankruptcy petition. The debtor's personal knowledge of the Live Oak loan transaction and his deputizing Brendan to handle the paperwork on his behalf coupled with the active assistance of Brendan in the debtor's preparing his bankruptcy papers, lead me to conclude that the false answer to question 28 on the statement of financial affairs was, at best, in reckless disregard of the truth and, at worst, intentional. By omitting any reference to Sparrell's financial statements in his statement of financial affairs, the debtor was reinforcing his inaccurate valuation of his ownership interest in Sparrell contained in schedule A/B by making it less likely that a creditor or trustee would ask to see those financial statements and question the debtor's valuation.

This subterfuge was furthered by the debtor's income information set forth in his schedule I which was supposed to disclose all the debtor's income as of his bankruptcy filing date. The only income that the debtor disclosed was his monthly social security check. During the months between Sparrell's sale to Brendan's companies in November 2016 and the debtor's

bankruptcy filing in April 2017, the debtor had received $4750 from Brendan's companies, representing five monthly installment payments of $950 on the BM Note. This income is consistent with Brendan's testimony that the BM Note was intended to provide an income to the debtor. The fact that the BM Note payments were not supposed to go directly to the debtor but instead to Sparrell, the note payee, and then be distributed to the debtor (perhaps net of Sparrell's debt service to Eastern Bank and Harbor One), does not justify the debtor's failure to disclose any portion of the income from the BM Note on his schedule I. Furthermore, while the bank did not raise it, I find that the debtor's answer to question 5 on his statement of financial affairs is also untrue. The debtor stated that he received no income between January 2017 and the date of his bankruptcy other than social security payments when in fact he had received BM Note payments totaling $4750.

The false information contained in the debtor's schedules and statement of financial affairs, particularly with respect to Sparrell, was highly material to his assets and financial condition. I find that the debtor knew the truth and yet willfully and intentionally swore to the accuracy of the false information. Applying the standards of *Tully* and its progeny, I find that the plaintiff has carried its burden of proof on count I of its complaint that the debtor's discharge should be denied pursuant to Bankruptcy Code § 727(a)(4)(A).[5]

---

[5] The plaintiff introduced evidence of other instances where it claims the debtor made a false oath in connection with his bankruptcy case, including falsely testifying at his deposition and § 341 meeting and by affidavit that he did not forge Brendan's name or sign his own name without authority on certain BM McNamara checks and that he did not regularly provide services in connection with the funeral business conducted by BM McNamara and Brendan. It marshalled examples of false oaths and other misconduct by the debtor in matters unrelated to his bankruptcy case, such as in connection with the eviction action and its aftermath, in an effort to establish that the debtor was generally a dishonest and untruthful person. Having determined that the debtor's conduct with regard to his bankruptcy schedules and statement of financial affairs, alone, justifies denying his discharge, it is not necessary to address the litany of additional examples heaped up by the plaintiff.

*b.  Count II - § 727(a)(5)*

The Bank of Canton relies on the fact that the debtor was unable to explain how he arrived at a zero valuation of his interest in Sparrell to support its claim that the debtor's discharge should be denied pursuant to Code § 727(a)(5) (inability to satisfactorily explain any loss or deficiency of assets to meet liabilities).

The prototypical example of a § 727(a)(5) claim is where a debtor owns a valuable asset, say stock in a publicly traded company, and sells the stock for cash prior to his bankruptcy. The debtor fails to list the cash as an asset on his schedule A/B and, when asked about it at his meeting of creditors, is unable to provide an adequate explanation of what happened to the cash.

Here, the debtor disclosed his 100% ownership interest in Sparrell on his schedule A/B and placed a zero value on his interest. The bank insists that because the debtor's interest in Sparrell did have value, the debtor's zero valuation should be deemed a loss of an asset and his explanation as to why he valued the asset at zero should be determined not satisfactory within the meaning of § 727(a)(5).

As previously noted, the debtor valued his interest in Sparrell at zero because he believed the million-dollar liability to Live Oak swamped any positive value the company may have had. In connection with the § 727(a)(4) discussion above, I characterized the debtor's explanation as simplistic and misleading because, BM McNamara having indemnified Sparrell from liability to Live Oak and taken on the responsibility to pay Live Oak and BM Mack having assumed the debt to Live Oak, the Live Oak loan was no longer a significant factor in valuing the company.

In the classic example where a debtor sells stock and can't account for the proceeds, the asset loss is actual. Here it is theoretical. According to the bank's reasoning, the asset is not the equity interest in Sparrell but the disappearing value of that asset according to the debtor's theory

of valuation. Undervaluing an asset on a bankruptcy schedule (even with improper motives) is not the kind of loss or deficiency of assets that § 727(a)(5) is intended to address. However flawed the debtor's explanation of how he valued his interest in Sparrell may have been, I do not find it unsatisfactory within the meaning of § 727(a)(5). The bank has not carried its burden of proof on count II of its complaint.

      *c.   Count III - § 727(a)(2)(A)*

The bank asserts that the debtor's discharge should be denied based on Bankruptcy Code § 727(a)(2)(A) because within the year prior to his bankruptcy filing he transferred his property with the intent to hinder, delay or defraud the bank. The property which is the primary focus of the bank's claim consisted of the assets of Sparrell which were transferred to Brendan's companies on November 7, 2016. In order to overcome the obvious difficulty that the assets transferred to Brendan's companies were owned by Sparrell, not the debtor, the bank makes allegations in its complaint that the debtor exercised pervasive control over Sparrell and used Sparrell as his personal bank. The complaint thereby suggests, but does not directly assert, claims for the equitable remedies of piercing the corporate veil and declaring alter ego liability in order to establish that Sparrell's assets should be considered the debtor's.

While in its closing arguments at the trial and in its post-trial proposed findings and rulings, the bank does a better job of explicitly identifying the sought after equitable remedy, which it terms "outsider reverse veil piercing," the actual trial record on which I must rely was not sufficiently developed to establish the necessary badges of fraud or other indicia necessary to disregard Sparrell's separate corporate status and to collapse its assets into the debtor's as the bank requests.

There is one allegation in the bank's complaint, however, that seeks § 727(a)(2)(A) relief without relying on veil-piercing or alter ego liability. That is the bank's claim that the debtor devalued his stock interest in Sparrell in order to hinder and delay the bank's effort to collect from the debtor the monies owed it.

Code § 727(a)(2)(A) requires denying a discharge to a debtor who "transferred, removed, destroyed, mutilated, or concealed" his property within the year prior to his bankruptcy with the intention to hinder, delay or defraud a creditor or bankruptcy trustee. The debtor's Sparrell stock was his property and its value or worth was the embodiment of that property. Hence, the dissipation of the stock's value by the debtor could qualify as the destruction or removal of that property. *See In re Hintze,* 570 B.R. 369, 387-88 (Bankr. N.D. Fla. 2017) ("If one can 'destroy' a reputation, then it stands to reason that one can destroy the value of a membership interest in an LLC.").

The bank argues that the destruction or removal of the value of the Sparrell stock occurred in November 2016, as a result of the sale of Sparrell's assets to Brendan's companies. Prior to that sale Sparrell owned the Norwell and Cohasset real estate, which had a combined value of $1,811,000 according to appraisals commissioned by Live Oak, and was an established funeral business about to be passed on to a new generation of McNamaras. Sparrell's liabilities in November 2016, prior to the sale to Brendan's companies, consisted primarily of the $1,390,000 debt to Live Oak secured by the Norwell and Cohasset real estate. Doing the math, prior to the sale to Brendan's companies, Sparrell had positive equity in its real estate of $421,000. On his personal financial statement given to Live Oak, the debtor valued his interest in Sparrell, as of May 2016, at $475,000.

22

Sparrell sold its assets to Brendan's companies for a price of $1,615,000, paid for by Brendan's companies' assuming the Live Oak debt and giving Sparrell the $225,000 BM Note. The upshot is that after the sale to Brendan's companies, Sparrell's worth which had previously been derived from valuable real estate and an active funeral business, was reduced to a single significant asset, the BM Note (plus a small bank account balance). By any measure, the value of the debtor's ownership interest in Sparrell before the sale was significantly greater than its value after.

That the debtor actually participated in the transaction with Brendan's companies is undisputed. He acted on behalf of the seller, Sparrell. Thus, I find that the debtor actively caused a significant loss in value of his 100% stock interest in Sparrell. Put in terms of the matter at hand, the debtor caused the destruction or removal of his property, through the November 2016 sale, within the year prior to his April 2017 bankruptcy filing. It remains to be determined whether the debtor did so with the intention to hinder, delay or defraud the bank.

Even in the best of circumstance it is often impossible to elicit by direct evidence a person's mental state in order to determine his intent. Here, where the debtor was unable to testify in person at the trial and his testimony was introduced by deposition transcript and affidavit, the process of determining his intent is made even more challenging. Recognizing these practical difficulties, the law permits a fact finder to resort to circumstantial evidence to determine intent. *See In re Watman*, 301 F.3d at 8.

Here is what is known. By the summer of 2016, the Bank of Canton had foreclosed on the debtor's home and was suing the debtor to collect the post-foreclosure deficiency due on the First Loan. It also held a $43,615 judgment against the debtor on the Second Loan along with an injunction prohibiting the debtor from transferring or disposing of certain of his assets, including

his interest in Sparrell, and prohibiting Sparrell from transferring any money to the debtor other than wages until the judgment was paid in full.

The debtor was not happy with the bank. He refused to vacate his home after the foreclosure sale compelling the bank to sue for eviction. He fought the eviction for over a year, including appealing the judgment for possession eventually obtained by the bank. The matter ended in a settlement whereby the debtor agreed to voluntarily vacate his home by July 6, 2016. He defaulted on that agreement, resulting in the bank's engaging a constable and moving company to forcibly remove the debtor and his possessions from the home. When the house was finally vacant the bank discovered that the debtor had stripped all the cabinets and fixtures from the kitchen.

At the same time as the debtor's personal financial situation was in turmoil, his funeral business faced an existential threat. Under his settlement with his brother John, the five-year lease of the Norwell and Cohasset real estate on which the funeral business operated was expiring and the debtor needed either to renew the lease for a second five-year term, something he could not afford, or exercise the option to purchase.

To purchase the funeral home real estate, the debtor needed financing. His personal creditworthiness being in ruins, he sought the assistance of his son and daughter-in-law, Brendan and Melissa. Melissa's brother was a loan officer with Live Oak Bank, a lender with a niche in funeral business financing. Live Oak agreed to make a loan to the debtor's company, Sparrell, but only if Brendan and Melissa signed on as guarantors. In order to facilitate Live Oak's making the loan, and incidentally to create consideration to support Brendan and Melissa's personal guarantees, the debtor gave Brendan a letter expressing his intention to gift Sparrell to Brendan.

Brendan had been actively involved in running the funeral business since at least 2011 and was being groomed to become the next generation of McNamaras owning the business.

The acquisition of the Norwell and Cohasset real estate from John, the financing from Live Oak, the transfer of Sparrell's assets to Brendan, and the debtor's bankruptcy filing were interlocking parts of a master plan by which the debtor insured the funeral business's future ability to continue to operate free from any interference or intrusion by John, and relieve the debtor, and collaterally Sparrell, from the bank's relentless collection efforts. The former would be achieved by the Live Oak financing which enabled Sparrell to purchase the Norwell and Cohasset real estate from John and to pay back the missing pre-needs funds. The latter would be accomplished by enabling the debtor to use a portion of the Live Oak loan proceeds to pay the bank's judgment on the Second Loan, thereby dissolving the injunction which prohibited the debtor from disposing of his interest in Sparrell and prohibited Sparrell from paying the debtor as it pleased. This in turn would free the debtor to complete the bargain-price sale of the real estate and business to Brendan's companies which he structured in such a way as to insure a source of income to himself, but only through an opaque process involving Sparrell as an intermediary collecting monthly payments on the BM Note.[6] This enabled the debtor to portray himself as judgment proof and to file what appeared to be a no-asset bankruptcy case in order to discharge the remaining $156,000 deficiency balance owed the bank on the First Loan.

Viewing the facts in their totality leads me to conclude that the debtor intended to hinder and delay the bank from collecting the monies due it by causing the value of his ownership

---

[6] While the debtor represented to Live Oak in his letter of intent that he would gift Sparrell to Brendan, he ultimately structured the transaction as a no-cash sale for consideration consisting of the assumption of the Live Oak debt and an unsecured 15-year note. Presumably this alteration was an attempt to insulate the transaction from fraudulent transfer claims by creditors. The record does not indicate whether Live Oak was informed of this alteration.

interest in Sparrell to be devalued—in effect, partially destroyed or removed—as a result of the sale to Brendan's companies. I therefore find that the bank has carried its burden of proving its claim under count III of the complaint that the debtor's discharge should be denied pursuant to Bankruptcy Code § 727(a)(2)(A).

VI.    *Conclusion*

Based on my findings and rulings set forth above, I will enter judgment on counts I and III of the complaint in favor of the bank and deny the debtor's discharge pursuant to Bankruptcy Code § 727(a)(4) and § 727(a)(2)(A). I will enter judgment on count II in favor of the debtor.

At Boston, Massachusetts this 18th day of September, 2020.

By the Court,

Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:    Michael A. Wirtz, Esq.
Jack Mikels & Associates, LLP
Quincy, MA
for the Bank of Canton, plaintiff

Joseph G. Butler, Esq.
Law Office of Joseph G. Butler
Westwood, MA
for Robert R. McNamara, defendant